**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>    ENERGY;<br><br>DR. ERNEST MONIZ,<br>in his official capacity as Secretary of<br>Energy;<br><br>NATIONAL NUCLEAR SECURITY<br>ADMINISTRATION; and<br><br>LT. GENERAL FRANK G. KLOTZ,<br>in his official capacity as Administrator of<br>the National Nuclear Security Administration<br>and Undersecretary for Nuclear Security.<br><br>    Defendants. | Case No. 1:16-cv-00391-JMC |

**MOTION TO DISMISS**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 3

I.   The Department of Energy's and National Nuclear Security Administration's Authority for Regulating and Handling Nuclear Material ................................................................ 3

II.  The History of Plutonium Disposition at the Savannah River Site ................................... 4

    A. The Mixed-Oxide Fuel Fabrication Facility at the Savanah River Site .................. 4

    B. U.S.-Russia Plutonium Management and Disposition Agreement ......................... 6

    C. 50 U.S.C. § 2566 .................................................................................................. 7

    D. Recent Developments Concerning the MOX Approach ......................................... 8

III.  Procedural History ......................................................................................................... 9

STANDARD OF REVIEW ...........................................................................……11

ARGUMENT ...............................................................................................……12

I.   The First Count of South Carolina's Complaint---Concerning the "Separation of Powers"—Fails to State a Claim...................................................................................... 13

II.  South Carolina Has No Cause of Action Under the APA to Compel the Immediate Removal of One Ton of Defense Plutonium.................................................................... 15

III.  This Court Lacks Jurisdiction Over South Carolina's Claim in Count III For Monetary Relief…....................................................................................................................... 23

IV.  Plaintiff Has Not Alleged an Injury Sufficient for Standing to Seek an Injunction Against Future Transfers of Defense Plutonium ........................................................................ 27

V.  South Carolina Lacks Standing to Seek Relief Concerning Potential Agency Action in Future Years ................................................................................................................. 29

CONCLUSION.................................................................................................……31

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Adams v. Bain*,
  697 F.2d 1213 (4th Cir. 1982) ............................................ 12

*Aiken County v. Bodman*,
  509 F. Supp. 2d 548 (D.S.C. 2007) ............................................ 6, 28, 29

*Anglers Conserv. Network v. Pritzker*,
  809 F.3d 664 (D.C. Cir. 2016) ............................................ 15, 16, 19

*Armstrong v. Exceptional Child Ctr., Inc.*,
  135 S. Ct. 1378 (2015) ............................................ 14

*ARRA Energy Co. I v. United States*,
  97 Fed. Cl. 12 (Fed. Cl. 2011) ............................................ 25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................ 12, 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................ 12

*Bucksport Water Sys., Inc. v. Weaver Eng'g, Inc.*,
  No. 4:13-CV-02503-RBH, 2013 WL 5914410 (D.S.C. Oct. 31, 2013) ............................................ 30

*Christopher Vill., L.P. v. United States*,
  360 F.3d 1319 (Fed. Cir. 2004) ............................................ 26

*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013) ............................................ 27, 30

*Consol. Edison Co. of N.Y. v. United States*,
  247 F.3d 1378 (Fed. Cir. 2001) ............................................ 25, 26

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................ 11,14, 29

*Dalton v. Specter*,
  511 U.S. 462 (1994) ............................................ 15

*Davis v. Mich. Dep't of Treasury*,
  489 U.S. 803 (1989) ............................................ 20

*Dep't of the Army v. Blue Fox*,
  525 U.S. 255 (1999) ............................................ 24

*Eagle-Picher Indus. v. United States*,
  901 F.2d 1530 (10th Cir. 1990) ............................................ 25, 26

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) ................................................................. 12

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ........................................................................... 20

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ........................................................................... 14

*Friends for Ferrell Parkway v. Stasko*,
   282 F.3d 315 (4th Cir. 2002) ................................................................. 28

*Hall v. Virginia*,
   385 F.3d 421 (4th Cir. 2004) ................................................................. 12

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) ............................................................... 15

*Int'l Sci. & Tech. Inst. v. Inacom Commc'ns*,
   106 F.3d 1146 (4th Cir. 1997) ......................................................... 24, 26

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ........................................................................ 19

*Lopez v. Davis*,
   531 U.S. 230 (2001) ........................................................................... 19

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ....................................................................... 11, 29

*Miss. v. Johnson*,
   71 U.S. (4 Wall.) 475 (1867) ................................................................. 14

*Nat'l Air Traffic Controllers Ass'n v. United States*,
   160 F.3d 714 (Fed. Cir. 1998) ............................................................... 26

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
   413 U.S. 405 (1973) ........................................................................... 23

*Norman v. Owens*,
   No. 5:12-cv-01158-RBH, 2013 WL 4042038 (D.S.C. Aug. 7, 2013) .................... 30

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................ 16

*Nat. Res. Def. Council v. Abraham*,
   388 F.3d 701 (9th Cir. 2004) ................................................................. 3

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
   557 U.S. 193 (2009) ........................................................................... 15

*Papasan v. Allain*,
    478 U.S. 265, 268 (1986)............................................................................12

*Pornomo v. United States*,
    814 F.3d 681 (4th Cir. 2016) ................................................................... 24

*Presidential Gardens Assocs. v. United States*,
    175 F.3d 132 (2d Cir. 1999) .................................................................... 26

*Reynolds Assoc. v. Kemp*,
    974 F.2d 1331 (1992)................................................................................ 25

*Richmond, F. & P.R. Co. v. United States*,
    945 F.2d 765 (4th Cir. 1991) ................................................................... 24

*Sec'y of State for Defence v. Trimble Nav. Ltd.*,
    484 F.3d 700 (4th Cir. 2007) ................................................................... 12

*Siegel v. Atomic Energy Comm'n*,
    400 F.2d 778 (D.C. Cir. 1968) ................................................................... 3

*Sierra Club & Valley Watch, Inc. v. Jackson*,
    648 F.3d 848 (D.C. Cir. 2011) .................................................................19

*Suburban Mortg. Assocs. v. U.S. HUD*,
    480 F.3d 1116 (Fed. Cir. 2007) .......................................................... 25, 27

*Telecare Corp. v. Leavitt*,
    409 F.3d 1345 (Fed. Cir. 2005) ............................................................... 27

*Toxco, Inc. v. Chu*,
    801 F. Supp. 2d 1 (D.D.C. 2011) ............................................................... 3

*United States v. Jicarilla Apache Nation*,
    131 S. Ct. 2313 (2011) ............................................................................. 21

*United States v. Kentucky*,
    252 F.3d 816 (6th Cir. 2001) ..................................................................... 4

*United States v. Sherwood*,
    312 U.S. 584 (1941) ................................................................................. 24

*United States v. White Mt. Apache Tribe*,
    537 U.S. 465 (2003) ................................................................................. 25

*Veda, Inc. v. U.S. Dep't of the Air Force*,
    111 F.3d 37 (6th Cir. 1997) .....................................................................26

*Weaver v. Aegon USA, LLC.*,
    No. 4:14-cv-03436, 2015 U.S. Dist. LEXIS 130026 (D.S.C. Sept. 28, 2015) ................ 12, 30

iv

*Young v. City of Mt. Rainier*,
   238 F.3d 567 (4th Cir. 2001) ................................................................ 12

## Federal Statutes

5 U.S.C. § 702 ............................................................................... 24, 26

5 U.S.C. § 704 .......................................................................... 26, 27, 28

5 U.S.C. § 706 ..................................................................... 2, 11, 16, 23

28 U.S.C. § 1346 ................................................................................. 26

28 U.S.C. § 1491 ................................................................................. 24

42 U.S.C. § 2011 ................................................................................... 3

42 U.S.C. § 2201(j) .............................................................................. 4

42 U.S.C. § 4321 ................................................................................... 8

42 U.S.C. § 5801 ................................................................................... 3

42 U.S.C. § 7131 ................................................................................... 4

42 U.S.C. § 7133(a)(8) .......................................................................... 3

42 U.S.C. § 7151(a) ............................................................................... 3

50 U.S.C. § 2481 ................................................................................... 4

50 U.S.C. § 2566 ........................................................................ *passim*

Pub. L. No. 107-314, 116 Stat. 2458 ........................................... 6, 20, 23

Pub. L. No. 109-103, 119 Stat. 2247 ................................................. 7, 30

Pub. L. No. 112-239, 126 Stat. 1632 ................................................. 7, 30

Pub. L. No. 113–291, 128 Stat. 3292 ....................................................... 7

## Federal Register

62 Fed. Reg. 3,014 (Jan. 21, 1997) ........................................................ 5

67 Fed. Reg. 19,432 (Apr. 19, 2002) ...................................................... 5

68 Fed. Reg. 20,134 (Apr. 24, 2003) ...................................................... 5

72 Fed. Reg. 51,807 (Sept. 11, 2007) ..................................................... 5

81 Fed. Reg. 19,588 (Apr. 05, 2016) ...................................................... 6

## Federal Rules of Civil Procedure

FED. R. CIV. P. 12(b)(1), (b)(6) .......................................................... 11

FED. R. CIV. P. 24(a), (b) .................................................................. 11

## Legislative History

148 Cong. Rec. S5681-82, 107th Congress, Second Session (June 18, 2002) .............................. 17

151 Cong. Rec. S12740-01, 2005 WL 3039286 (Nov. 14, 2005)............................................ 17,18

S. Rep. No. 1118, 95th Cong., 2d Sess. 33 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235.......... 24

## INTRODUCTION

The State of South Carolina brings this lawsuit in an attempt to compel the United States Department of Energy ("DOE" or "Department") and the National Nuclear Security Administration ("NNSA")[1] to remove one metric ton of defense plutonium or defense plutonium materials ("defense plutonium") from the Savannah River Site ("SRS") to another location outside of the State of South Carolina, pay $100 million to South Carolina for the federal government's alleged failure to remove one metric ton of defense plutonium from the State after January 1, 2016, and enjoin the transfer of any defense plutonium to South Carolina. South Carolina argues that these actions are mandatory, nondiscretionary duties imposed by 50 U.S.C. § 2566 and therefore requests declaratory and injunctive relief under the Administrative Procedure Act ("APA") to force compliance with these alleged duties under the statute.

South Carolina's multiple requests for relief, ranging from injunctive to monetary in nature, are based on fundamental misunderstandings of the statutory scheme at issue and the limitations of APA review. In section 2566, Congress set forth goals for a facility at SRS that would process defense plutonium into mixed-oxide fuel (MOX), along with dates by which it hoped the facility would achieve Congress's production objective. *See id.* § 2566(h)(1) (defining the "MOX production objective" as production of MOX "at an average rate equivalent to not less than one metric ton of mixed-oxide fuel per year"). However, Congress also recognized that the MOX facility may not be operational or able to achieve the production objective by those dates, and it therefore provided for alternative measures in the event that the MOX production objective could not be met: the removal of defense plutonium from SRS to another location. *See id.* § 2566(c). But Congress also recognized that even the transfer of such sensitive materials may

---

[1] For ease of usage, this memorandum will refer to DOE and the NNSA collectively as "the Department" throughout.

prove problematic, so it included a backstop in the statute to compensate South Carolina and pressure the agency to meet either the production or removal objective: a "financial and economic assistance" payment ("assistance payment"), payable "subject to appropriations." *See id.* § 2566(d).

Because Congress left it to the Department to decide how to meet the statutory goals, giving the agency the option of making the assistance payment if neither the MOX production objective nor plutonium removal could be achieved, South Carolina cannot use the APA to rewrite the statute in a manner that would provide *both* injunctive and financial relief. Under section 706(1) of the APA, this court can only compel compliance with statutory commands that are both mandatory and non-discretionary. 5 U.S.C. § 706(1). The statutory goal of removing defense plutonium cannot be described as non-discretionary, as Congress left it to the agency to decide whether to remove defense plutonium or pay the financial penalty, in the event that the MOX production objective was not achieved by certain dates.

That, of course, does not mean that South Carolina is left without a potential remedy. It is, instead, confined to the remedy that Congress specified: the assistance payment. However, that remedy, which South Carolina concedes is financial and compensatory in nature, could only be asserted in the Court of Federal Claims. The APA does not provide a waiver of sovereign immunity or a cause of action to decide claims such as the present one, which seeks payment of monetary damages in the amount of $100 million pursuant to a money-mandating statute.

For these reasons, this Court should dismiss the present Complaint in its entirety.

## BACKGROUND

### I. The Department of Energy's and National Nuclear Security Administration's Authority for Regulating and Handling Nuclear Material

The Atomic Energy Act of 1954, *as amended,* 42 U.S.C. § 2011 *et seq*., "established a comprehensive regulatory scheme for military and domestic nuclear energy." *Natural Resources Defense Council v. Abraham ("NRDC")*, 388 F.3d 701, 704 (9th Cir. 2004) (quotation marks omitted); *see also Siegel v. Atomic Energy Comm'n,* 400 F.2d 778, 783 (D.C. Cir. 1968) (noting that in enacting the Atomic Energy Act of 1954, Congress "enact[ed] a regulatory scheme which is virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives"). It authorized the Atomic Energy Commission "to establish instructions by rule, regulation, or order, governing possession and use of nuclear material and the operation of facilities used in conducting its activities." *NRDC*, 388 F.3d at 708.

In 1974, Congress enacted the Energy Reorganization Act, pursuant to which it abolished the Atomic Energy Commission and divided its functions between the Energy Research and Development Agency and what is now the Nuclear Regulatory Commission. *See* 42 U.S.C. § 5801 *et seq*. In 1977, pursuant to the Department of Energy Organization Act, the Department of Energy assumed the responsibilities of the then-abolished Energy Research Development Agency. *See* 42 U.S.C. § 7151(a). This vested all non-licensing Atomic Energy Act authorities in the Department, including control over existing government facilities and defense nuclear waste. *See* 42 U.S.C. § 7133(a)(8)(A), (B), (C), and (E); *Toxco, Inc. v. Chu*, 801 F. Supp. 2d 1 (D.D.C. 2011) (the Department "oversees the disposal of radioactive waste at nuclear waste facilities across the country").

The Atomic Energy Act confers upon the Department and the Nuclear Regulatory

3

Commission the "exclusive responsibility for regulating source, special nuclear, and byproduct material." *United States v. Kentucky*, 252 F.3d 816, 821 (6th Cir. 2001). Thus, the Atomic Energy Act provides broad authority to the Department, including authority to "make such disposition as it may deem desirable of (1) radioactive materials, and (2) any other property, the special disposition of which is . . . in the interest of the national security." 42 U.S.C. § 2201(j).

In 1995, Congress amended the Department of Energy Organization Act, 42 U.S.C. § 7131 *et seq*., and established the Office of Fissile Material Disposition within the Department, with responsibility for managing and disposing of excess nuclear materials. This section was later repealed and the functions moved to the National Nuclear Security Administration (NNSA), a separately-organized agency within the Department. *See* 50 U.S.C. § 2481.

## II. The History of Plutonium Disposition at the Savannah River Site

### A. The Mixed-Oxide Fuel Fabrication Facility at the Savanah River Site

The federal government established the Savannah River Site (SRS) as a nuclear reservation in the 1950s to refine nuclear materials for deployment in nuclear weapons. *See* Dep't of Energy, *Savannah River Site Overview*, at 3, Oct. 14, 2015.[2] SRS covers 310 square miles and is located in portions of three counties in South Carolina: Aiken, Allendale and Barnwell. *See* Savannah River Solutions, *Facts About the Savannah River Site*, at 1, Jan. 2011.[3] SRS is currently engaged in a number of missions, including the disposition of surplus, weapons-usable plutonium. *See* Dep't of Energy, *SRS History Highlights*, Mar. 17, 2016.[4] The end of the

---

[2] *Available at* https://www.emcbc.doe.gov/SEB/SRSLiquidWaste/Documents/Site%20Tours/2%20SRS%20Liquid%20Waste%20-%20Site%20Overview%20Presentation.pdf.

[3] *Available at* http://www.srs.gov/general/news/factsheets/srs.pdf.

[4] *Available at* http://www.srs.gov/general/about/history1.htm (last visited April 15, 2016).

Cold War in the early 1990s left the United States and the Russian Federation with large stockpiles of excess plutonium from their nuclear weapons programs.[5] Accordingly, the Department has taken a number of steps to dispose of surplus plutonium so that it can never again be readily used in nuclear weapons.[6] A number of programs at SRS currently serve that mission. For instance, SRS is the designated location for foreign plutonium being returned under the United States' nonproliferation mission, undertaken by the NNSA's Office of Material Management and Minimization.[7] The Department has also, since the early 2000s, transferred to SRS limited quantities of surplus defense plutonium from other DOE sites for consolidated storage pending disposition.[8] Most recently, the Department has decided to process and remove from South Carolina over six metric tons of plutonium—including plutonium transferred to SRS from other sites in the United States and abroad—and dispose of the material at the Waste Isolation Pilot Plant (WIPP) near Carlsbad, New Mexico.[9] Starting in 1999, the Department

---

[5] *See Final Surplus Plutonium Disposition Supplemental Environmental Impact Statement*, DOE/EIS-0283-S2, Apr. 2015, *available at* http://energy.gov/nepa/nepa-documents.

[6] *Id.*

[7] Environmental Assessment for Gap Material Plutonium—Transport, Receipt, and Processing, DOE/EA-2024, Dec. 2015, *available at* http://nnsa.energy.gov/sites/default/files/nnsa/inlinefiles/Final%20Environmental%20Assessment_122315.pdf.

[8] *See Amended Record of Decision: Storage of Surplus Plutonium Materials at the Savannah River Site*, 72 Fed. Reg. 51807, Sept. 11, 2007; *Amended Record of Decision*, 67 Fed. Reg. 19432, Apr. 19, 2002.

[9] *See Surplus Plutonium Disposition Record of Decision*, 81 Fed. Reg. 19588, Apr. 5, 2016. The Department suspended disposal activities at WIPP in February 2014 following a salt truck fire and unrelated radiological event underground. Waste emplacement operations at WIPP are expected to commence in late 2016. *See Surplus Plutonium Disposition Record of Decision,* 81 Fed. Reg. Apr. 5, 2016.

began designing a facility at SRS for processing surplus defense plutonium into MOX fuel.[10] The Nuclear Regulatory Commission granted construction authorization in March 2005, the Department approved the project's cost and schedule baselines in April 2007, and construction began in August 2007.[11]

**B. U.S.-Russia Plutonium Management and Disposition Agreement**

In September 2000, the United States and the Russian Federation signed an agreement—called the "Plutonium Management and Disposition Agreement" or "PMDA"—which, along with two Protocols added in 2006 and 2010, entered into force in July 2011.  *See* Compl., Exhibit 11, PMDA.  The PMDA calls for each country to dispose of no less than 34 metric tons of excess weapon-grade plutonium, by irradiation as fuel in nuclear reactors "or any other methods as may be agreed to by the Parties in writing."  PMDA, Art. III.1; *see Aiken County v. Bodman*, 509 F. Supp. 2d 548, 550 (D.S.C. 2007).  Article XIII of the PMDA specifically allows for amendment by written agreement of the Parties.  The PMDA Annex on Key Program Elements, which provides for disposition of excess weapon-grade plutonium by irradiation as MOX fuel, likewise provides for changes to facilities used for plutonium disposition.  *See* PMDA, Annex on Key Program Elements, paras. 1, 2, 6.

**C. 50 U.S.C. § 2566**

Section 2566—enacted as section 3182 of the Bob Stump National Defense Authorization Act for Fiscal Year 2003, P.L. 107-314, 116 Stat. 2747, Dec. 2, 2002—sets forth

---

[10] *See Surplus Plutonium Disposition Program, Amended Record of Decision*, 68 Fed. Reg. 20134, April, 2003; *Record of Decision for the Storage and Disposition of Weapons-Usable Fissile Material Programmatic Environmental Impact Statement*, 62 Fed Reg. 3014, Jan. 21, 1997, Compl. Ex. 7.

[11] *See* Gov't Accountability Office, Report to the Subcommittee on Energy and Water Development, and Related Agencies, Committee on Appropriations, House of Representatives, *Plutonium Disposition Program* ("*2014 GAO Report*"), GAO-14-231, at 2, 12 n.14, Feb. 2014, *available at* http://www.gao.gov/assets/670/660927.pdf.

various timelines for construction and operation of the MOX facility at SRS, along with various reporting requirements to Congress.  Its timelines have been moved back by statute twice, in 2005 and 2013.  *See* Pub. L. 109–103, title III, §313, Nov. 19, 2005, 119 Stat. 2280; P. L. 112–239, div. C, title XXXI, §3116, Jan. 2, 2013, 126 Stat. 2172.[12]

The statute defines a "MOX production objective" as "production at the MOX facility" of MOX fuel "at an average rate equivalent to not less than one metric ton . . . per year," determined by measuring production starting on "the date the facility is declared operational." 50 U.S.C. § 2566(h)(1).  The statute requires the Department to submit a series of plans and reports to Congress concerning construction and operation of the MOX facility.  *See id.* § 2566(a).  If construction falls behind schedule, the statute calls for the Department to submit plans to Congress for corrective action, *see id.* § 2566(b)(1)-(3), (6), and it must eventually "suspend further transfers" of defense plutonium to SRS "to be processed by the MOX facility" until the Secretary certifies that the MOX production objective can be met, *see id.* § 2566(b)(4)-(5).

Although Congress hoped the MOX facility would achieve the MOX production objective and process the 34 metric tons of plutonium covered by the PMDA, *see id.* §§ 2566(a)(2)(B), 2566(a)(3), Congress recognized that, for any number of reasons, that goal might prove unfeasible.  In the event that the MOX production objective could not be achieved, the statute gives the Department the option to either remove defense plutonium from South Carolina or pay the State an "economic and impact assistance payment" (or "assistance payment").  *See id.* §§ 2566(c), (d).  If the MOX production objective is not achieved by January 1, 2014, the statute directs the Department to remove one ton of defense plutonium from the

---

[12] In 2014, minor technical corrections also were made to Section 2566 by Pub. L. 113–291, div. C, title XXXI, §3142(f), Dec. 19, 2014, 128 Stat. 3900.

State consistent with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and other applicable laws. *Id.* § 2566(c)(1). If it does not, then, starting on January 1, 2016, the Department must pay the State an annual payment of $1 million per day (up to $100 million per year), "subject to the availability of appropriations," until the Department either removes one metric ton of defense plutonium or achieves the MOX production objective. *Id.* § 2566(d)(1). If the Department has not processed a specified amount of MOX fuel by 2022, the yearly assistance payment can only be avoided by removing all the defense plutonium that has been transferred to South Carolina since 2002. *See id.* § 2566(d)(2)(A). Finally, if the MOX Facility remains in use and less than 34 metric tons of defense plutonium have been processed into MOX fuel in 2025, the Department must submit yearly plans to Congress for either completing the processing of 34 metric tons or removing certain defense plutonium from the State. *Id.* § 2566(e).

### D. Recent Developments Concerning the MOX Approach

The construction of the MOX and related facilities has been delayed by a number of unanticipated events and cost increases. The MOX facility contractor began working on the design of the MOX facility in 1999; the project baseline was approved in April 2007. *See* U.S. Dep't of Energy, Office of Inspector General, Audit Report, *Cost and Schedule of the Mixed Oxide Fuel Fabrication Facility at the Savanah River Site ("2014 Inspector General Report")*, May 2014, *available at* http://energy.gov/sites/prod/files/2014/05/f16/DOE-IG-0911.pdf.

In January 2014, the Department suspended transfers to SRS of plutonium slated to be processed at the MOX Fuel Fabrication Facility.[13] In February 2014, GAO issued a report analyzing the various cost increases in constructing and operating the MOX facility. *See 2014*

---

[13] Exhibit A, *MOX Fuel Fabrication Facility Construction and Operations Report to Congress*, September 2014; Exhibit B, *MOX Fuel Fabrication Facility Construction and Operations Report to Congress*, May 2015.

*GAO Report*, *supra*.  GAO noted that, in April 2007, the Department approved a cost estimate for the MOX facility of $4.8 billion and start of operations in September 2016.  *Id.* at 2.  The contractor began construction in August 2007.  *Id*.  In 2012, however, the contractor submitted a proposal to increase the cost of the facility to $7.7 billion with the start of operations delayed to November 2019.  *Id*.  In a May 2014 report, the Department's Inspector General issued similar findings to those of GAO's February 2014 report.  *See 2014 Inspector General Report*, *supra*.  In addition, the Department has conducted and commissioned three other studies, which reported costs increases and schedule delays for the MOX project beyond what was previously reported.[14]

### III. Procedural History

On December 14, 2015, South Carolina Governor Nikki Haley sent a letter to Secretary Moniz regarding the State's position as to the Department's purported obligations under section 2566.  The letter stated that

> the United States Department of Energy (DOE) is statutorily mandated by 50 U.S.C.A. § 2566 to dispose of one metric ton of defense plutonium through production (MOX Production Objective) at the Mixed Oxide Fuel Fabrication Facility (MOX Facility) currently under construction at the Savannah River Site in Aiken, South Carolina or remove not less than one metric ton or defense plutonium or defense plutonium materials from the state by January 1, 2016.  As you are also aware, failure to meet this deadline will subject DOE to a $1 million per day economic and impact assistance payment not to exceed $100 million per year, payable to the State of South Carolina.

---

[14] *Plutonium Disposition Study Options Independent Assessment*, Phase I and Phase II Reports (2015), *available at* http://nnsa.energy.gov/fieldoffices/savannah-river-field-office/mixed-oxide-mox-fuel-fabrication-facility; Thom Mason, Chair, Oak Ridge National Laboratory, *Final Report of the Plutonium Disposition Red Team* (2015), *available at* http://nnsa.energy.gov/fieldoffices/savannah-river-field-office/mixed-oxide-mox-fuel-fabrication-facility; Dep't of Energy, *Analysis of Surplus Weapon-Grade Plutonium Disposition Options* (2014), *available at* http://nnsa.energy.gov/sites/default/files/nnsa/04-14-inlinefiles/SurplusPuDispositionOptions.pdf.

Pl. S.J. Mem., Ex. 37. Governor Haley further stated that this letter constituted the State's "intent to enforce federal law and collect from DOE the $1 million per day economic and impact assistance payment beginning on January 1, 2016." *Id.*

On January 19, 2016, Secretary Ernest Moniz wrote in response to Governor Haley's December 14, 2015 letter stating, *inter alia*, that DOE remains committed to the safe, secure, and cost effective disposition of U.S. surplus plutonium. In keeping with statutory obligations of 50 U.S.C. § 2566, Secretary Moniz stated that: (1) DOE had suspended further transfers of such material to be processed at the MOX facility in SRS in compliance with 50 U.S.C. § 2566(b)(5); (2) on December 24, 2015, the Department had announced "its Preferred Alternative to prepare 6 metric tons of non-pit plutonium for final disposal at the Waste Isolation Pilot Plant (WIPP) in Carlsbad, New Mexico"; and (3) this Preferred Alternative would permit the Department to dispose of surplus plutonium while meeting the commitment for final disposal of such material outside of the State of South Carolina. *See* Pl. S.J. Mem., Ex. 38.

On February 9, 2016, the State of South Carolina filed the present lawsuit against the Department and NNSA. The Complaint alleges that defendants have non-discretionary, mandatory duties to the State under 50 U.S.C.A. § 2566 to (1) immediately remove one ton of defense plutonium from the State, (2) pay South Carolina $100 million if an additional ton of defense plutonium is not removed from the state by the hundredth day of 2016,[15] and (3) suspend any further transfers of plutonium into South Carolina. *See* Compl. at 27-32. Pursuant to the APA, 5 U.S.C. § 706, South Carolina requests an order requiring the Department to remove one

---

[15] Because the Complaint was filed before that date, the Prayer for Relief asks for "One Million Dollars ($1,000,000) per day, beginning on January 1, 2016, until the earlier of the first 100 days of calendar year 2016 or the date the Defendants remove an additional one (1) metric ton of defense plutonium or defense plutonium materials from the State pursuant to Section 2566(d)." Compl. at 32. The hundredth day of 2016 was April 9.

metric ton of defense plutonium, to pay a $100 million assistance payment to the State, and to suspend any further transfers of plutonium into South Carolina. *See* Compl. 31-32. South Carolina also asks this Court to retain continuing jurisdiction over this matter regarding defendants' future compliance with Section 2566.[16] *Id.* On April 6, 2016, plaintiff filed a motion for summary judgment. *See* ECF No. 10. The defendants' response to that motion is currently due May 25, 2016. *See* ECF No. 16.

## STANDARD OF REVIEW

Defendants move to dismiss plaintiff's Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. Plaintiff bears the burden of establishing that the court has subject matter jurisdiction, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and must do so "for each claim [it] seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). In deciding a 12(b)(1) motion, a court need not limit itself to the complaint; rather, it may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Weaver v. Aegon USA, LLC*, 2015 U.S. Dist. LEXIS 130026, 5-6 (D.S.C. Sept. 28, 2015).

To withstand a motion to dismiss pursuant to 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" and "naked assertion[s] devoid of further factual

---

[16] On March 31, 2016, pursuant to Rule 24(a) and (b) of the Federal Rules of Civil Procedure, applicant Southern Carolina Regional Development Alliance ("Southern Carolina Alliance" or "SCRD") moved for leave to intervene as of right or, in the alternative, for permissive intervention as party plaintiff. SCRD Mot. to Intervene, ECF No. 6. On April 22, 2016, the Court granted defendants' motion for extension of time to respond to SCRD's intervention motion. *See* ECF 16.

enhancement" are not sufficient.  *Id.* at 678 (quotation omitted).  While courts must accept all precisely worded factual allegations as true, the court is "not required to accept as true the legal conclusions set forth in a plaintiff's complaint."  *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).   Rather, a court must disregard "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and determine whether the remaining "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Id.* at 679.  "The presence of a few conclusory legal terms [does not] . . . insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support" the legal conclusion.  *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001).   In reviewing the dismissal of a complaint under Rule 12(b)(6), a court may properly take judicial notice of matters of public record without converting the motion to one for summary judgment. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004) (citing *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986)).

## ARGUMENT

None of South Carolina's claims can be advanced in this Court.  First, South Carolina claims that the Department is violating the Constitution by failing to comply with a statute.  But the Complaint fails to specify which statutory violations somehow also violate the Constitution. In any case, this claim is purely duplicative of the others, because it alleges nothing more than the same statutory violations alleged in the other counts.   It is also wrong: the violation of a statute is not automatically a violation of the Constitution.  Second, South Carolina claims that it is entitled to an injunction ordering the Department to immediately remove one ton of defense plutonium from SRS.  This fundamentally misreads the statutory scheme, which does not

12

categorically mandate such removal, but instead gives the Department the option of either removing certain defense plutonium or paying the assistance payment, subject to the availability of appropriations.  Third, South Carolina claims that it can seek the assistance payment in this Court.  Such a claim for monetary compensation is cognizable only in the Court of Federal Claims, which has exclusive jurisdiction over claims for such monetary relief against the United States.[17]  Accordingly, the APA does not permit the relief that South Carolina seeks in this Court. Fourth, South Carolina seeks an injunction to prevent further shipments of defense plutonium to SRS for processing in the MOX facility.  But the Department has *already* suspended such shipments, and so there is no injury to support standing for this claim.  Finally, South Carolina asks the Court to retain jurisdiction over this case for a number of years, just in case the law is violated in the future.  The State has no standing to seek relief related to any hypothesized injuries it speculates may occur in the future.  The Complaint should be dismissed in its entirety.

## I.  The First Count of South Carolina's Complaint---Concerning the "Separation of Powers"—Fails to State a Claim

In the first count of its Complaint, South Carolina claims that the Department's alleged non-compliance with 50 U.S.C. § 2566 amounts to a violation of the U.S. Constitution.  *See* Compl. ¶¶ 84-88.  As an initial matter, this count is insufficiently detailed to state a claim, because it fails to identify the specific statutory violations that purportedly rise to the level of a constitutional violation of the separation of powers.  The Complaint states that "Defendants' actions and inactions violate the Constitution," but the only action or inaction it mentions is a failure to meet "statutory obligations under Section 2566."  *Id.* ¶¶ 88, 87.  Section 2566 contains eight subsections, some of which have multiple subparts.  To avoid dismissal, a complaint must

---

[17] Of course, a claim for money damages brought in the Court of Federal Claims would need to meet the jurisdictional and procedural requirements of that court.

contain "sufficient factual matter, accepted as true, to state a claim that is plausible on its face," *Iqbal*, 556 U.S. at 678 (quotation marks omitted), and it must do so "for each claim [it] seeks to press." *Cuno*, 547 U.S. at 352. Count I fails for this reason alone.

To the extent South Carolina is alleging that the President has abdicated his duties under the Take Care Clause, there is no cause of action, whether under the APA or the Clause itself, to assert this claim. *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) ("[T]he President is not an agency within the meaning of the [APA]."); *cf. Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383-84 (2015) (holding that the Supremacy Clause provides no private cause of action because "[i]t would be strange indeed" to "impos[e] mandatory private enforcement" on Congress in a provision meant to effectuate the will of Congress)). Even if there was a cause of action, such a claim is not justiciable. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867) (holding that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" is "purely executive and political" and so not subject to judicial review).

Moreover, it is simply not the case that any time an agency violates a statute it automatically violates the Constitution as well. As the Supreme Court has explained, the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution" is "well established." *Dalton v. Specter*, 511 U.S. 462, 474 (1994). Its "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472.[18] To do so would flip the doctrine of constitutional

_____

[18] In the case cited in the Complaint, *see* Compl. ¶ 87 (citing *In re Aiken Cty.*, 725 F.3d 255 (D.C. Cir. 2013)), the D.C. Circuit simply granted a petition for mandamus against an agency that was violating a statute. The court discussed the separation of powers only to make the point that our system requires agencies to follow statutory commands. *See id.* at 393-94. That observation is both uncontroversial and unhelpful to South Carolina, because nowhere did

avoidance on its head, as relief under the APA would remedy the purported constitutional violation and therefore make resolution of the constitutional claim unnecessary and inadvisable. *See, e.g.*, *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204-06 (2009). There is simply no situation in which this claim would have any independent force. Accordingly, the claim should be rejected.

## II.    South Carolina Has No Cause of Action Under the APA to Compel the Immediate Removal of One Ton of Defense Plutonium

In Count II of its Complaint, South Carolina claims that it is entitled, pursuant to section 2566 and the APA, to an order compelling the Department to immediately relocate one metric ton of defense plutonium from SRS to an unspecified location outside of the state. *See* Compl. ¶¶ 89-96. It is mistaken. Under the APA, mandamus is an extraordinary remedy, available only where a statutory duty is unmistakably clear. *See, e.g.*, *Anglers Cons. Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). Here, Congress imposed no such duty; instead, while it set certain goals, it provided for a different and more realistic remedy in the event that those goals could not be met: the assistance payment. A careful read of the statute makes clear that, while Congress hoped the Department would be able to process or remove plutonium from South Carolina by certain dates, it recognized that such actions might not be achieved, in which case the state's sole remedy was the assistance payment. It therefore gave the Department the choice, in the event that the production objective was not met on time, between removing defense plutonium or making the assistance payment, subject to appropriations. The legislative history

---

the court suggest that the agency had violated anything more than the statute. One judge, writing alone, went on to discuss the President's Article II authority to *disregard* statutes in certain cases. *See id.* at 261-66 (Kavanaugh, J.); *id.* at 267 (Randolph, J., declining to join this part of the opinion); *id.* at 268 (Garland, J., dissenting). And that judge never endorsed the striking proposition that all statutory violations are constitutional violations.

repeatedly conforms to this understanding. South Carolina's interpretation of the statute, by contrast, would produce all kinds of anomalies, none of which were ever mentioned in the statute's extensive legislative history. The Court should not accept South Carolina's invitation to contort the statutory scheme by forcing the immediate removal of any plutonium from SRS.

The APA provides a cause of action to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). This provision codified the common-law mandamus cause of action for judicial review of agency inaction. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004). The cause of action, however, requires an unmistakable command to carry out the claimed duty.[19] "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Id.* at 64 (emphasis in original). For a statutory duty to be enforceable under §706(1), it must "amount[] to 'a specific, unequivocal command.'" *Anglers Cons. Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) (quoting *Norton*, 542 U.S. at 63-64)). *See id*. ("Section 706(1) permits judicial review of agency inaction, but only within strict limits.").

Congress did not impose that sort of duty in subsection 2566(c)(1), because the statute advances its goals through a different mechanism: the "economic impact and assistance" payment in subsection (d). Subsection (c) imposes certain goals for processing or removal, and subsection (d) enforces them through the assistance payment. Their provisions interlock: In the event that the production objective is not achieved, subsection (d)(1) addresses the consequences of failing to meet subsection (c)(1)'s 2016 deadline to remove one ton of plutonium; meanwhile,

---

[19] The APA provision also includes challenges to agency action "unreasonably delayed." 5 U.S.C. § 706(1). But here, where the only question is whether the Department has a given obligation in the first place, this second prong has no independent force. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63 n.1 (2004) ("[A] delay cannot be unreasonable with respect to action that is not required.").

subsection (d)(2) addresses the consequences of failing to meet subsection (c)(2)'s deadline to remove all plutonium transferred to SRS since 2002. Read together, subsection (d) functions as the enforcement mechanism for subsection (c).

The statute's proponents, at multiple stages of the legislative process, confirmed this understanding: that a failure to reach the production objective results in *either* removal *or*, should the removal goal not be met, payment (subject to appropriations). The Congressional Budget Office's ("CBO") summary of the original bill, which was read to the Senate, described the bill to "require that the Secretary of Energy pay up to $100 million a year to the state of South Carolina beginning in 2011, if the planned conversion schedule was not met." 148 Cong. Rec. S5681-82, 107th Congress, Second Session (June 18, 2002). The CBO report was based on the assumption that were this to occur—were the MOX production objective to go unmet—the Department would have a choice moving forward. "The federal government could . . . remove[] at least one metric ton of plutonium a year from South Carolina over the [2016-2021 period, after statutory changes to the deadlines]." *Id.* However, "[i]f DOE does not remove the required surplus plutonium from the state of South Carolina, DOE would need to pay up to $100 million a year to the state starting in [2016, after statutory changes to the deadlines]." *Id.* In other words, removal and payment were meant to be mutually exclusive alternatives, with the financial payment serving as a backstop in the event that neither production nor removal was achieved. Nowhere did the CBO mention an additional injunctive remedy that would function as a coordinate and concurrent penalty to payment.

The legislators who negotiated and enacted the statute expressed the same understanding. During debate over subsequent energy appropriations, Senator Lindsay Graham of South Carolina—the bill's sponsor and one of the strongest proponents of statutory protections for his

state—explained that section 2566 required the Department "to convert one metric ton of defense plutonium into fuel for commercial nuclear reactors by [2014, after amendment,] *or* face penalties of $1 million per day up to $100 million per year until the plutonium is either converted into the fuel *or* removed from the State." 151 Cong. Rec. S12745, 2005 WL 3039286, 109th Congress, First Session (Nov. 14, 2005) (emphasis added). Nowhere did he mention an injunction to force the Department to turn on a dime and immediately remove plutonium from SRS, despite the obvious difficulty of securing a new destination for such sensitive materials. In later budget debates, South Carolina Congressman John Spratt confirmed that Congress "put in place penalty payments for the Department of Energy if the MOX fuel plant's construction delayed . . . ." 151 Cong. Rec. S12740-01, 2005 WL 3039286, 109th Congress, First Session (Nov. 14, 2005). "The penalty payments imposed on the Department of Energy," not an unmentioned injunctive remedy, "were our ace in the hole." *Id.*

Even South Carolina, which negotiated the statute's remedial structure, has consistently expressed its understanding that the economic and assistance payment is the sole remedy if the project falls behind schedule. In the Governor's December 14, 2015 demand letter to the Department, South Carolina explained that "failure to meet" the deadline to achieve the production objective or remove one ton of plutonium "will subject DOE to a $1 million per day economic and impact assistance payment." Letter from Nikki R. Haley, Gov., to Ernest J. Moniz, Sec. of Energy, at 1, Dec. 14, 2015. The State made doubly clear that it understood the payment to be its only remedy: It described its "intent to enforce federal law and collect from DOE the $1 million per day economic and assistance payment." *Id.* at 1. And it explained that it would be forced to sue only if "DOE refuses to make these payments in violation of federal law." *Id.* In sum, the legislative history and other public statements by those involved in the drafting

and implementation of the statute has described subsection (d) as the only enforcement provision for a purported failure to meet the objectives of section 2566, including those specified in subsection (c).

South Carolina's only argument for a mandatory duty is the use of "shall" in subsection (c)(1). Pl. S.J. Mem. 25. But the word "shall," standing alone, does not automatically render a provision mandatory and enforceable through the APA's mandamus cause of action. *See, e.g.*, *Anglers*, 809 F.3d at 671 ("There are instances when 'may' has been taken to mean 'must' and when 'shall' has been construed to mean 'may.'"); *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011) (ruling that statute's use of "shall" still preserved agency's discretion, explaining that "[w]e cannot, however, consider those words in isolation. We must also consider the language and structure of the statute to determine whether the Administrator retained discretion").[20] Indeed, a provision that appears clear in isolation is frequently less clear when read in conjunction with the rest of the statute. "[O]ftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (quotation marks omitted). As a result, the Court cannot read subsection (c)(1) alone. *See FDA v. Brown & Williamson*, 529 U.S. 120, 132 (2000) ("[A] reviewing court should not confine itself to examining a particular statutory provision in isolation."). It should interpret the provision in light of the entire statutory scheme, rejecting interpretations that create anomalies elsewhere. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute

---

[20] In fact, the situation in which "shall" is most likely to give rise to a mandatory duty for APA purposes—in a statute that uses both "shall" and "may," *see, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 241 (2001); *Anglers*, 809 F.3d at 671; *Jackson*, 648 F.3d at 856—is not present in section 2566, which does not distinguish between actions that the Department "shall" take and "may" take.

must be read in their context and with a view to their place in the overall statutory scheme.").
And when viewed in the context of the entire statutory scheme, South Carolina's interpretation is
untenable.

Under South Carolina's interpretation, which would require defendants to immediately
remove one metric ton of defense plutonium from SRS, a number of statutory anomalies would
arise. Most problematically, if subsection (c)(1) is enforceable through mandamus, the same
would be true for subsection (c)(2). That provision provides that, if the MOX production
schedule is not achieved by January 1, 2014, then "not later than January 1, 2022," the
Department must remove *all* defense plutonium transferred to the Savanah River Site for
processing since 2002. 50 U.S.C. § 2566(c)(2). Under South Carolina's reading, then, if the
MOX facility is not up and running by 2014, then eight years later, all unprocessed defense
plutonium must be removed from the site, *regardless* of developments concerning the
construction and operation of the facility between 2014 and 2022. Thus, even if the facility was
processing MOX fuel at or beyond the production objective after 2014, it would have to
suddenly shut down all of its operations on January 1, 2022 solely due to missing a 2014
deadline. That cannot be so for at least three reasons. First, there would have been no rational
reason to force closure of a productive facility hitting its milestones, solely because it missed one
milestone a decade earlier. The enacting Congress—along with South Carolina—wanted to
achieve the production objective even if there was initial delay. As Congress explained in
enacting section 2566, "[t]he MOX facility will also be economically beneficial to the State of
South Carolina, and that economic benefit will not be fully realized unless the MOX facility is
built." *See* Pub. L. No. 107-314, § 3181(5). In fact, since January 1, 2014, South Carolina has

20

*continued* to press for completion of the MOX facility—a goal that is incompatible with the prospect of a forced shut-down in 2022.  *See* Compl. ¶¶ 74-80.[21]

Second, other provisions of the statute expressly contemplate that processing may continue until 2025 and beyond.  *See id.* § 2566(e) (providing that, if the MOX facility is still in use and 34 metric tons have not been processed by July 1, 2025, the Department must submit yearly plans to Congress for processing the 34 metric tons or removing certain plutonium from South Carolina).  Third, subsection (d)(2) lays out detailed processing goals that must be achieved by 2022 to avoid the assistance payment.  The Department must have processed both "one metric ton, in each of any two consecutive calendar years," and "three metric tons total" by January 1, 2022.  *Id.* § 2566(d)(2)(A)(i), (ii).  Yet under South Carolina's interpretation, *even if* the Department has met those goals, it would still need to suddenly remove *all* the defense plutonium in South Carolina on January 1, rendering these more detailed targets superfluous. *See United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2330 (2011) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.") (quotation marks omitted).

Another anomaly created by South Carolina's interpretation relates to subsection (b)(5). Under this provision, if the MOX production objective is not achieved by January 1, 2014, the Secretary of Energy must suspend further transfers of defense plutonium to be processed at the MOX facility, until he certifies that the production objective can be met.  *Id.* § 2566(b)(5). Therefore, as long as the Secretary can make the requisite certification, this provision expressly

---

[21]  In a 2015 letter to the Secretary of Energy, the South Carolina Attorney General explained that suspending construction of the MOX facility—a result that would be practically foreordained by South Carolina's interpretation of section 2566(c) to categorically require all plutonium be removed in 2022 if the project is behind schedule—would "cost over 1,500 [Savannah River Site] workers their jobs."  Ltr. from Alan Wilson, Att'y Gen., to Ernest J. Moniz, Sec'y of Energy, Sept. 4, 2015, Pl. S.J. Mem., Ex. 36.

contemplates further transfers of plutonium despite missing the 2014 deadline. In South Carolina's view, if the Secretary made that certification in 2015 or 2016, the statute would permit the Department to transfer plutonium into the state (as permitted by section 2566(b)(5)) while simultaneously compelling the Department to remove it (as South Carolina claims section 2566(c)(1) requires).

The absurdity of South Carolina's interpretation is placed in sharp relief by considering the difference between achieving the MOX production objective in 2013 and meeting it only one year later in 2014. South Carolina claims that subsection (c)(1)—and thus, necessarily, subsection (c)(2)—provide for injunctive relief to force the removal of one ton of defense plutonium in 2016 and all remaining defense plutonium in 2022, due to the Department's failure to achieve the production objective by January 1, 2014. If that were true, then the only agency action that is truly relevant is the one taken before January 1, 2014. If the Department meets the production objective before that date, but then slows down or even closes the facility altogether, it does not have to remove any plutonium starting in 2022; it can simply make the assistance payment. By contrast, under the scenario where the Department meets the production objective *after* January 1, 2014, but then processes MOX fuel consistently over the next decade—thus obviating both the 2016-triggered penalties of subsection (d)(1) and the 2022-triggered penalties of subsection (d)(2)—it would nevertheless have to about-face and shut down operations entirely on January 1, 2022. South Carolina would thus have the statute shutter a productive operation for no reason in 2022, while it would allow a non-functional operation to leave defense plutonium in the State indefinitely. This Court should not impute to Congress the intention to create such an irrational scheme. *See New York State Dept. of Social Servs. v. Dublino,* 413 U.S. 405, 419–420 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.")

The statute is far more naturally read to impose certain processing and removal goals in subsection (c), and to specify enforcement mechanisms for those requirements in subsection (d). There is a good reason why Congress opted for financial remedies instead of injunctive ones. As the history of surplus plutonium disposal makes painfully clear, the Department would face a host of obstacles if it had to abruptly change course and transfer weapons-usable plutonium to a new state. Knowing the complicated legal,[22] technological, infrastructural, political, diplomatic, and security challenges that the movement of defense plutonium creates, Congress was understandably reluctant to create an injunctive remedy, which might, more than a decade in the future,[23] suddenly force the Department to fundamentally reorient its approach to defense plutonium disposition.

In sum, South Carolina has no cause of action under 5 U.S.C. § 706(1), because section 2566 does not impose an absolute mandate to immediately remove one ton of plutonium. As the text and structure of the statute make clear, and as the legislative history amply confirms, Congress left the choice the agency to remove defense plutonium or, failing that, make the specified assistance payment, subject to appropriations.

### III. This Court Lacks Jurisdiction Over South Carolina's Claim in Count III For Monetary Relief

South Carolina's third cause of action seeks monetary damages of $100 million. *See* Compl. ¶¶ 89-96. As with any claim against the United States, a plaintiff must show that for each specific claim, the United States has waived sovereign immunity, without which a court

---

[22] In fact, Congress explicitly acknowledged these legal complexities in section 2566 itself. *See* 50 U.S.C. § 2566(c) (requiring that any removal of defense plutonium be "consistent with the National Environmental Policy Act of 1969 and other applicable laws").

[23] When the original statute was enacted in 2002, the trigger date in subsections (c)(2) and (d)(2) was January 1, 2017. *See* Pub. L. No. 107-314, § 3182(c)(2), (d)(2).

lacks subject matter jurisdiction. *See United States v. Sherwood*, 312 U.S. 584, 586 (1941); *Pornomo v. United States*, 814 F.3d 681, 687 (4th Cir. 2016). "[A]ny waiver of that immunity must be strictly construed . . . in favor of the sovereign." *Id.* (quotation marks omitted); *see Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (Plaintiff has the burden of proving that subject matter jurisdiction exists).

The United States has not waived sovereign immunity for South Carolina's money claim to be brought in this court. The APA only waives sovereign immunity for claims "seeking relief other than money damages." 5 U.S.C. § 702. "The term 'money damages' . . . normally refers to a sum of money used as compensatory relief." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 262 (1999) (citing 5 U.S.C. § 702) (quotation marks omitted). The $100 million payment South Carolina seeks is exactly that kind of relief. It is seeking "[e]conomic and impact assistance" as compensation for the Department's failure to meet section 2566's processing and removal goals. 50 U.S.C. § 2566(d). The United States has not waived sovereign immunity for this claim.

Moreover, the APA's waiver of sovereign immunity, by its own terms, is not available "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act—which grants the Court of Federal Claims exclusive jurisdiction over monetary claims for over $10,000—is such a statute. 28 U.S.C. § 1491(a)(1); S.Rep. No. 1118, 95th Cong., 2d Sess. 33 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5235, 5267; *see Int'l Science & Tech. Inst., Inc. v. Inacom Comm., Inc.*, 106 F.3d 1146, 1155 n.2 (4th Cir. 1997) ("[J]urisdiction of cases involving more than $10,000 lies exclusively in the Court of Federal Claims."), *abrogated on other grounds*, *Mims v. Arrow Fin. Svcs., LLC*, 132 S. Ct. 740 (2012); *Eagle-Pitcher Industries, Inc. v. United States*, 901 F.2d 1530, 1532 (10th Cir. 1990) (same).

That exclusive jurisdiction extends to claims such as the present one, in which a plaintiff claims that it is currently owed money by the United States. *See, e.g.*, *Reynolds Assoc. v. Kemp*, 974 F.2d 1331 (Table), 1992 WL 207747, at *4 (explaining that Claims Court jurisdiction extends to claims "seek[ing] monetary relief in excess of $10,000"); *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 19 (Fed. Cl. 2011). This is equally true for claims, like South Carolina's, predicated on money-mandating statutes. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) ("[A] statute creates a right capable of grounding a claim within the [Tucker Act's] waiver of sovereign immunity if . . . it can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.") (quotation marks omitted); *Suburban Mortgage Assoc., Inc. v. HUD*, 480 F.3d 1116, 1125-26 (Fed. Cir. 2007) (holding that the Tucker Act's jurisdictional requirements are met whenever "the claim is for more than $10,000 and is based on a money-mandating statute, regulation, or constitutional provision, or an express or implied contract with the Government"); *ARRA Energy Co.*, 97 Fed. Cl. at 19 ("In general, a statute will be deemed to be a money-mandating source of law [under the Tucker Act] if it compels the government to make a payment to an identified party or group.").

South Carolina may not plead around this limitation on the Court's jurisdiction simply by styling its claim as seeking an "order *enjoining* and requiring Defendants to pay" the assistance payment. Compl. ¶ 112, Prayer for Relief ¶ C. "A party may not circumvent the Claims Court's exclusive jurisdiction by framing a Complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States." *Eagle-Pitcher Indus.*, 901 F.2d at 1532 (quotation marks omitted); *Consol. Edison Co. of N.Y. v. United States*, 247 F.3d 1378, 1385 (Fed. Cir. 2001) ("This court and its sister circuits

will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims."); *see Christopher Vill., L.P. v. United Sta*tes, 360 F.3d 1319, 1328 (Fed. Cir. 2004) (same); *Veda, Inc. v. U.S. Dep't of the Air Force*, 111 F.3d 37, 39 (6th Cir.) (same). Instead, courts apply the "prime objective" test. "The test states that if the 'prime objective' of the complaining party is simply to obtain money from the federal government, the case belongs in federal claims court." *Veda*, 111 F.3d at 39; *accord Presidential Gardens Assoc. v. United States*, 175 F.3d 132, 143 (2d Cir. 1999); *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 717 (Fed. Cir. 1998) (confirming that the "prime objective" test is used "for determining whether a plaintiff" is "required to litigate is underlying claim in the Court of Federal Claims"); *Eagle-Pitcher Indus.*, 901 F.2d at 1532. The prime objective of South Carolina's claim—which simply seeks $100 million from the Department—is "to obtain money from the federal government." The claim therefore falls outside the APA's limited waiver of sovereign immunity, both because it seeks "money damages," and because the Tucker Act "impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act's grant of exclusive jurisdiction in the Court of Federal Claims also divests all other courts, including this one, of jurisdiction, 28 U.S.C. §§ 1346, 1491; *Int'l Science & Tech. Inst.*, 106 F.3d at 1155 n.2.

Even if South Carolina's money claim was not barred by § 702, it would be barred by § 704. That provision precludes judicial review of claims for which there is an "adequate remedy" elsewhere. 5 U.S.C. § 704. In this case, the monetary claim available in the Court of Federal Claims would allow South Carolina to seek the exact remedy it claims in Count III: $100 million. "The availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for § 704 purposes." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005). This provides an independent reason to dismiss South

Carolina's money claim. "If the suit is at base a claim for money, and the relief available through the Court of Federal Claims under the Tucker Act—a money judgment—will provide an adequate remedy, the inquiry is at an end." *Suburban Mortgage*, 480 F.3d at 1125.

### IV. Plaintiff Has Not Alleged an Injury Sufficient for Standing to Seek an Injunction Against Future Transfers of Defense Plutonium

In Count II, South Carolina also alleges that defendants seek an order enjoining further transfers of any defense plutonium to South Carolina after January 1, 2014 pursuant to Section 2566(b)(5). *See* Compl. ¶¶ 25, 96. That subsection provides that, if the MOX production objective is not achieved by January 1, 2014, the Department "shall suspend future transfers of defense plutonium and defense plutonium materials *to be processed by the MOX facility* until the Secretary certifies that the MOX production objective can be met." 50 U.S.C. § 2566(b)(5) (emphasis added). Therefore, by its express terms, this provision does not require a suspension of such material that is *not* "to be processed by the MOX facility." *Id.*

As South Carolina is aware, defendants have suspended further transfers to SRS of defense plutonium to be processed by the MOX facility. *See* Ltr. from Ernest Moniz, Sec'y of Energy, to Nikki Haley, Gov., Jan. 19, 2016, Pl. S.J. Mem., Ex. 38 ("DOE suspended further transfers of defense plutonium designated for processing at the [MOX facility] to the SRS after the Department determined that it would not meet the . . . production objective."). Accordingly, South Carolina has not alleged—and cannot allege—the type of "imminent" or "certainly impending" injury necessary for standing under Article III. *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013) (quotation marks omitted). In essence, without any allegation that the Department has or is about to violate subsection (b)(5), South Carolina asks this Court to order the Department to keep complying with the statute. Without a concrete injury that a favorable

decision could redress, this Court does not have jurisdiction over this claim.[24]  A "plaintiff bears the burden of establishing injury, traceability, and redressability because it is the party seeking to invoke federal jurisdiction."  *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002).  South Carolina has failed to do so as to its suspension claim under subsection (b)(5).

Even if South Carolina had standing to bring a challenge under section 2566(b)(5), the claim would fail for the exact same reasons an identical claim brought by Aiken County failed a decade ago: without any imminent prospect of illegal shipments, the claim is not ripe for adjudication, and there is no "final agency action" to challenge.  *See Aiken County v. Bodman*, 509 F. Supp. 2d 548 (D.S.C. 2007).  In *Bodman*, Aiken County sued the Department to enforce the suspension provision in section 2566(b)(5).  The Court rejected its claim for two separate reasons.  First, because there was no imminent shipment that would allegedly violate the section 2566(b)(5), there was "no 'final agency action' for th[e] Court to review."  *Id.* at 554 (quoting 5 U.S.C. § 704).  Second, the Court held that the claim was not ripe, because without an imminent shipment in violation of the statute, "further factual development of the issues is needed for adjudication," and the plaintiff would not "suffer hardship if review of this matter is delayed."  *Id.* at 556.  The same is true here.  South Carolina's Complaint does not identify any final agency

---

[24] To the extent South Carolina tries to premise this claim on any future transfers to SRS of defense plutonium that is not "to be processed by the MOX facility," 50 U.S.C. § 2566(b)(5), the statute does not prohibit those transfers.  As explained above, *see supra* Part II.A, the Savannah River Site, both before and after the commencement of the MOX effort in 2002, has housed a variety of programs for handling, storing, and otherwise utilizing nuclear materials, including plutonium.  Nothing in section 2566 suggests that Congress meant to discontinue any *other* program in the event that the MOX program was behind schedule.  Indeed, Congress said so explicitly, because it only restricted the Department's ability to transfer that defense plutonium which was "to be processed by the MOX facility."  *Id.*

action to challenge under section 2566(b)(5).  And without concrete factual allegations asserting some likely harm to South Carolina, the issue is not ripe for judicial review.[25]

## V.  South Carolina Lacks Standing to Seek Relief Concerning Potential Agency Action in Future Years

In paragraph E of it prayer for relief, South Carolina seeks a declaration and order that defendants provide a status report to this Court on the 101st day of each year in 2017, 2018, 2019, 2020, and 2021, as to:  (1) whether the MOX production objective has been met, (2) whether defendants have removed one metric ton of defense plutonium material during that calendar year, an (3) whether a legal constraint exists prohibiting the economic and impact assistance pursuant to Section 2566(d)(1).  *See* Compl. at 32.  Plaintiff fails to allege any injury or imminent prospect of injury as the basis for this requested relief.

A plaintiff's obligation to demonstrate standing "is an essential and unchanging" prerequisite to a court's jurisdiction to consider the plaintiff's claims.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).   "A plaintiff must demonstrate standing 'for each claim he seeks to press' and for 'each form of relief sought.'"  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Thus, to establish standing for relief relating to future years, plaintiff must identify for each an injury-in-fact, fairly traceable to the defendants' challenged actions, and

---

[25] In its April 21, 2016 Opposition to Motion for Extension of Time, ECF No. 15, South Carolina claims that in *Bodman*, a case to which South Carolina was not a party, the Department of Justice conceded that "the State could bring a claim to enforce Section 2566."  *Id.* at 2 n.1, 4 (citing *Aiken County v. Bodman*, 509 F. Supp. 2d 548, 551 & n.2 (D.S.C. 2007)).  *See Bodman*, 509 F. Supp. 2d at 551-52 (describing Aiken County's claims).  The Department argued that Aiken County fell outside section 2566's zone of interests, and therefore could not sue to enforce it through the APA.  When asked whether South Carolina would fall within the statute's zone of interests, the Department's attorney responded that it probably would: "The State of South Carolina is going to have the right if anybody does."  *See id.*, Motion to Dismiss Transcript Hearing, at 53, ECF No. 37.  The Court noted this statement in its opinion, *id.* at 551 & n.2, and then dismissed the claim for lack of finality and a lack of ripeness.  In the instant case, the Department does not assert that South Carolina falls outside the zone of interests of section 2566, and its arguments are therefore consistent with its arguments in *Bodman*.

redressable by a favorable ruling; the alleged injury must be "concrete, particularized, and actual or imminent." *Id.* Because plaintiff seeks only injunctive and declaratory relief, it must identify an imminent prospect of future injury. *See Weaver v. Aegon USA, LLC*, 2015 U.S. Dist. LEXIS 130026, 5-6 (D.S.C. Sept. 28, 2015) (*citing Norman v. Owens*, No. 5:12-cv-01158-RBH, 2013 U.S. Dist. LEXIS 112002, 2013 WL 4042038, at (D.S.C. Aug. 7, 2013) and *Bucksport Water Sys., Inc. v. Weaver Eng'g, Inc.*, No. 4:13-CV-02503-RBH, 2013 U.S. Dist. LEXIS 156067, 2013 WL 5914410, at 2 (D.S.C. Oct. 31, 2013)). Such a future injury "must be certainly impending to constitute injury in fact," whereas "allegations of possible future injury are not sufficient." *Clapper*, 133 S. Ct. at 1147.

South Carolina has not met its burden to establish standing to challenge possible statutory violations in future years. As the Complaint itself acknowledges, the relief requested in this count turns on a number of future contingencies, some or all of which may not come to pass. In future years, South Carolina's claim to the assistance payment will depend on whether the MOX production objective is achieved, whether the Department removes defense plutonium from the State, *when* the Department removes plutonium if at all, and whether any other legal constraints affect the assistance payment. South Carolina's own Complaint acknowledges all of these uncertainties, both as to whether it will be entitled to any payment at all, and if so, how much and when. Federal courts do not have jurisdiction to pursue the kind of ongoing supervision—based on hypothetical and speculative future statutory violations—that South Carolina seeks. Furthermore, it is entirely unknowable at this juncture whether those dates and associated obligations will remain the same in subsequent years. Indeed, Congress has previously amended the statute at least twice to extend the statutory dates. *See* Pub. L. No. 109-103, title III, § 313, Nov. 19, 2005, 119 Stat. 2280; Pub. L. No. 112-239, div. C, title XXXI, § 3116, Jan. 2, 2013,

126 Stat. 2172.  Accordingly, plaintiff's claim for injunctive relief related to future years should be dismissed for lack of jurisdiction.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss plaintiff's Complaint.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

ERIC WOMACK
Assistant Director
Federal Programs Branch

WILLIAM N. NETTLES
United States Attorney

By:     /s/ Barbara M. Bowens
BARBARA M. BOWENS (#4004)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201
Telephone: (803) 929-3000

RAPHAEL O. GOMEZ
(D.C. Bar #305540)
Senior Trial Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-1318
Facsimile: (202) 616-8460
raphael.gomez@usdoj.gov

April 25, 2016          *Attorneys for Defendants*