# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# AIKEN DIVISION

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES;<br><br>UNITED STATES DEPARTMENT OF ENERGY;<br><br>DR. ERNEST MONIZ,<br>in his official capacity as Secretary of Energy;<br><br>NATIONAL NUCLEAR SECURITY ADMINISTRATION; and<br><br>LT. GENERAL FRANK G. KLOTZ,<br>in his official capacity as Administrator of the National Nuclear Security Administration and Undersecretary for Nuclear Security.<br><br>        Defendants. | Case No. 1:16-cv-00391-JMC |

# DEFENDANTS' OPPOSITION TO PLAINTIFF'S
# MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS ..................... ix

INTRODUCTION .......................................................................... 1

BACKGROUND ............................................................................ 2

STANDARD OF REVIEW ................................................................. 6

ARGUMENT ............................................................................... 7

    I.    South Carolina Is Not Entitled to Summary Judgment on Its Removal Claim ....... 7

        A.  Section 2566 Does Not Impose a Mandatory Removal Duty Enforceable Through Mandamus ............................................................ 7

        B.  Defendants Are Effectuating Section 2566's Removal Provision in Light of Competing Legal Obligations and Technical Obstacles ..................... 9

        C.  Equitable Considerations Preclude Mandamus .................................. 14

            1.  Courts Have Substantial Discretion to Decline Mandamus Based on Equitable Considerations ................................................... 14

            2.  The Court Should Exercise Its Discretion to Deny Mandamus ..................... 16

    II.    South Carolina Is Not Entitled to Summary Judgment on Its Money Claim ........ 20

        A.  The Money Claim Cannot Be Adjudicated in This Court ................................. 20

        B.  Congress Has Not Appropriated Funds for the Assistance Payment for Fiscal Year 2016 .............................................................. 21

        C.  South Carolina Is Not Entitled to Payment from the Judgment Fund ................ 27

    III.  South Carolina Is Not Entitled to An Injunction Barring Future Transfers of Defense Plutonium to SRS .................................................... 29

        A.  This Claim Is Not Before the Court ................................................. 30

        B.  Even If Properly Raised, South Carolina Lacks Standing for this Claim .......... 31

        C.  Even if South Carolina Had Standing, Its Suspension Claim Is Meritless ........ 32

    IV.  Section 2566(d) Does Not Impose Any Removal Requirements ......................... 33

V.  South Carolina Lacks Standing to Seek Relief as to Future Years ....................... 35

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Aiken County v. Bodman*, 509 F. Supp. 2d 548 (D.S.C. 2007) ........................................... 32

*Alamgir v. Napolitano*, 2010 WL 2723209 (W.D. Pa. July 8, 2010) ............................... 35

*American Littoral Society v. EPA*, 199 F. Supp. 2d 217 (D.N.J. 2002) ............................ 10

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013) ................... 7, 15

*Bady v. Sullivan*, 1992 WL 332307 (N.D. Ill. 1992) ......................................................... 34

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ....................................................... 10

*Bradley v. U.S. Foods, Inc.*, 2015 WL 5158731 (D.S.C. 2015) ........................................ 33

*Brazos Elec. Power Co-op., Inc. v. United States*, 144 F.3d 784 (Fed. Cir. 1998) .......... 21

*Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005) ................................. 28, 29

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ........................................................... 15

*Consolidated Edison Co. of N.Y. v. United States*, 247 F.3d 1378 (Fed. Cir. 2001) ........ 20

*Cricket Store 17, LLC v. City of Columbia*, 2015 WL 1499399 (D.S.C. 2015) ............... 33

*Cumberland County Hospital System, Inc. v. Burwell*, 816 F.3d 48 (4th Cir. 2016) ...................................................................................................................... passim

*Cumberland Cty. Hosp. Sys., Inc. v. Burwell*, 2015 WL 1249959 (E.D.N.C. Mar. 18, 2015) ........................................................................................................................... 14

*Dep't of Treasury v. FLRA*, 88 F.3d 1279 (Table) (D.C. Cir. 1996) ................................. 34

*Eagle-Picher Industries, Inc. v. United States*, 901 F.2d 1530 (10th Cir. 1990) .............. 20

*First Fed. Savings & Loan Ass'n v. Baker*, 860 F.2d 135 (4th Cir. 1988) ......................... 7

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ......................................... 15

*Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F.3d 244 (1st Cir. 2012) .............. 30

*Hemingway v. Speights*, 2009 WL 302319 (D.S.C. Feb. 6, 2009) ................................... 30

*Hodges v. Abraham*, 300 F.3d 432 (4th Cir. 2002) .......................................................... 11

*Horton v. Donley*, 2009 WL 2782226 (D.S.C. 2009) ....................................................... 33

iii

*Hosh v. Lucero*, 680 F.3d 375 (4th Cir. 2012) .................................................................. 10

*Ibrahim v. Chertoff*, 529 F. Supp. 2d 611 (E.D.N.C. 2007) .......................................... 7, 15

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) ........................................................ 11

*In re American Federation of Government Employees*, 790 F.2d 116 (D.C. Cir. 1986) .. 10

*In re Barr Laboratories, Inc.,* 930 F.2d 72 (D.C. Cir. 1991) ................................. 14, 15, 19

*In re City of Virginia Beach*, 42 F.3d 881 (4th Cir. 1994) ............................................... 15

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ....................................................................... 22, 27

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................... 31

*Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354 (D. Maryland 2008) .............. 30

*Maryland v. Dep't of Veterans Affairs*, 130 F. Supp. 3d 342 (D.D.C. 2015) ................... 33

*N.Y. Statewide Senior Action Council v. Leavitt*, 409 F. Supp. 2d 325 (S.D.N.Y. 2005). 35

*Nevada v. Dep't of Energy*, 400 F.3d 9 (D.C. Cir. 2005) ................................................. 22

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ................................ 15

*NRDC v. EPA*, 966 F.2d 1292 (9th Cir. 1992) .......................................................... 15, 19

*Oil, Chemical & Atomic Workers Int'l Union v. Zegeer*, 768 F.2d 1480 (D.C. Cir. 1985) .......................................................................................................................... 10

*Ottis v. Shalala*, No. 92-425, 1993 WL 475518 (W.D. Mich. 1993) ............................... 11

*Plaut v. Spendthrift Farm*, 514 U.S. 211 (1995) ............................................................. 27

*Prairie County v. United States*, 113 Fed. Cl. 194 (2013) .............................................. 29

*Public Citizen, Inc. v. Mukasey*, 2008 WL 4532540 (N.D. Cal. 2008) ........................... 15

*Reyes-Gaona v. North Carolina Growers Ass'n*, 250 F.3d 861 (4th Cir. 2001) ............. 33

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) .............................. 12

*Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181 (2012) ................................. 27, 28, 29

*Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005) ........................ 21

*Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994) ..................................................................... 7

*Sikka v. Rumsfeld*, 98 Fed. App'x 254 (4th Cir. 2004) (per curiam) ................................. 7

iv

*Suburban Mortgage Assoc., Inc. v. HUD*, 480 F.3d 1116 (Fed. Cir. 2007) .................... 20

*Texas v. United States*, 523 U.S. 296 (1998) ..................................................... 35

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ......................................................... 32

*United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284 (4th Cir. 2002) ......................................................................................................... 22

*United States ex rel. Rahman v. Oncology Assoc., P.C.*, 198 F.3d 502 (4th Cir. 1999)... 14

*United States v. Brockamp*, 519 U.S. 347 (1997) ............................................... 32

*United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991)...................................... 31

*Village of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186 (4th Cir. 2013) ......................................................................................................... 15

*WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013) ............................. 12

## **Statutes**

25 U.S.C. § 450 ............................................................................................ 28

31 U.S.C. § 1301 .......................................................................................... 24

31 U.S.C. § 1304 .......................................................................................... 27

31 U.S.C. § 1341 .......................................................................................... 21

41 U.S.C. § 7108 .......................................................................................... 28

42 U.S.C. §§ 10101 *et seq.* .......................................................................... 12

42 U.S.C. §§ 4321 *et seq.* ......................................................................... 4, 11

49 U.S.C. §§ 5101 *et seq.* ........................................................................... 12

5 U.S.C. § 704 .............................................................................................. 32

5 U.S.C. § 706 .......................................................................................... 15, 35

50 U.S.C. § 2566 ................................................................................... passim

50 U.S.C. § 2567 .......................................................................................... 12

50 U.S.C. § 2569 ...................................................................................... 31, 32

50 U.S.C. § 2633 .......................................................................................... 12

Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, Dec. 2, 2002 ........................................................................................................ 2

Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, div. D, tit. III, Dec. 18, 2015................................................................................................................ passim

Department of Interior and Related Agencies Appropriations Act for 2003, Pub. L. No. 108-7 (Feb. 20, 2003)...................................................................................... 23

Department of the Interior and Related Agencies Appropriations Act for 2001, Pub. L. No. 106-291, Oct. 11, 2000............................................................................ 28

National Defense Authorization Act for 2016, Pub. L. No. 114-92, Nov. 25, 2015 .... 5, 25

Waste Isolation Pilot Plant Land Withdrawal Act of 1992, Pub. L. No. 102-579, Oct. 30, 1992................................................................................................................... 12

**Administrative Materials**

David C. Moody, *Interim Action Determination, Disposition of Certain Plutonium Materials Stored at the Savannah River Site*, Savannah River Operations Office, Aiken, South Carolina, Oct. 17, 2011 ........................................................................ 5

Dep't of Energy, *Amended Notice of Intent to Modify the Scope of the Surplus Plutonium Disposition Supplemental Environmental Impact Statement*, 75 Fed. Reg. 41850-02 (July 19, 2010) ........................................................................... 4

Dep't of Energy, *Final Surplus Plutonium Disposition Supplemental Environmental Impact Statement*, DOE/EIS-292-S2, Apr. 2015 ........................................... 6, 9, 12, 13

Dep't of Energy, *Notice of Intent to Prepare a Supplemental Environmental Impact Statement for Surplus Plutonium Disposition at the Savannah River Site*, 72 Fed. Reg. 14543-01 (Mar. 28, 2007)...................................................................... 4

Dep't of Energy, *Preferred Alternative for Certain Quantities of Plutonium*, 80 Fed. Reg. 80348 (Dec. 24, 2015) .......................................................................... 6, 9

Dep't of Energy, *Record of Decision*, 62 Fed. Reg. 2014-01 (Jan. 21, 1997).......... 2, 3, 17

Dep't of Energy, *Safeguards and Security Upgrades for Storage of Plutonium Materials at the Savannah River Site*, DOE/EA-1538 (Dec. 2005)................................................ 3

Dep't of Energy, *Second Amended Notice of Intent, to Modify the Scope of the Surplus Plutonium Disposition Supplemental Environmental Impact Statement*, 77 Fed. Reg. 1920-02 (Jan. 12, 2012) ................................................................. 4

Dep't of Energy, *Storage and Disposition of Weapons-Usable Fissile Materials Programmatic Environmental Impact Statement*, DOE/EIS-229 (Dec. 1996)............... 2

Dep't of Energy, *Surplus Plutonium Disposition Program*, 67 Fed. Reg. 19432-01 (Apr. 19, 2002) ........................................................................................................ 2

Record of Decision, *Surplus Plutonium Disposition*, 81 Fed. Reg. 19588 (Apr. 5, 2016) 6, 14

**Treatises**

Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure (1973) ................. 15

Government Accountability Office, Principles of Federal Appropriations Law (3d ed. 2004) ...................................................................................................... passim

Government Accountability Office, Principles of Federal Appropriations Law, Annual Update of the Third Edition (Mar. 2015) ...................................................... 22

**Regulations**

10 C.F.R. § 1021 ....................................................................................... 11

10 C.F.R. § 70 ........................................................................................... 12

10 C.F.R. § 820 ......................................................................................... 12

10 C.F.R. § 830 ......................................................................................... 12

10 C.F.R. § 835 ......................................................................................... 12

40 C.F.R. § 191 ......................................................................................... 12

40 C.F.R. § 51.166 ..................................................................................... 13

40 C.F.R. § 61 ........................................................................................... 13

40 C.F.R. §§ 1500-1508 ............................................................................. 11

49 C.F.R. § 71 ........................................................................................... 12

49 C.F.R. §§ 171-180 ................................................................................. 12

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl. 7 ....................................................................... 21

**Reports**

Aerospace Corp., *Plutonium Disposition Study Options Independent Assessment*, Apr. 13, 2015 ....................................................................................................... 14

Government Accountability Office, *Plutonium Disposition Program*, GAO-14-231, Feb. 2014 ................................................................................................................. 4, 5, 13

Mark Holt & Mary Beth D. Nikitin, Cong. Res. Serv., *Mixed-Oxide Fuel Fabrication Plant and Plutonium Disposition*, R43125 (Mar. 28, 2014) ........................................... 4

Oak Ridge National Laboratory, *Final Report of the Plutonium Disposition Red Team*, Aug. 13, 2015 ................................................................................................................. 14

## RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 7.05(A)(5), Defendants hereby respond to Plaintiff's statement of material facts. Judicial review of this action is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, and summary judgment is therefore the appropriate mechanism for resolving disputes of material fact.

### Responses to Plaintiff's Statement of Material Facts

1. "The Secretary and DOE failed to achieve the MOX production objective by January 1, 2014." S.J. Mem. 22, ECF No. 10-1.

**Response**: It is undisputed that the MOX facility is not yet operational, and therefore has not processed any defense plutonium or defense plutonium materials into mixed-oxide fuel.

2. "The Secretary and DOE failed to achieve the MOX production objective by January 1, 2016." S.J. Mem. 22, ECF No. 10-1.

**Response**: It is undisputed that the MOX facility is not yet operational, and therefore has not processed any defense plutonium or defense plutonium materials into mixed-oxide fuel.

3. "The Secretary and DOE have failed to remove any defense plutonium or defense plutonium materials from the State of South Carolina pursuant to its obligations under Section 2566." S.J. Mem. 22, ECF No. 10-1.

**Response**: This paragraph asserts a legal conclusion rather than a material fact. Defendants deny that they have not removed any defense plutonium from the State of South Carolina. *See* Gunter Decl. ¶¶ 15, 16, 17, 18, 37, 38, Ex. 2; Record of Decision,

*Surplus Plutonium Disposition*, 81 Fed. Reg. 19588 (Apr. 5, 2016), Ex. 1.  Defendants also deny that they have a removal obligation in section that is judicially enforceable.

4. "The Secretary and DOE have failed to provide economic and impact assistance payments to the State of South Carolina pursuant to the Secretary and DOE's obligations under Section 2566."  S.J. Mem. 22, ECF No. 10-1.

**Response**:  This paragraph asserts a legal conclusion rather than a material fact. Defendants dispute that they have failed to make a payment in violation of any legal obligation in section 2566.  *See* 50 U.S.C. § 2566(d)(1) ("subject to the availability of appropriations"); Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, div. D, tit. III, § 301(d), 129 Stat. 2417, Dec. 18, 2015, Ex. 5; Explanatory Table, 161 Cong. Rec. H10106, H10117 (daily ed. Dec. 17, 2015), Ex. 6.

## Additional Material Facts

1. Defendants have issued a Record of Decision for removing six metric tons of defense plutonium from South Carolina.  Gunter Decl. ¶¶ 13-18, 37; Record of Decision, *Surplus Plutonium Disposition*, 81 Fed. Reg. 19588 (Apr. 5, 2016); *see* Dep't of Energy, *Preferred Alternative for Certain Quantities of Plutonium*, 80 Fed. Reg. 80348 (Dec. 24, 2015), Ex. 4; *Final Surplus Plutonium Disposition Supplemental Environmental Impact Statement*, DOE/EIS-292-S2, Apr. 2015.

2. It is estimated that removing one metric ton of defense plutonium from South Carolina for storage only would take approximately five years, after all technical and regulatory requirements are met.  Gunter Decl. ¶¶ 28, 31, 35.

3. Removing one metric ton of defense plutonium from South Carolina for storage only would bring almost no environmental benefit to neighboring communities, and in

the process, it would have adverse environmental effects from transportation and workers' increased radiation exposure, it would delay disposition efforts by many years, it would impede the MOX program, it would pose a number of security risks, and it might require new construction at other facilities.  Gunter Decl. ¶¶ 19-38.

4. Congress has appropriated no funds for fiscal year 2016 for paying economic and impact assistance to South Carolina pursuant to section 2566.  None of Defendants' appropriations are legally available for that purpose.  Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, div. D, tit. III, § 301(d), 129 Stat. 2417, Dec. 18, 2015; Explanatory Table, 161 Cong. Rec. H10106, H10117 (daily ed. Dec. 17, 2015).

5. All transfers of defense plutonium to be processed by the MOX facility were suspended in 2014.  Hanlon Decl. ¶ 11, Ex. 8.

6. No transfers of any foreign-source plutonium to South Carolina are planned for the next two years.  Hanlon Decl. ¶ 6, 10, 11.

## INTRODUCTION

South Carolina has moved for summary judgment on its claims seeking the removal of one ton of defense plutonium and its claim seeking payment of $100 million. Neither of those claims belongs in this Court.  As Defendants argued in their Motion to Dismiss, 50 U.S.C. § 2566 does not provide a cause of action to force the removal of defense plutonium through mandamus.  Instead, its remedy, in case of delays in the MOX project, is the "economic and impact assistance" payment.  But that remedy—to the extent it is available—can only be pursued in the Court of Federal Claims, not in this Court.  Because South Carolina has no cause of action for one of its claims, and this Court lacks jurisdiction for the other, summary judgment should be denied.

Even if the Court reaches the merits of either claim, it should still deny relief.  As to the removal claim, Defendants are already pursuing a reasonable path for the removal and disposition of multiple tons of plutonium from SRS.  Any injunction forcing Defendants to abandon that plan—which South Carolina has not directly challenged— would delay the disposition of weapons-usable plutonium by many years, impose serious costs on human health and the environment, and pose unnecessary risks to national security.  As to the monetary claim, Congress expressly provided that assistance payments were "subject to the availability of appropriations," and none of Defendants' 2016 appropriations are legally available for making those payments.  As a result, South Carolina is not entitled to relief on either claim.

South Carolina's summary judgment motion also lists several requests for relief that the State has not argued in its Memorandum—for the suspension of future shipments,

for the removal of an additional ton of plutonium, and for the Court to supervise Defendants' actions over the next several years. These should be denied as well.[1]

## BACKGROUND

The end of the Cold War left the United States with large stockpiles of excess plutonium from its nuclear weapons programs. Throughout the 1990s, the Department of Energy explored options for disposing of that surplus plutonium, so that it could never again readily be used in nuclear weapons. *See* Dep't of Energy, *Storage and Disposition of Weapons-Usable Fissile Materials Programmatic Environmental Impact Statement*, DOE/EIS-229 (Dec. 1996) (NEPA analysis for four categories of disposition alternatives, totaling 37 disposition options). It eventually settled on a plan to convert defense plutonium into mixed-oxide fuel ("MOX"), which could be irradiated in domestic commercial nuclear reactors. *See* Dep't of Energy, *Record of Decision*, 62 Fed. Reg. 2014-01 (Jan. 21, 1997) ("1997 Record of Decision") (adopting both the MOX approach and an immobilization approach); Dep't of Energy, *Surplus Plutonium Disposition Program*, 67 Fed. Reg. 19432-01, 19434 (Apr. 19, 2002) (cancelling the immobilization approach because "with available funds, only one approach can be supported"). The MOX facility is being built at the Savannah River Site ("SRS"), a federal nuclear facility in South Carolina that has been in operation since the 1950s, which employs around 11,000 workers. *See* Gunter Decl. ¶ 3, Ex. 2; Compl. ¶ 30, ECF No. 1.

In 2002, Congress enacted 50 U.S.C. § 2566 to guide the MOX program at SRS. *See* Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, § 3182, 116 Stat. 2747, Dec. 2, 2002. The statute's goals include "the

---

[1] Should this Court deny Defendants' Motion to Dismiss, Defendants intend to move for summary judgment at a later juncture, after filing an administrative record, which is the normal procedure for a case brought under the Administrative Procedure Act ("APA").

construction and operations of the MOX facility," 50 U.S.C. § 2566(a)(1), achievement of the "MOX production objective" of producing at least "one metric ton of mixed-oxide fuel per year," *id.* § 2566(h)(1), and, ultimately, processing 34 metric tons of defense plutonium into MOX fuel, *id.* §§ 2566(a)(2)(B), (e). The Act sets forth a series of deadlines for reaching certain milestones in the construction and operation of the MOX facility. If the production objective is not achieved on time, the statute provides that the Department must either remove defense plutonium from SRS or make "economic and impact assistance" payments, subject to appropriations, to South Carolina. *Id.* § 2566(d).

After September 11, 2001, to better manage the national security risks associated with storing weapons-usable nuclear material, the Department also decided to consolidate scattered quantities of surplus defense plutonium in one location. *See* Dep't of Energy, *Safeguards and Security Upgrades for Storage of Plutonium Materials at the Savannah River Site*, DOE/EA-1538 (Dec. 2005); Gunter Decl. ¶¶ 5-10. This consolidation was encouraged by numerous entities in both the executive and legislative branches. *Id.* ¶ 9; H.R. Conf. Rep. No. 109, H.R. 2419, June 16, 2005 ("The consolidation and the safe disposal of this material from across the complex will significantly lower safety and security costs, and facilitate the closure of former nuclear weapons sites across the NNSA complex."). It took approximately nine years to consolidate the non-pit plutonium currently at SRS, Gunter Decl. ¶ 10, because shipment and storage had to be carried out in compliance with numerous regulatory requirements, and because nuclear material can only be shipped in small quantities. *See infra* nn.2-5; 1997 Record of Decision, at 3020 ("The packaging, vehicles, and transport procedures being used are specifically designed and tested to prevent a radiological release under all credible accident scenarios.").

While the consolidation was taking place, the Department began studying ways to pursue the disposition of the defense plutonium being sent to SRS.  In 2007, pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, it issued a Notice of Intent to analyze several alternatives for achieving the disposition of 13.1 metric tons of defense plutonium at SRS.  Dep't of Energy, *Notice of Intent to Prepare a Supplemental Environmental Impact Statement for Surplus Plutonium Disposition at the Savannah River Site*, 72 Fed. Reg. 14543-01 (Mar. 28, 2007) ("2007 Notice of Intent"). The scope of that analysis expanded several times over the next five years.  *See* Dep't of Energy, *Amended Notice of Intent to Modify the Scope of the Surplus Plutonium Disposition Supplemental Environmental Impact Statement*, 75 Fed. Reg. 41850-02 (July 19, 2010) (amending 2007 Notice of Intent "to refine the quantity and types of surplus weapons-usable plutonium material, evaluate additional alternatives, and no longer consider in detail one alternative"); Dep't of Energy, *Second Amended Notice of Intent*, *to Modify the Scope of the Surplus Plutonium Disposition Supplemental Environmental Impact Statement*, 77 Fed. Reg. 1920-02 (Jan. 12, 2012) (amending "to add additional alternatives" for pit disassembly and conversion to feed material for the MOX facility).

Meanwhile, the contractor hired to build the MOX facility at SRS started construction in 2007.  *See* Gov't Accountability Office, *Plutonium Disposition Program*, at 2, GAO-14-231, Feb. 2014 ("2014 GAO Report").  In the five years after section 2566's enactment, the estimated cost of the MOX facility increased by a factor of five; over the next five years, that estimate again doubled.  Mark Holt & Mary Beth D. Nikitin, Cong. Res. Serv., *Mixed-Oxide Fuel Fabrication Plant and Plutonium Disposition*, at 1-2, R43125 (Mar. 28, 2014); 2014 GAO Report, at 11-13 (identifying the drivers of cost

increases). The project has also faced multi-year delays, caused by numerous technical, financial, and other factors. *Id.* The Department has nonetheless continued building the MOX facility to this day, as required by Congress. *See, e.g.*, Nat'l Defense Auth. Act ("2016 NDAA"), Pub. L. No. 114-92, § 3119(a)(1), 129 Stat. 1197, Ex. 3. The Department's yearly appropriations have continued to fund construction. *See* Consol. Appropriations Act of 2016, Pub. L. No. 114-113, div. D, tit. III, Dec. 18, 2015.

Throughout the construction period, the Department has been working on other ways to pursue the disposition of the defense plutonium at SRS. Between 2009 and 2011, the Department combined some defense plutonium at SRS with high-level waste and vitrified the mixture into glass logs, for eventual disposal in a geologic repository. Gunter Decl. ¶ 12. In 2011, Defendants utilized a different approach and authorized the down-blending[2] of about half a ton of defense plutonium at SRS. David C. Moody, *Interim Action Determination, Disposition of Certain Plutonium Materials Stored at the Savannah River Site*, Savannah River Operations Office, Aiken, South Carolina, Oct. 17, 2011.[3] They began down-blending in 2012, and they shipped some of the down-blended plutonium to the Waste Isolation Pilot Plant ("WIPP"), in New Mexico, until a fire and an underground radiological event temporarily shut down that facility in early 2014. Gunter Decl. ¶ 15 & n.7. WIPP plans to reopen in late 2016. *Id.* ¶ 15.

---

[2] Down-blending is the process of mixing a radioactive substance with particular inert material, which renders the substance more proliferation resistant and suitable for being stored (or "emplaced") long-term in an underground geologic repository.

[3] Available at
http://www.srs.gov/general/pubs/envbul/documents/Interim_Action_500kg_to_WIPP_10-17-11.pdf.

In April 2015, the Department completed its NEPA analysis for 13.1 metric tons of non-pit defense plutonium located at SRS.  *See* Dep't of Energy, *Final Surplus Plutonium Disposition Supplemental Environmental Impact Statement*, DOE/EIS-292-S2, Apr. 2015 ("2015 Environmental Impact Statement").  The analysis, which stretches more than a thousand pages, considered four alternatives, including the MOX project and the WIPP down-blending alternative.  In December 24, 2015, the Department announced that its preferred alternative for six metric tons of this material was the WIPP approach.[4] *See* Dep't of Energy, *Preferred Alternative for Certain Quantities of Plutonium*, 80 Fed. Reg. 80348 (Dec. 24, 2015) ("*Preferred Alternative*"), Ex. 4.  It explained that the WIPP approach would allow it "to continue progress on the disposition of surplus weapons usable plutonium in furtherance of the policies of the United States to ensure that surplus plutonium is never used in a nuclear weapon, and to remove surplus plutonium from the State of South Carolina."  *Id.* at 80349.  In April 2016, the Department announced its decision to implement that approach, *see* Record of Decision, *Surplus Plutonium Disposition*, 81 Fed. Reg. 19588 (Apr. 5, 2016) ("2016 Record of Decision"), Ex. 1, explaining that "[b]lending for disposal at WIPP is a proven process that is ongoing at SRS" and that "disposal of this surplus non-pit plutonium will avoid long-term impacts, risks, and costs associated with storage."  *Id.* at 19591.

## STANDARD OF REVIEW

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The party seeking summary judgment has the initial burden to

---

[4] This approach—down-blending at SRS followed by emplacement at WIPP—is often referred to as the "dilute and dispose" method.  No preferred alternative has been selected for the remaining 7.1 metric tons.

show absence of evidence to support the nonmoving party's case." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The Court "must view the factual evidence, and all justifiable inferences drawn therefrom, in the light most favorable to the non-moving party." *Sikka v. Rumsfeld*, 98 Fed. App'x 254, 255 (4th Cir. 2004) (per curiam).

## ARGUMENT

### I. South Carolina Is Not Entitled to Summary Judgment on Its Removal Claim

#### A. Section 2566 Does Not Impose a Mandatory Removal Duty Enforceable Through Mandamus

In its Memorandum, South Carolina seeks an order compelling Defendants to remove one ton of defense plutonium from SRS. *See* S.J. Mem. 20-21, ECF No. 10-1 (identifying mandamus and APA causes of action); *Ibrahim v. Chertoff*, 529 F. Supp. 2d 611, 615 (E.D.N.C. 2007) ("[C]laims under the APA must pertain to actions the government is required by law to accomplish and are subject to the same standard as those under the Mandamus Act."); *accord Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2260 n.10 (2013) (describing "a writ of mandamus to 'compel agency action unlawfully withheld or unreasonably delayed'") (quoting 5 U.S.C. § 706(1)). The relief it seeks is a "drastic remedy that must be reserved for extraordinary situations." *Cumberland Cty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 52 (4th Cir. 2016) (quotation marks omitted). A plaintiff must demonstrate that it "has a clear right to the relief sought," that the defendant "has a clear duty to do the particular act," and, in a suit "brought against a public official," that the alleged duty involves a "ministerial obligation which is so plainly prescribed as to be free of doubt." *Ibrahim*, 529 F. Supp. 2d at 613 (quoting *First Fed. Savings & Loan Ass'n v. Baker*, 860 F.2d 135, 138 (4th Cir. 1988).

South Carolina cannot satisfy that high standard. While section 2566 seeks the removal of defense plutonium from SRS, its enforcement mechanism is the assistance payment, subject to appropriations, not a mandatory injunction. *See* 50 U.S.C. § 2566(c) (removal); *id.* § 2566(d) (assistance payment). In their Motion to Dismiss, Defendants explained the absurdities, large and small, occasioned by reading section 2566(c) to impose mandatory removal duties enforceable through mandamus. *See* Mot. to Dismiss 21-22 (clashing with § 2566(b)(4), (5)); *id.* at 21 (negating § 2566(d)(2)(A), (B)); Mot. to Dismiss 20, 22 (defeating statutory purpose of reaching the MOX production objective after initial delay); MTD Reply 4-5 (same); *id.* 5 (inconsistency with recent appropriations statutes); Mot. to Dismiss 17-19 (no mention of mandamus or injunction in legislative history); MTD Reply 8-9 (same).[5]

South Carolina's only justification for those bizarre results is that the statute says "shall." S.J. Mem 22, 25, 26. But the Fourth Circuit has held that the word "shall" is insufficient when mandamus would impair the statutory scheme. In *Cumberland County Hospital System, Inc. v. Burwell*, 816 F.3d 48 (4th Cir. 2016), the court faced a mandamus claim based on a statutory directive that "an administrative law judge *shall* conduct and conclude a hearing . . . and render a decision on such hearing by *not later than the end of the 90-day period*" after a hearing request. *Id.* at 49 (quoting 42 U.S.C. § 1395ff(d)(1)(A)) (emphasis added). After considering that provision's place in the larger statutory scheme, the Fourth Circuit observed that the statute not only "establishe[d] deadlines," it also "specifie[d] the consequences when such deadlines are not met." *Id.* at 53. It concluded that enforcing the timeline through mandamus would upend the larger

---

[5] These arguments have been thoroughly briefed in the Motion to Dismiss, which Defendants incorporate by reference here. ECF No. 17.

scheme, explaining that the plaintiff's "argument focuse[d] on only the provision creating the 90-day time frame and fail[ed] to account for its context in the comprehensive administrative process. Our reading of the statute cannot be so restricted." *Id.* at 55 (quoting *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015)). The court instructed that "the judiciary" must not "enforce an isolated deadline and thereby impose a process not contemplated by the [broader statute]—indeed, in conflict with it." *Id.* at 54.

As in *Cumberland County*, Congress could not have given South Carolina the right to empty SRS of all defense plutonium brought there since 2002 the moment the MOX facility is built, as South Carolina's interpretation would require. As the Motion to Dismiss explained, that result would defeat the basic purpose of section 2566 and render futile recent statutes that mandate and fund ongoing construction. South Carolina has no cause of action to force removal.

## B. Defendants Are Effectuating Section 2566's Removal Provision in Light of Competing Legal Obligations and Technical Obstacles

If this Court holds that section 2566(c)(1) is enforceable through mandamus, it would still have to decide whether Defendants are satisfying its obligations. Last year, Defendants completed the NEPA analysis required by section 2566(c) and identified a path for removing six metric tons of defense plutonium from SRS for final disposition outside South Carolina. Gunter Decl. ¶¶ 17, 18; 2015 Environmental Impact Statement, *supra*; *Preferred Alternative*, *supra*. Defendants are taking concrete steps this year to advance that approach, which involves down-blending plutonium at SRS, packaging it for long-term storage underground, and shipping it to WIPP for emplacement. Gunter Decl. ¶¶ 17, 18. It is true that the date for removal in section 2566(c)(1)—January 1, 2016—has passed, but that fact alone does not entitle South Carolina to relief. *See Am.*

9

*Littoral Society v. EPA*, 199 F. Supp. 2d 217, 240 (D.N.J. 2002) (explaining that a court's "sole power in [the § 706(1)] context is to require [the agency] to conform its present conduct to the law," and that "past noncompliance is irrelevant to the question of the agency's present compliance, and to whether the Court will compel [it] to act in a particular manner").  Defendants' current disposal efforts satisfy any statutory removal obligations.

At the outset, delay without more is not enough reason to issue an injunction. South Carolina suggests that the mere fact that removal was not achieved by January 1, 2016 requires judicial sanction.  But the Fourth Circuit has instructed that "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction."  *Hosh v. Lucero*, 680 F.3d 375, 381 (4th Cir. 2012).  *See also Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 160 (2003) ("[W]e do not readily infer congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time.").

When an agency is working toward a statutory goal despite delay, courts regularly decline to intervene.  *See, e.g.*, *In re Am. Fed. of Gov't Employees*, 790 F.2d 116, 119 (D.C. Cir. 1986) (refusing injunctive relief where agency demonstrated it planned to "diligently pursue[ ] its current case management endeavors"); *Oil, Chemical & Atomic Workers Int'l Union v. Zegeer*, 768 F.2d 1480, 1488 (D.C. Cir. 1985) (ruling that "there is accordingly no need, at this juncture, for a court order compelling agency action unreasonably delayed" after finding the agency was "proceeding toward completion" of its duties "within a reasonable time"); *Ottis v. Shalala*, No. 92-425, 1993 WL 475518, at

*7 (W.D. Mich. 1993) ("[B]ecause the Secretary is now proceeding under a reasonable timetable to finalize the regulations, the Court need not determine whether the prior delay was in fact unreasonable."). South Carolina points to the mandamus issued in *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) (cited at S.J. Mem. 20), but in that case, the D.C. Circuit only granted mandamus after concluding that "by its own admission, the [Nuclear Regulatory] Commission has no current intention of complying with the law. Rather, the Commission has simply shut down its review and consideration of the Department of Energy's license application." *Id.* at 258.

The opposite is true in this case. Defendants have chosen a removal approach and are actively working to continue removing plutonium from SRS. That choice and those efforts have been shaped by a number of technical obstacles and competing legal obligations to which Defendants are subject, and would continue to be subject even if this Court issued an injunction. The legal obligations are acknowledged in section 2566(c) itself, which requires that any approach to removal from SRS be "consistent with [NEPA] and other applicable laws." The list of such laws is long. NEPA, for starters, requires agencies to "follow certain procedures prior to undertaking any" action "that may affect the environment." *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002); *see* 42 U.S.C. §§ 4321 *et seq.* These requirements are implemented, in part, through regulations promulgated by the Department and the Council on Environmental Quality. *See* 40 C.F.R. §§ 1500-1508; 10 C.F.R. § 1021. A NEPA analysis is not just a formality; Defendants were required to "carefully consider[] detailed information concerning significant environmental impacts" and "take a 'hard look' at environmental consequences before making a decision." *Hodges*, 300 F.3d at 438 (quoting *Robertson v.*

11

*Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989)); 40 C.F.R. § 1505.2(g) (prohibiting the use of a NEPA analysis to "justify[] decisions already made"); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013).

Defendants also have broad statutory responsibilities to pursue the disposition of surplus defense plutonium, keep defense plutonium secure at all times, and minimize impacts on workers and the environment.[6]  In addition, Defendants must abide by detailed rules for the handling,[7] storage,[8] and transport[9] of defense plutonium, as well as the construction and maintenance of facilities for storing it.[10]  Again, section 2566(c) *explicitly* requires that removal decisions and efforts comply with these duties.

---

[6] *See, e.g.*, 50 U.S.C. § 2567(c), (d) (requiring the Department to "identify a disposition path," not just a removal path, for the plutonium at SRS); 50 U.S.C. § 2633 ("The Secretary of Energy shall continue operations and maintain a high state of readiness at [SRS] and shall provide technical staff necessary to operate and so maintain such facility.").  For a more complete list of statutory and regulatory duties, see 2015 Environmental Impact Statement, § 5-2, tbl. 5-1 ("The complexity of managing nuclear materials is reflected in the regulatory scheme governing these activities.").

[7] *See, e.g.*, 40 C.F.R. § 191 (governs radiation exposure limits for the disposal of certain nuclear materials); 10 C.F.R. § 830 ("Nuclear Safety Management"); 10 C.F.R. § 835 ("Occupational Radiation Protection"); DOE Order 410.2 (8/17/09) ("Management of Nuclear Materials"); DOE Order 435.1, Chg. 1, *Radioactive Waste Management* (07/09/99) (setting radioactive waste management requirements to protect workers, public health, and the environment); DOE Order 458.1, Admin. Chg. 3, *Radiation Protection of the Public and the Environment* (2/11/11).

[8] *See, e.g.*, Waste Isolation Pilot Plant Land Withdrawal Act of 1992, Pub. L. No. 102-579, Oct. 30, 1992, *amended*, Pub. L. No. 104-201 (establishing requirements for any materials sent to WIPP for disposal); 10 C.F.R. § 820 ("Procedural Rules for DOE Nuclear Facilities"); DOE Policy 470.1A, *Safeguards and Security Program* (12/29/10) (requirements for protecting nuclear material); DOE Order 470.3B, *Graded Security Protection Policy* (8/12/08) [classified]; DOE Order 470.4B, Admin. Chg. 1, *Safeguards and Security Program* (7/21/11).

[9] *See, e.g.*, 49 U.S.C. §§ 5101 *et seq.* (Hazardous Materials Transportation Act); 49 C.F.R. §§ 171-180 (Department of Transportation requirements for packaging, handling, and transporting hazardous materials); 49 C.F.R. Part 71 (same); DOE Order 460.1C, *Packaging and Transportation Safety* (5/14/10); DOE Order 460.2A, *Departmental Materials Transportation and Packaging Management* (12/22/04); DOE Order 461.1B, *Packaging and Transportation for Offsite Shipment of Materials of National Security Interest* (12/16/10).

[10] *See, e.g.*, 40 C.F.R. Part 61, subpart H (emission standards for DOE facilities); 40 C.F.R. § 51.166 (pre-construction air-quality review); DOE Order 426.2, *Personnel Selection, Training,*

With these multiple—and often competing—legal obligations in mind, the Department, throughout the last decade, has been actively working to find a disposition option for the surplus defense plutonium at SRS. It conducted extensive NEPA analysis, running more than a thousand pages, to evaluate options for disposing of defense plutonium at SRS. *See* 2015 Environmental Impact Statement.[11] It has authorized and undertaken down-blending. Gunter Decl. ¶¶ 13-15. It has shipped some of SRS's down-blended plutonium to WIPP. *Id.* ¶¶ 15, 16.[12] It has developed specific plans for down-blending and then removing six more tons of defense plutonium from SRS. *Id.* ¶ 17. All of this has taken place alongside the MOX program, to which Defendants have devoted substantial resources.

Along the way, a number of serious obstacles have impeded Defendants' progress. In 2014, two major events at WIPP—"a salt truck fire and an unrelated radiological event underground," *id.* ¶ 15 n.7—prevented any further shipments of down-blended material, from anywhere. As for the MOX project, the cost and time required to complete the facility have sky-rocketed. *See* 2014 GAO Report, *supra*, at 32-33 (five-fold increase); Aerospace Corp., *Plutonium Disposition Study Options Independent Assessment*, at 3, Apr. 13, 2015[13] (ten- to twenty-fold increase); Oak Ridge Nat'l Lab.,

---

*Qualification, and Certification Requirements for DOE Nuclear Facilities* (4/21/10); DOE Order 433.1B, Admin. Chg. 1, *Maintenance Management Program for DOE Nuclear Facilities* (4/21/10) (requirements for safety management program for DOE nuclear facilities); DOE Order 420.1C, *Facility Safety* (12/13/12) (establishes programmatic safety requirements for DOE nuclear facilities).

[11] The analysis is available at https://nnsa.energy.gov/aboutus/ouroperations/generalcounsel/nepaoverview/nepa/spdsupplementaleis.

[12] The Department has also vitrified plutonium materials through SRS's high-level waste system. Gunter Decl. ¶ 12.

[13] *Available at* http://fissilematerials.org/library/doe15a.pdf.

*Final Report of the Plutonium Disposition Red Team*, at x, Aug. 13, 2015 ("2015 Oak Ridge Report")[14] (five-fold increase).  Defendants have had to adapt to each of these unforeseen hurdles.

Nevertheless, Defendants have identified a way forward that will comply with section 2566(c).  Emplacement at WIPP will achieve both removal and disposition for multiple tons of weapons-usable plutonium.  *See* 2016 Record of Decision, *supra*.  In their recent budget requests, Defendants have asked Congress for additional resources to carry out that plan.  *See* Gunter Decl. ¶ 18.  Defendants are working diligently to remove defense plutonium from SRS under unavoidable technical and legal constraints.  Thus, assuming *arguendo* that the statute imposes a removal duty enforceable through mandamus, Defendants are already complying with that duty.

## C.  Equitable Considerations Preclude Mandamus

### 1.  Courts Have Substantial Discretion to Decline Mandamus Based on Equitable Considerations

Even if it finds that Defendants are in violation of section 2566, the Court should not issue an injunction forcing them to abandon their current removal approach, which South Carolina has not challenged.  "Judicial intervention does not necessarily follow a violation of a statutory timeframe."  *Cumberland Cty. Hosp. Sys., Inc. v. Burwell*, 2015 WL 1249959, at *6 (E.D.N.C. Mar. 18, 2015) (citing *In re Barr Labs., Inc.,* 930 F.2d 72, 75 (D.C. Cir. 1991)), *aff'd*, 816 F.3d 48 (4th Cir. 2016).  The Fourth Circuit has instructed that mandamus be "administered with equitable principles in the interest of justice and at the discretion of the issuing court."  *United States ex rel. Rahman v. Oncology Assoc., P.C.*, 198 F.3d 502, 511 (4th Cir. 1999) ("[T]he party seeking the writ

---

[14] *Available at* http://www.ucsusa.org/sites/default/files/attach/2015/08/final-pu-disposition-red-team-report.pdf?_ga=1.83196566.125071388.1463082245.

14

must demonstrate that . . . there are no other adequate means to attain the relief he desires[] and [] the issuance of the writ will effect right and justice in the circumstances.").  The same discretion must be applied to any possible injunction under 5 U.S.C. § 706(1).  "Injunctions are an extraordinary remedy issued at a court's discretion when there is a compelling need."  *NRDC v. EPA*, 966 F.2d 1292, 1299-1300 (9th Cir. 1992) ("Injunctive relief may be inappropriate where it requires constant supervision.") (citing 11 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2942, at 365, 368–69 (1973)).  Both the Fourth Circuit and the Supreme Court have consistently treated mandamus and § 706(1) as equivalent.  *See, e.g.*, *Inter Tribal Council of Arizona*, 133 S. Ct. at 2260 n.10; *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) (explaining that § 706(1) "carried forward" the traditional mandamus remedy); *Village of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 195 (4th Cir. 2013); *In re City of Virginia Beach*, 42 F.3d 881, 884 (4th Cir. 1994); *Ibrahim v. Chertoff*, 529 F. Supp. 2d 611, 615 (E.D.N.C. 2007) ("[C]laims under the APA . . . are subject to the same standard as those under the Mandamus Act.").

South Carolina cites *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999), for the proposition that courts cannot exercise equitable discretion when a deadline is imposed by statute.  *See* S.J. Mem. 23-24.  But the Fourth Circuit has followed the circuits that have disagreed with *Forest Guardians* on this count.  *See Cumberland Cty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d at 56 (applying *In re Barr Labs., Inc.*, 930 F.2d 72 (D.C. Cir. 1991)); *Cobell v. Norton*, 240 F.3d 1081, 1096 & n.4 (D.C. Cir. 2001); *Public Citizen, Inc. v. Mukasey*, 2008 WL 4532540, at *10 (N.D. Cal. 2008) ("In the Ninth

15

Circuit, courts have discretion as to whether or not to compel agency action.").[15]   In fact, no court within the Fourth Circuit has ever cited *Forest Guardians*.[16]   This Court is bound by the Fourth Circuit's decision in *Cumberland County*, which rejected *Forest Guardians* in favor of the discretionary approach of *Barr Laboratories*.

### 2.   The Court Should Exercise Its Discretion to Deny Mandamus

Equitable considerations strongly militate against mandamus in this case.   The consequences for the Nation's nuclear security would be grim.   Outside SRS, disposal at WIPP is the only viable path to disposition that currently exists.   No other location has the capacity, security, and safety arrangements to receive and store a significant amount of defense plutonium in its present form.   Gunter Decl. ¶ 19.   Furthermore, transporting unblended plutonium is a difficult and slow endeavor; it took nine years to consolidate the defense plutonium currently in South Carolina.   *Id.* ¶ 10.   An order requiring Defendants to remove undiluted plutonium for storage only would disrupt and delay the safer WIPP approach and could set the Nation's disposition of weapons-usable plutonium back by many years.   *Id.* ¶¶ 24, 28, 31, 35, 37, 38.   In light of the following obstacles to a storage-only approach, this Court should not issue an injunction.

First, Defendants would have to undertake an extensive packaging campaign at SRS to prepare the undiluted plutonium for transport.   *See id.* ¶¶ 22-28, 32.   This would require shutting down all down-blending operations at SRS.   *Id.* ¶ 24, 32.   It would divert

---

[15] In *Cumberland County*, the plaintiff urged the Fourth Circuit to apply *Forest Guardians* instead of *Barr Laboratories*, *see* Appellant's Br. 18-19, but the Fourth Circuit chose the latter approach.

[16] It is also worth noting that in *Forest Guardians*, the Tenth Circuit did not account for the fact that the APA *explicitly* preserves courts' discretion "to dismiss any action or deny relief on any other appropriate legal or equitable ground."   5 U.S.C. § 702.   Moreover, since *Forest Guardians*, the Supreme Court has clarified that § 706(1) simply "carried forward the traditional [mandamus] practice prior to its passage," which involved ample discretion.   *Norton*, 542 U.S. at 63.

resources away from producing oxide for the MOX feed—one of section 2566's primary goals. *See* 2015 Oak Ridge Report, *supra*, at 5 (discussing the importance of feedstock for the MOX facility). It would expose personnel at SRS to significant levels of radiation while they perform the repackaging activities. *Id.* ¶¶ 25, 27, 29, 33. And it would require Defendants to hire and train new employees, over several years, in order to spread out the radiation doses. *Id.* ¶ 26. The packaging campaign would take multiple years, during which no down-blending could occur and progress on the MOX project would be slowed.

Second, a receiving facility would have to undergo a host of changes. Defendants would have to conduct a number of analyses required of any new construction or facility upgrades. *See, e.g.*, DOE Order 433.1B, Admin. Chg. 1, *Maintenance Management Program for DOE Nuclear Facilities* (4/21/10); DOE Order 420.1C, Chg. 1, *Facility Safety* (12/13/12). Depending on the results of those analyses, construction itself could take multiple years. Gunter Decl. ¶ 20. The workers handling the incoming undiluted plutonium would be exposed to additional radiation. *Id.* ¶ 25-27, 29, 33. In order to manage the increased safety and security risks, the facility would need to adopt a whole range of new procedures to comply with applicable requirements. *Id.* ¶ 21.

Third, shipping itself would pose risks to human health, the environment, and national security. *See* Gunter Decl. ¶¶ 19, 25-27, 29, 33, 34, 36. For those reasons, Defendants' policy has always been to minimize unnecessary shipments. *Id.* ¶ 30, 38; 1997 Record of Decision, at 3020 ("The security risks posed by transportation can be reduced by minimizing the amount of transportation required."). If the Court ordered removal for storage only, Defendants would eventually have to *reship* the defense plutonium again, for pre-WIPP processing, before they could finally ship it to WIPP for

emplacement.  Gunter Decl. ¶¶ 29, 38.  This means Defendants would have to transport the material three times, instead of once.

Thus, an order requiring Defendants to abandon the WIPP approach and initiate a packaging campaign for storage-only shipment would set disposition efforts back by at least a decade.  Instead of continuing progress on disposition *this year* through down-blending at SRS, Defendants would have to wait until sometime in the 2020s or 2030s.  At the same time, removing one ton of defense plutonium from SRS would bring virtually no environmental benefit to surrounding communities, and would instead expose them to "adverse environmental effects from transportation and additional radiation doses received by SRS employees."  *Id.* ¶ 36.

The Court should not order that kind of drastic remedy.  It could take as long as the current removal plan, and would achieve far less.  *See* Gunter Decl. ¶¶ 18, 31, 35.  In the process, it would waste an untold amount of time and resources, it would expose Defendants' employees and the public to unnecessary doses of radiation, and it would prevent Defendants from carrying out their core nuclear security and plutonium disposition missions.  In return, it would bring virtually no environmental benefit for the communities near SRS.  Moreover, this is an issue that already commands the political branches' active attention.  *See* H.R. 4909, Nat'l Defense Auth. Act for Fiscal Year 2017, § 3113, *introduced* Apr. 12, 2016; Exec. Office of the President, *Statement of Administration Policy, H.R. 4909 – Nat'l Defense Auth. Act for Fiscal Year 2017*, at 7, May 16, 2016 ("[T]he [WIPP] alternative to MOX would likely enable the United States to remove plutonium from South Carolina decades sooner than MOX could.").

Courts frequently decline to intervene in such circumstances. The Fourth Circuit has explained that "our 'respect for the autonomy and comparative institutional advantage of the executive branch' must make us mighty 'slow to assume command over an agency's choice of priorities.'" *Cumberland Cty.*, 816 F.3d at 56 (quoting *Barr Laboratories*, 930 F.2d at 74). In refusing intervention, it explained, "we are convinced that the district court acted correctly in leaving treatment to the political branches." *Id.* at 57. The D.C. Circuit described as "exceptionally rare" a case where the court "actually issued an order compelling an agency to press forward with a specific project," which it only did because of "agency concessions" that "the project backed by plaintiff was plainly more 'urgent' than any that the project's acceleration might retard." *Barr Labs.*, 930 F.2d at 76. *See also NRDC*, 966 F.2d at 1300 ("Injunctive relief may be inappropriate where it requires constant supervision. . . . The permitting process will go on for several years. While recognizing the importance of the interests involved, we nevertheless decline to engage in the active management of such a remedy.").

South Carolina has litigated this case as if removing one ton of undiluted weapons-usable plutonium is a simple matter of putting a one-ton barrel on a truck and driving off. *See* Pl.'s Opp. to Mot. for Ext., ECF. 15, at 3 (calling this "really a simple and straightforward case"); S.J. Mem. 25 (devoting one page to its removal claim). It misunderstands the technical and legal demands in play. It has never said where it thinks Defendants should be ordered to ship plutonium, or how that process would take place. It is has put forward no evidence to suggest that an injunction would be either feasible or equitable, and consequently it is not entitled to summary judgment on this claim.

## II. South Carolina Is Not Entitled to Summary Judgment on Its Money Claim

### A. The Money Claim Cannot Be Adjudicated in This Court

As Defendants explained in their Motion to Dismiss, South Carolina may not pursue its monetary claim in this Court, because there is no cause of action or waiver of sovereign immunity under the APA. *See* Mot. to Dismiss 26-27 ("adequate remedy" under 5 U.S.C. § 704); MTD Reply 10-14 (same); Mot. to Dismiss 23-24 ("money damages" under § 702); MTD Reply 15-17 (same); Mot. to Dismiss 24-26 (other statute "impliedly forbids the relief which is sought" under § 702); MTD Reply 14-15 (same). South Carolina cannot clear even one of these hurdles, much less all three. *See Suburban Mortgage Assoc., Inc. v. HUD*, 480 F.3d 1116, 1126 (Fed. Cir. 2007) ("The three limitations function in the disjunctive; the application of any one is enough to deny a district court jurisdiction under the APA.").

South Carolina has argued that its claim does not fall within the Court of Federal Claim's jurisdiction—either because the relief it seeks is actually "declaratory and equitable," MTD Opp. at 22, ECF No. 27, or because Defendants had the ability to avoid the payment, *id.* at 26-27. Both contentions are squarely foreclosed by case law. As to the first, "[a] party may not circumvent the Claims Court's exclusive jurisdiction by framing a Complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States." *Eagle-Picher Industries, Inc. v. United States*, 901 F.2d 1530, 1532 (10th Cir. 1990); *see Consol. Edison Co. of N.Y. v. United States*, 247 F.3d 1378, 1385 (Fed. Cir. 2001) ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims."); *see Brazos*

20

*Elec. Power Co-op., Inc. v. United States*, 144 F.3d 784, 787 (Fed. Cir. 1998) (collecting cases); S.J. Mem. 27 (seeking "payment to the State of the economic and impact assistance"). As to the second, "certain discretionary schemes also support claims within the Court of Federal Claims jurisdiction." *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005). "These include statutes: (1) that provide 'clear standards for paying' money to recipients; (2) that state the 'precise amounts' that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions." *Id.* at 1364-65. All are true here.

This Court therefore lacks authority to adjudicate South Carolina's money claim. Nevertheless, if the Court were to proceed to the merits, the motion should be denied.

### B. Congress Has Not Appropriated Funds for the Assistance Payment for Fiscal Year 2016

Federal agencies may only spend money that Congress has appropriated. U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."); 31 U.S.C. § 1341(a)(1) ("An officer or employee of the United States Government . . . may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation."). All expenditures, therefore, require *both* a substantive provision allowing for payment—an "authorization"—*and* an "appropriation" giving the agency authority to actually obligate the funds. "Congress is free to appropriate less than an amount authorized either in an authorization act or in program legislation." Gov't Accountability Office, Principles of Federal Appropriations Law, at 2-47 (3d ed. 2004)

("Red Book").[17]  Even "[w]here the amount authorized to be appropriated is mandatory rather than discretionary, Congress can still appropriate less," in which case the agency has no authority to spend beyond the appropriated amount.  *Id.* at 2-47.  And "a direction to pay without a designation of the source of funds is not an appropriation."  *Id.* at 2-17.

Section 2566(d)(1) provides for economic and impact assistance payments only "subject to the availability of appropriations."  50 U.S.C. § 2566(d)(1).  This means that assistance payment is only owed if Congress appropriates funds for its payment.  "The courts have agreed that the 'subject to the availability of appropriations' language conditions the Act's entitlement, so that the [payment] intended by the Act must be reduced where Congress has clearly appropriated insufficient funds to meet them in full."  Red Book at 2-50; *see also id.* (citing cases); *accord* Gov't Accountability Office, Principles of Federal Appropriations Law, Annual Update of the Third Edition, at 2-13 (Mar. 2015) (confirming that "the 'subject to the availability of appropriations' language conditions the Act's entitlement").  As the D.C. Circuit has explained, the phrase "subject to appropriations" "expressly limits DOE's authority to make expenditures . . . to the amounts later appropriated by Congress."  *Nevada v. Dep't of Energy*, 400 F.3d 9, 133-34 (D.C. Cir. 2005) (quotation marks omitted); *see id.* at 134 (holding slight terminological variation irrelevant, because "'subject to appropriations' means just that—subject to appropriations").  Thus, section 2566(d)(1)'s requirements only arise when Congress later appropriates money for that purpose.

---

[17] Courts uniformly "give special weight to" the Government Accountability Office's views, because of its "accumulated experience and expertise in the field of government appropriations." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quotation marks omitted).  *Accord Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 286 & nn.1 & 3 (4th Cir. 2002).

Congress has not appropriated funds for paying the assistance payment. In the most recent appropriations statute, *see* Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, div. D, tit. III, Dec. 18, 2015 ("2016 CAA"), Ex. 5, Congress did not include any budget line for economic and impact assistance. Nor did it include any budget line for generally carrying out the purposes of 50 U.S.C. § 2566—a common type of lump-sum appropriations language. *See, e.g.*, Dep't of Interior and Related Agencies Appropriations Act, 2003, Pub. L. No. 108-7, 117 Stat. 11, 216, 218 (Feb. 20, 2003) ("For expenses necessary to implement the Act of October 20, 1976 . . . ."). Nor did it even include any budget line for more broadly carrying out the atomic energy defense activities within Title 50. As a careful read of the operative statutory language makes clear, no appropriations account is legally available for making assistance payments in FY 2016.

The 2016 CAA specifies in some detail how all of Defendants' funding must be spent.[18] Section 301(d) restricts the overall appropriations by requiring that "the amounts made available by this title shall be expended as authorized by law for the programs, projects, and activities specified in the . . . 'Department of Energy' table . . . in the explanatory statement described in section 4." 2016 CAA, 129 Stat. 2417, Ex. 5. Section 4 of the CAA, in turn, references an "explanatory statement regarding this Act, printed in the House of Representatives section of the Congressional Record on or about December 17, 2015." *Id.* at 3; *see* Explanatory Statement, 114 Cong. Rec. 161, H10102-H10107, Ex. 7. In other words, according to the text of the enacted statute, the Department's

---

[18] As the Red Book explains, appropriations' "purposes are stated with varying degrees of specificity." Red Book at 4-09 to 4-10; *see generally id.* at 4-09 to 4-19.

appropriations can only be expended as provided in the CAA's explanatory table.[19]  *See* Explanatory Table, 144 Cong. Rec. 161, H10108-10123 (daily ed. Dec. 17, 2015), Ex. 6.

All of Defendants' expenditures must be tied to one of the explanatory table's budget lines—which the statute references using the term of art "program, project, or activity."[20]  *See* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").  "Where an appropriation specifies the purpose for which the funds are to be used, 31 U.S.C. § 1301(a) applies in its purest form to restrict the use of the funds to the specified purpose." Red Book at 4-11; *see id.* at 4-11 to 4-14 (listing examples).  While the CAA allows for reprogramming within appropriation accounts,[21] *see* 2016 CAA § 301(e), reprogramming cannot be used to "create[], initiate[], or eliminate a program project, or activity," *id.* § 301(f)(1); that is, the Department can shift funds between lines, but it cannot create new ones.[22]  And for an expense to be chargeable to a budget line, the expenditure must either be described by the line itself, or else fall within the "necessary expense" doctrine, which

---

[19] Congress has funded the Department of Energy using this type of limitation since 2012.  *See* Consolidation Appropriations Act of 2012, Pub. L. No. 112-74, div. B, tit. III, § 301, 125 Stat. 786, 875 (2011).

[20] *See* Explanatory Statement, 114 Cong. Rec. 161, H10056 ("The term 'program, project, or activity' shall include the most specific level of budget items identified in the Energy and Water Development Appropriations Act, 2016 and the explanatory statement accompanying the Act."). In table, each appropriations account is divided into individual "programs, projects, and activities."  *See id.* ("Funds for the individual programs and activities within the accounts in this Act are displayed in the detailed table at the end of the explanatory statement for this Act.").

[21] "Reprogramming" means shifting funds between the budget lines within an appropriation account.  Red Book at 2-30 (emphasis in original).  Section 301(d), (e), and (f) serve to *restrict* reprogramming authority, for which ordinarily "no statutory authority is necessary." *Id.*

[22] The statute also allows the Secretary of Energy to waive funding restrictions in circumstances not at issue in this case: "if compliance with such requirement or restriction would pose a substantial risk to human health, the environment, welfare, or national security."  2016 CAA, § 301(g)(1).

24

gives agencies some leeway to charge budget lines for expenses that "make a direct contribution to carrying out" the budget line's purpose.  Red Book at 4-21.[23]  An expenditure's necessity is gauged by "the extent to which it will contribute to accomplishing the purposes of the appropriation the agency wishes to charge."  *Id.* 4-22.

The assistance payment does not satisfy that standard for any of the budget lines in the explanatory table.  No line directly references assistance payments or the general purposes of section 2566.  Nor would the assistance payment "contribute to accomplishing the purposes" of any budget lines in the 2016 CAA.  South Carolina identifies the only two budget lines that could conceivably relate to the assistance payment: "Material Management and Minimization" and the line for constructing the MOX facility.  S.J. Mem. 29.  The MOX facility funds, which appear in one budget line only, cannot be used for assistance payments, because the 2016 NDAA provides that they "shall be available only for construction and for project support activities."  2016 NDAA § 3119.[24]  South Carolina concedes as much.  *See* S.J. Mem. 30-31.

The heading for Material Management and Minimization contains three budget lines: "HEU reactor conversion," "Nuclear material removal," and "Material disposition." 114 Cong. Rec. 161, H10117.  It does not contain a line for assistance payments, or for any other "program, project, or activity" in which assistance payments might logically fall.  And it is hard to see how the assistance payment could "make a direct contribution

---

[23] The necessary expense doctrine was developed by the GAO in recognition of the fact that "[t]he spending agency has reasonable discretion in determining how to carry out the objects of the appropriation."  Red Book at 4-20.  *See generally id.* at 4-19 to 4-27 (explaining the doctrine).

[24] "Project support activities" include "engineering, procurement, quality and project management resources."  Dep't of Energy, 1 FY 2016 Cong. Budget Request, Nat'l Nuclear Sec. Admin., at 545 (2015); *see* S. Rep. No. 114-54, at 102 (2015) (adopting the Department's budget request for the MOX project); H.R. Rep. No. 114-91, at 122-23 (2015) (same).

to carrying out" any of the three budget lines.  Red Book at 4-21.  Assistance payments would not contribute to removing any nuclear material; indeed, they would impede such removal by virtually exhausting the $114 million appropriated for that purpose.[25]  The same goes for material disposition, which is not advanced in any conceivable way by the assistance payment, and whose entire $82.6 million allocation would be exhausted by it.  Put simply, these lines are implausibly cryptic places for Congress to have appropriated assistance payment funds.  *See* Red Book 4-11 to 14 (collecting examples to demonstrate how close the connection must be between an expenditure and the text of a budget line).

South Carolina also points to the headline appropriation for Defense Nuclear Nonproliferation.  *See* S.J. Mem. 29; Compl. ¶ 109.  The Department was indeed appropriated $1.9 billion for Defense Nuclear Nonproliferation activities.  But that, of course, does not mean that those funds are unrestricted, as South Carolina asserts.  *See* S.J. Mem. 29, 31.  Just the opposite.  Those funds "shall be expended" according to the detailed chart in the explanatory statement.  *See* 2016 CAA, § 301(d).  South Carolina makes no mention of this chart, or its incorporation into the operative statutory text. Instead, it baldly asserts that "Congress largely left it to the Secretary and DOE's discretion as to how to use and spend the amounts within the 'Defense Nuclear Nonproliferation' appropriation account to meet DOE's obligations."  S.J. Mem. 29.  If that were true, the entire chart, along with the specific provisions for reprogramming and waiver (among others), *see* 2016 CAA, § 301(e), (f), (g), would be rendered inoperative.

---

[25] The description for "nuclear material removal" in the Department's budget request makes clear what Congress understood itself to be funding: "identify[ing] and eliminat[ing] excess HEU and plutonium, including removing and/or disposing of 225 kilograms of material from Kazakhstan, Argentina, Canada, Germany, Switzerland, Poland, and possibly Ghana." Dep't of Energy, *FY 2016 Congressional Budget Request*, at 551, DOE/CF-0107 (Feb. 2015), *available at* http://energy.gov/sites/prod/files/2015/02/f19/FY2016BudgetVolume1_1.pdf.

Congress does not enact inoperative statutory text, and appropriations statutes are no exception. *See, e.g.*, Red Book at 2-87 to 2-88 ("Words in a statute will not be treated as 'utterly without effect.'") (quoting *Plaut v. Spendthrift Farm*, 514 U.S. 211, 216 (1995)).[26]

The Department's funding thus comes with specific instructions, and none of those instructions even arguably include the assistance payment. Congress has "circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statutes." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). As a result, even if this Court had authority to adjudicate this claim—which it does not—it could not order payment. Congress made the assistance payment "subject to the availability of appropriations," 50 U.S.C. § 2566(d)(1), and Congress chose not to appropriate any money for it in FY 2016. Congress is, of course, free to appropriate such funds moving forward.

### C.  South Carolina Is Not Entitled to Payment from the Judgment Fund

Because the appropriations caveat in section 2566(d)(1) "conditions the Act's entitlement" itself, Red Book at 2-50, South Carolina cannot be paid any assistance payments for 2016. And where a plaintiff is not entitled to payment in the first place, it cannot recover anything from the Judgment Fund. *See* 31 U.S.C. § 1304.

The Supreme Court's decision in *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181 (2012), is not to the contrary. There, the substantive statute at issue explicitly

---

[26] The same reasoning applies to the $12.5 billion in cumulative appropriations for "Atomic Energy Defense," which encompasses the Defense Nuclear Nonproliferation appropriation; South Carolina incorrectly implies that this entire amount is unrestricted. *See* S.J. Mem. 29, 31. To the contrary, that amount is divided into separate appropriations accounts, none of which has anything to do with assistance payments. *See, e.g.*, 2016 CAA, div. D, tit. III, at 171 ("Weapons Activities," "Naval Reactors," "Federal Salaries and Expenses"). The only account that could plausibly be used for assistance payments is Defense Nuclear Nonproliferation, and, for the reasons given above, those funds are not legally available for assistance payments.

provided that contractors could seek payment from the Judgment Fund.  *See id.* at 2193-94 (citing 25 U.S.C. § 450m-1; 41 U.S.C. § 7108(a)).  Section 2566 contains no such provision.

More fundamentally, *Ramah* involved a contract claim for which Congress *had* "appropriate[d] adequate legally unrestricted funds to pay the contracts at issue."  *Id.* at 2189; *see id.* at 2187 ("During each relevant FY, Congress appropriated sufficient funds to pay in full any individual tribal contractor's contract support costs.").  Congress had required the Secretary of the Interior to pay contract support costs for tribal self-determination contracts.  *Id.* at 2187 (citing 25 U.S.C. § 450).  It also specifically appropriated funds "for payments to tribes and tribal organizations for contract support costs."  *Id.* (quoting Department of the Interior and Related Agencies Appropriations Act for 2001, Pub. L. No. 106-291, 113 Stat. 1501A-148, Oct. 11, 2000).  The Court held that because "the funds appropriated by Congress were legally available to pay any individual tribal contractor in full," the "subject to the availability of appropriations" condition "was satisfied" and the government could not "back out of its contractual promises to pay each Tribe's full contract support costs."  *Id.* at 2191.  Here, by contrast, *none* of the Department's appropriations are "legally available to pay any" assistance payments.  *Id.* Congress has appropriated *no* funds for that purpose.  In *Ramah*, the payment obligation explicitly depended on there being an available appropriation sufficient to pay the contract in question.  The Court never suggested that the same obligation would have existed *without* an available appropriation.  That would have eviscerated the "subject to the availability of appropriations" condition.[27]

---

[27] The Court's decision in *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005), is inapposite for the same reason.  There, too, Congress had appropriated funds "'to carry out,' *inter*

Lower courts have subsequently understood *Ramah*'s holding as limited to its unique contractual circumstances. *See Prairie Cty. v. United States*, 113 Fed. Cl. 194, 202 (2013) ("[T]he contractual relationship between the tribes and the United States in *Ramah* was fundamental to the Supreme Court's decision."); *id.* at 200-01 (analyzing *Ramah*), *aff'd*, *Prairie Cty. v. United States*, 782 F.3d 685, 689-90 (Fed. Cir. 2015); *id.* at 688 ("We agree with the Claims Court" in its interpretation of *Ramah*.). Indeed, the "well-established principles of Government contracting law" that underlay *Cherokee Nation* "dictate[d] the result in" *Ramah* as well. *Ramah*, 132 S. Ct. at 2189, 2190. Those principles—namely, that the government must pay contractual obligations for which there are legally available appropriations—have no purchase in the present case.

### III. South Carolina Is Not Entitled to An Injunction Barring Future Transfers of Defense Plutonium to SRS

In its Memorandum in support its Motion for Summary Judgment, South Carolina argues two claims: removal and payment. *See* S.J. Mem. i (table of contents), 22-31 (entirety of "argument" section). Neither the background section, nor either of the argument sections, mention any other duties or claims. However, on the very last page, in the conclusion section, South Carolina requests an additional form of relief: "order the Defendants not to move or transfer any plutonium to South Carolina, regardless of origin." *Id.* at 32 ¶ 4. The Memorandum says nothing more. It does not even identify the statutory provision upon which such an order would be based.

---

*alia,* 'the Indian Self-Determination Act," which were explicitly available "for contract support costs." *Id.* at 2187. The Court held that "'as long as Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue,' the Government's promise to pay was binding." *Ramah*, 132 S. Ct. at 2189 (quoting *Cherokee Nation*, 543 U.S. at 637-38). Here, by contrast, Congress has *not* appropriated funds for the assistance payment, and there are *no* legally unrestricted funds available to pay them. The Court's "conclusion in *Cherokee Nation* followed directly from well-established principles of Government contracting law." *Ramah*, 132 S. Ct. at 2189. Here, contractual obligations are not at issue.

This claim is not properly before the Court on summary judgment. Even if it were, South Carolina lacks standing for this claim, which in any event is meritless.

### A. This Claim Is Not Before the Court

The Memorandum contains no argument to support a total bar on future shipments to SRS. A one-sentence request for relief is not enough to preserve a claim. The Court should dismiss this claim on those grounds. *See, e.g.*, *Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F.3d 244, 250 (1st Cir. 2012) ("To the extent that the appellants had any argument, it is waived by 'perfunctory' treatment."); *Hemingway v. Speights*, 2009 WL 302319, at *2 (D.S.C. Feb. 6, 2009) ("Parties should properly plead their claims and fully advance their arguments, at all stages of litigation, unless they are prepared to waive them."); *Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354, 359 (D. Maryland 2008) ("An underdeveloped argument, or argument not raised at all, is a waived argument.") (quotation marks omitted).

South Carolina's only explanation for its request has come in two filings *after* its summary judgment motion: its Opposition to Defendants' Motion to Dismiss, *see* ECF No. 27, at 34 n.19, and its Opposition to Defendants' Motion for Stay, *see* ECF No. 35, at 5-6. Even there, South Carolina's explanation was perfunctory and incomplete: it argued that section 2566*(c)* imposes a suspension obligation because that provision is generally concerned with removing plutonium from South Carolina; it never addressed the fact that section 2566(c) does not mention suspension, or that neighboring provisions do. Such austere explanation, in footnotes of other briefs opposing other motions, is no way to raise any claim, much less one that would halt one of the United States' major international nuclear non-proliferation efforts. *See* Hanlon Decl. ¶¶ 3, 7-11, Ex. 8

("[T]he Gap Material Removal program" safeguards plutonium "from civilian sites around the world that could be used by terrorists to make an improvised nuclear device."); 50 U.S.C. § 2569(a)(1); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.").

### B.  Even If Properly Raised, South Carolina Lacks Standing for this Claim

Even if South Carolina had argued for suspension in its Memorandum, it would lack standing for this claim.  Defendants' Motion to Dismiss explains why, and those arguments are incorporated here.  *See* Mot. to Dismiss 27-28; MTD Reply 17-18.  In brief, a plaintiff must establish standing at every stage of litigation, with the requisite level of proof required at that stage.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  In its pleadings, a plaintiff must allege facts sufficient to demonstrate an injury-in-fact caused by the complained-of conduct and redressable by a court.  South Carolina's Complaint pled no facts related to future shipments.  In moving for summary judgment, a plaintiff must "must 'set forth' by affidavit or other evidence 'specific facts'" demonstrating its injury.  *Id.* at 561 (quoting Fed. R. Civ. P. 56(e)).  South Carolina has not.  Its summary judgment Memorandum contains one sentence on the matter, along with a citation to an Environmental Assessment from several months earlier about potential future shipments under the Gap Plutonium Program.  *See* S.J. Mem. 25 n.58. South Carolina put forward no evidence about whether such a shipment was ever undertaken, or whether it remains pending.  At any rate, no shipments are scheduled to

occur in the next two years.  *See* Hanlon Decl. ¶ 6, 10, 11.  South Carolina therefore lacks Article III standing for this claim.[28]

### C.  Even If South Carolina Had Standing, Its Suspension Claim Is Meritless

In any case, section 2566(c) does not require any suspension beyond the ones imposed by sections 2566(b)(4) and (5).  *See* MTD Reply 18 n.7.  For one thing, section 2566(c) does not contain the words "shipment," "suspend," "suspension," or any other text to support the interpretation South Carolina suggests.  Section 2566(c)(1), on which this claim is apparently based, only mentions the *removal* of defense plutonium.

For another, the structure of the statute precludes reading a silent suspension requirement into section 2566(c).  In section 2566(b), Congress explicitly spoke to the suspension of further shipments in the event of delays.  It limited those suspensions to shipments of defense plutonium "to be processed" by the MOX facility—in other words, shipments under the MOX program.  50 U.S.C. § 2566(b)(4), (5).  There was a clear reason for this: SRS supports other plutonium-related programs, and Congress did not intend for a delay in the MOX program to affect completely separate programs, like the Gap Material Removal program.  *See* Hanlon Decl. ¶ 3, 6, 7-11 (describing the program); 50 U.S.C. § 2569(a)(1) (describing the program as a "top priority" for national security). When Congress has spoken to an issue in a statute, a court cannot impose additional requirements that Congress saw fit to omit.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001) ("Congress implicitly excluded a general discovery rule by explicitly including a more limited one."); *United States v. Brockamp*, 519 U.S. 347, 352 (1997) ("Congress did not intend courts to read other unmentioned, open-ended, 'equitable' exceptions into

---

[28] This claim also fails for the reasons stated in the Motion to Dismiss and *Aiken County v. Bodman*, 509 F. Supp. 2d 548 (D.S.C. 2007): it is not ripe for review, and South Carolina has not challenged "final agency action," 5 U.S.C. § 704.  *See* Mot. to Dismiss 28-29.

the statute that it wrote."); *Reyes-Gaona v. North Carolina Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001) ("[W]here a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded."). The suspension South Carolina seeks would in fact contradict sections 2566(b)(4) and (5), which explicitly permit further shipments after the requisite certification.  Under South Carolina's interpretation, that permission would evaporate in the event that removal under section 2566(c) was delayed.  Thus, both the text and structure of the statute preclude South Carolina's novel and unexplained reading of the statute.

## IV. Section 2566(d) Does Not Impose Any Removal Requirements

In its Complaint, South Carolina asserted that section 2566(d) imposes one duty on Defendants—the payment of economic and impact assistance.  *See* Compl. ¶ 112, Prayer for Relief ¶¶ C, D.  In its Memorandum, however, it adds a brand new claim, that *in addition* to the assistance payment, section 2566(d) requires the yearly removal of one ton of defense plutonium.  S.J. Mem. 26-27.  A plaintiff may not raise new claims for the first time in a motion for summary judgment.  *See, e.g.*, *Maryland v. Dep't of Veterans Affairs*, 130 F. Supp. 3d 342, 355-56 (D.D.C. 2015) ("Only those claims in the operative complaint are before the Court."); *Bradley v. U.S. Foods, Inc.*, 2015 WL 5158731, at *28 n.23 (D.S.C. 2015) ("[P]laintiff could not raise claims for first time in summary judgment briefing.") (quoting *Cricket Store 17, LLC v. City of Columbia*, 2015 WL 1499399, at *23 (D.S.C. 2015)); *Horton v. Donley*, 2009 WL 2782226, at *10 (D.S.C. 2009) (refusing to consider claim raised for the first time in a motion for summary judgment).  This claim is therefore not before the Court.  Even if it were, South Carolina has repeatedly conceded the claim's lack of merit by admitting that section 2566(d) imposes no removal

obligation—not just in its Complaint, but also in its Opposition to Defendants' Motion to Dismiss. *See* Opp. 3, 13; Compl. ¶ 112, Prayer for Relief ¶¶ C, D; *Dep't of Treasury v. FLRA*, 88 F.3d 1279 (Table) (D.C. Cir. 1996) (rejecting an "argument" for being "self-contradictory"); *Bady v. Sullivan*, 1992 WL 332307, *2 (N.D. Ill. 1992) ("[P]laintiff waived her CPI argument by virtue of her subsequent self-contradictions.").

Even if the claim were not waived by its absence from the pleadings, or from South Carolina's serial concessions against it, the claim would be waived for lack of explanation. In its Memorandum, South Carolina repeats this claim precisely seven times—each time without no explanation whatsoever. *See* S.J. Mem. 1, 11 n.33, 26 & n.59, 27, 31, 32. Such bare assertions are not enough to preserve this claim, for the same reasons that South Carolina's suspension claim was not preserved. *See infra* Part III.A.

Finally, this claim fails on the merits. Section 2566(d)(1) does not purport to impose any removal obligation, only a payment obligation that can be negated by removal.[29] The provision cannot plausibly be read to require *both* payment and removal, whether in isolation or in the context of the broader statutory scheme. And no other provision within section 2566 supports an atextual yearly removal requirement. South Carolina has not explained this claim, so no further response is possible. Any argument it advances for the first time in its Reply—to which Defendants will not have had an opportunity to respond—should be disregarded.

---

[29] Section 2566(d)(1) lists *two* conditions that can cut off the assistance payment: meeting the MOX production objective, *id.* § 2566(d)(1)(A), and removing one ton of defense plutonium, *id.* § 2566(d)(1)(B). South Carolina has never claimed—and could not plausibly—that section 2566(d)(1) requires Defendants to achieve the MOX production objective every year between now and 2021, in addition to paying the assistance payment. But surely the second condition (§ 2566(d)(1)(B)) cannot be any more obligatory than the first (§ 2566(d)(1)(A)).

### V.  South Carolina Lacks Standing to Seek Relief as to Future Years

In the conclusion of its Memorandum, South Carolina asks the Court to "retain continuing jurisdiction over this matter" in order to provide relief under section 2566(d) in future years.  S.J. Mem. 32.  As the Motion to Dismiss explained, South Carolina lacks standing to seek relief in future years, based on injuries that may or may not occur.  *See* MTD 29-30; MTD Reply 19-20.  While courts sometimes retain jurisdiction to ensure compliance with orders they have already issued, they do not retain jurisdiction—as South Carolina requests—to wait and see whether a statute is violated years in the future. "[S]peculation about possible future delays . . . is simply not ripe for adjudication." *Alamgir v. Napolitano*, 2010 WL 2723209, at *7 (W.D. Pa. July 8, 2010).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks omitted).  In each year from 2017 to 2021, South Carolina's right to relief will depend on the state of the MOX project, the state of removal efforts, and "the availability of appropriations."  50 U.S.C. § 2566(d).  There is "no legal precedent that would support judicial intervention under § 706(1) prior to an agency's deadline to take action"—especially not *multiple years* prior to any such deadline.  *N.Y. Statewide Senior Action Council v. Leavitt*, 409 F. Supp. 2d 325, 330 (S.D.N.Y. 2005).

### CONCLUSION

For the foregoing reasons, this Court should deny summary judgment.

Respectfully submitted,

BENJAMIN C. MIZER
Assistant Attorney General
Civil Division

ERIC WOMACK
Assistant Director
Federal Programs Branch

RAPHAEL O. GOMEZ
(D.C. Bar #305540)
Senior Trial Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-1318
Facsimile: (202) 616-8460
raphael.gomez@usdoj.gov

WILLIAM N. NETTLES
United States Attorney

By:     */s/ Barbara M. Bowens*
BARBARA M. BOWENS (#4004)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201
Telephone: (803) 929-3000

SPENCER E. AMDUR
(Pennsylvania Bar #322007)
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 616-7420
Facsimile: (202) 616-8460
spencer.amdur@usdoj.gov

June 10, 2016                    *Attorneys for Defendants*