**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | | |
|---|---|---|
| State of South Carolina, | ) | Civil Action No. 1:16-cv-00391-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| United States; | ) | |
| | ) | |
| United States Department of Energy; | ) | |
| | ) | |
| Rick Perry, *in his official capacity as Secretary of Energy*;[1] | ) | |
| | ) | |
| National Nuclear Security Administration; *and* | ) | |
| | ) | |
| Lt. General Frank G. Klotz, *in his official capacity as Administrator of the National Nuclear Security Administration and Undersecretary for Nuclear Security*, | ) | |
| | ) | |
| Defendants. | ) | |

The State of South Carolina ("the State") filed a complaint alleging that Defendants United States, the United States Department of Energy ("DOE"), the Secretary of Energy, the National Nuclear Security Administration ("NNSA"), and the Administrator of NNSA (collectively "Defendants") failed to adhere to statutory obligations within 50 U.S.C. § 2566. (ECF No. 1.) This matter is before the court again[2] pursuant to Defendants' motion to dismiss the State's complaint.

---

[1] Rick Perry became the Secretary of Energy on March 2, 2017. Pursuant to Fed. R. Civ. P. 25(d), Rick Perry is substituted for former Secretary Dr. Ernest Moniz as a Defendant in this lawsuit.

[2] As explained below, the court previously considered several aspects of the motion to dismiss, resulting in an order directing supplemental briefing (*see* ECF No. 56), which may be found at *South Carolina v. United States*, ___ F. Supp. 3d ___, 2016 WL 7191567 (D.S.C. 2016). The State moved for reconsideration of that order, which the court denied in another order (ECF No. 75), which may be found at *South Carolina v. United States*, ___ F. Supp. 3d ___, 2017 WL 491694

(ECF No. 17). For the reasons that follow, the court **GRANTS** the motion **IN PART** and **DENIES** it **IN PART**.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

At the end of the Cold War, the United States and Russia engaged in efforts to consolidate and reduce their surplus weapons-usable plutonium ("defense plutonium," *see* 50 U.S.C. § 2566(h)(3)) and jointly developed plans to prevent the proliferation of nuclear weapons. (ECF No. 1 at 8.) In September 2000, the United States and Russia entered into the Plutonium Management and Disposition Agreement ("PMDA"), under which each country is committed to disposing of at least 34 metric tons of defense plutonium withdrawn from their respective nuclear weapons program. (ECF No. 1 at 11); *see Aiken Cnty. v. Bodman*, 509 F. Supp. 2d 548, 550 (D.S.C. 2007). While non-proliferation discussions were underway, DOE, over a number of years, evaluated dozens of options for disposing of the United States' surplus defense plutonium. (ECF No. 1 at 9.) Ultimately, DOE designated as its "preferred alternative" a dual-path strategy: DOE would immobilize a portion of the defense plutonium within glass or ceramic materials and would convert the other portion into mixed-oxide ("MOX") fuel, which would be used as fuel for commercial nuclear reactors. (*Id.* at 9-11.)

Producing MOX fuel from defense plutonium required the construction of a facility to fabricate the fuel, and, in early 2000, DOE chose to construct a MOX fabrication facility ("MOX Facility") at the Savannah River Site ("SRS"). (*Id.* at 10-11); *see* 50 U.S.C. § 2566(h)(2). SRS

---

(D.S.C. 2017). Following the filing of the supplemental briefs, the court entered an order granting in part the motion to dismiss and dismissing the State's third cause of action without prejudice to the State's ability to file an original action in the Court of Federal Claims ("CFC") and raise the issue there (ECF No. 76.) In the dismissal order, the court noted that it had yet to address the grounds presented by Defendants for dismissing the first and second causes of action in the State's complaint. (*See id.* at 3 n.1.)

encompasses 310 square miles in western South Carolina, adjacent to the Savannah River, which forms much of the border between South Carolina and Georgia. (ECF No. 1 at 2.) When constructed in the 1950s, SRS produced materials, primarily plutonium, for weapons and other national defense missions. (*Id.* at 7.) Currently, aside from serving as the location for the MOX Facility, SRS also is dedicated to conducting research and development and storing plutonium and uranium waste from around the world. (*Id.* at 7-10.)

In late 2002, Congress enacted, and the President signed into law, the Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, 116 Stat. 2458 (2002), relevant parts of which are now codified at 50 U.S.C. § 2566. As later amended, § 2566, entitled, "Disposition of Weapons-Usable Plutonium at Savannah River Site," provides a detailed plan for the MOX Facility, including the requirement that the Secretary of Energy submit to Congress, by a certain date, a plan for the construction and operation of the MOX Facility. 50 U.S.C. § 2566(a). Starting in 2004, the Secretary also must submit to Congress an annual report assessing the United States' progress toward meeting its obligations under the PMDA and "whether the MOX production objective has been met." *Id.* The MOX production objective is defined as the average rate at which the MOX Facility converts defense plutonium into MOX fuel over a given period of time, but may not be less than the equivalent of producing one metric ton of MOX fuel per year. 50 U.S.C. § 2566(h)(2).

In the event that the MOX production objective is not achieved as of January 1, 2014, subsection (c)(1) states that "the Secretary shall . . . remove" from South Carolina "not less than [one] metric ton of defense plutonium" by January 1, 2016. Furthermore, if the MOX production objective is not achieved by January 1, 2014, subsection (c)(2) states that "the Secretary shall . . . not later than January 1, 2022, remove an amount of defense plutonium . . . equal to the amount

transferred to [SRS] between April 15, 2002, and January 1, 2022," that was "not processed by the MOX facility." 50 U.S.C. § 2566(c). The statute states that the removal of the defense plutonium is to be consistent with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and other applicable laws. *Id.*

Subsection (d)(1) provides for financial and economic assistance payments to the State in the years 2016 through 2021 in the event that the MOX production objective is not achieved by January 1, 2016:

> If the MOX production objective is not achieved as of January 1, 2016, the Secretary shall, subject to the availability of appropriations, pay to the State of South Carolina each year beginning on or after that date through 2021 for economic and impact assistance an amount equal to $1,000,000 per day, not to exceed $100,000,000 per year, until the later of—
>
> (A) the date on which the MOX production objective is achieved in such year; or
>
> (B) the date on which the Secretary has removed from the State of South Carolina in such year at least [one] metric ton of defense plutonium or defense plutonium materials.

50 U.S.C. § 2566(d)(1).

Subsection (d)(2) provides for economic and impact assistance payments in the years following 2021:

> If, as of January 1, 2022, the MOX facility has not processed mixed-oxide fuel from defense plutonium and defense plutonium materials in the amount of not less than—
>
> (i) one metric ton, in each of any two consecutive calendar years; and
>
> (ii) three metric tons total,
>
> the Secretary shall, from funds available to the Secretary, pay to the State of South Carolina for economic and impact assistance an amount equal to $1,000,000 per day, not to exceed $100,000,000 per year, until the removal by the Secretary from the State of South Carolina of an amount of defense plutonium or defense plutonium materials equal to the amount of defense

> plutonium or defense plutonium materials transferred to the Savannah River Site between April 15, 2002, and January 1, 2022, but not processed by the MOX facility.

50 U.S.C. § 2566(d)(2)(A).

The State filed its complaint on February 9, 2016, alleging that Defendants had not yet completed construction of the MOX Facility at SRS, and had not met the MOX production objective by January 1, 2014, or January 1, 2016. (ECF No. 1 at 24, 27.) The State also alleges that Defendants failed to remove plutonium from South Carolina pursuant to § 2566(c)(1) and failed to make economic and impact assistance payments pursuant to § 2566(d)(1). (*Id.* at 25, 27-28.)

The State's complaint included three causes of action. In the first cause of action, the State alleges that "Defendants have failed to meet the mandatory statutory obligations under [§] 2566 and in doing so have affirmatively undermined the [project to construct the MOX Facility and achieve the MOX production objective] and therefore failed to faithfully execute the laws enacted by Congress and by which the President and these executive Defendants are bound." (*Id.* at 26.) Based on this allegation, the State asserts that it is "entitled to a declaration and order that Defendants' action and inactions violate the Constitution and requiring [Defendants] to comply with the requirements of [§] 2566." (*Id.*) In the second cause of action, the State alleges that Defendants have unlawfully withheld a non-discretionary, mandatory duty and obligation to the State, and it seeks an order enjoining and requiring Defendants to remove from South Carolina one metric ton of defense plutonium pursuant to § 2566(c) and preventing Defendants from transferring additional defense plutonium to SRS. (*Id.* at 27-28, 31-32.) In the third cause of action, which has since been dismissed, the State alleged that Defendants unlawfully withheld a non-discretionary, mandatory duty and obligation to the State, and it sought an order enjoining and requiring Defendants to pay the State the economic and impact assistance amount and to remove

an additional one metric ton of defense plutonium from South Carolina, pursuant to § 2566(d). (*Id.* at 31-32.)

On April 25, 2016, Defendants filed the instant motion to dismiss the complaint, raising a number of arguments. (ECF No. 17.) Defendants asserted that the court lacked subject-matter jurisdiction over the third cause of action because they had not waived sovereign immunity with respect to that cause of action except for a suit brought in the CFC, pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*, and the Tucker Act, 28 U.S.C. §§ 1346, 1491. (*See id.* at 30-34.) Defendants also asserted that the State could not meet the constitutional standing requirements with respect to several forms of relief sought as remedies for the injury alleged in the second cause of action. (*Id.* at 34-38.) Aside from jurisdictional reasons, Defendants also seek dismissal of the State's first and second causes of action, pursuant to Rule 12(b)(6), on the ground that they fail to state a claim for which relief may be granted. (*See id.* at 20-30.) Regarding the first cause of action, Defendants contend that it does not allege sufficient factual matter to survive a Rule 12(b)(6) motion because it fails to specify which of Defendants' actions and inactions constituted violations of § 2566 and which provisions of § 2566 were violated. (*See id.* at 20-21 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).) They also contend, among other things, that under no circumstance would the court reach the constitutional claim: if the State prevailed on its statutory claims, adjudicating the constitutional claim would be unnecessary, and, if the State did not prevail on its statutory claim, it could not prevail on it constitutional claim. (*See id.* at 21-22.) Regarding the second cause of action, Defendants argue that § 2566(c)(1) imposes no duty to remove defense plutonium from South Carolina that is enforceable by the court. (*See id.* at 22-30.) Instead, Defendants assert that § 2566(c), which states that the Secretary shall remove defense plutonium if, among other things, the MOX production objective is not met by January 1, 2014,

only imposes goals for MOX fuel production and defense plutonium removal and that § 2566(d), which in effect permits Defendants to choose between removing defense plutonium and making economic impact and assistance payments, provides the only enforcement mechanisms for the goals set forth in subsection (c) and is the only provision to which the State may turn for relief. (*See id.*) For this reason, Defendants argue, the second cause of action—seeking to enforce subsection (c)'s removal provision—fails to state a claim for which the court could grant relief. (*See id.*)

In response to the jurisdictional arguments raised in the motion to dismiss, the State argued that, under the Tucker Act, the CFC could not provide adequate relief for its third cause of action and that therefore Defendants had waived sovereign immunity for that cause of action under the APA. (*See* ECF No. 27 at 27-39.) The State also argued that it met the constitutional standing requirements to bring its second cause of action. (*See id.* at 39-42.) Aside from the jurisdictional issues, the State also argues that its first cause of action is not subject to dismissal under Rule 12(b)(6) because the complaint sufficiently sets forth the statutory provisions that Defendants are alleged to have violated (*see id.* at 36-37) and because the cause of action "provides a supplemental basis for other causes of action, all of which collectively seek the same declaratory and injunctive relief" (*id.* at 36). As for the second cause of action, the State argues that the plain language, legislative history, and purpose behind § 2566 demonstrate that subsection (c) imposes a nondiscretionary obligation on Defendants, not a mere goal, to remove one metric ton of defense plutonium from South Carolina; that subsection (c) operates independently of subsection (d), such that subsection (d) does not operate as an enforcement mechanism for subsection (c); and that, therefore, the second cause of action states a claim for which the court could grant relief, pursuant to the APA, to compel agency action unlawfully withheld. (*See id.* at 11-27.)

Recognizing its obligation to address questions concerning its subject-matter jurisdiction, the court elected to assess the portions of the motion to dismiss implicating subject-matter jurisdiction before assessing the portions raising arguments pursuant to Rule 12(b)(6). (*See* ECF No. 56 at 24-31; ECF No. 76.) Ultimately, the court concluded that, although it lacked jurisdiction over the third cause of action, it had jurisdiction over the second cause of action and that the State had met the standing requirements with respect to the second cause of action. (*See* ECF Nos. 56, 76, 77.) The court declined to address the remaining arguments raised in the motion to dismiss until after it decided, with the parties' input, the appropriate means of disposing of the third cause of action. (*See* ECF No. 56 at 24-31; ECF No. 76.) After denying a motion for reconsideration of its dismissal (*see* ECF No. 75) and receiving the parties' supplemental briefing on the issue (*see* ECF Nos. 63, 64), the court dismissed the third cause of action without prejudice to the State's ability to prosecute it in the CFC (*see* ECF No. 76). The remaining non-jurisdictional arguments raised in Defendants' motion to dismiss are now ripe for consideration.

## II. DOCUMENTS CONSIDERED

Before turning to the merits of the Rule 12(b)(6) motion, the court preliminarily must determine what extrinsic documents appropriately may be considered in its assessment. Without any explanation as to why the court should consider them, Defendants refer to 24 documents in the relevant portions of their motion to dismiss and two additional documents in the relevant portion of their reply brief. Not to be outdone, the State, also with no explanation, refers to seven documents in the relevant portions of its response. Although at first blush this may appear to be a modest sum compared to the large number of documents referenced without any attempt at explanation in Defendants' filings, the State also incorporates by reference into its response its memorandum in support of its motion for summary judgment (*see* ECF No. 27 at 12 n.2

(incorporating ECF No. 10-1))[3] and cites to 25 pages of that memorandum, which refer to an additional 38 documents. Even though there is some overlap of the documents referenced by Defendants and the documents referenced by the State, in all, the parties, in their filings, reference 60 documents that they ask the court to consider in making its Rule 12(b)(6) determination.

Courts "generally do not consider extrinsic evidence when evaluating the sufficiency of a complaint" in a Rule 12(b)(6) motion to dismiss. *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014). A court's consideration of extrinsic documents in deciding a Rule 12(b)(6) motion converts the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). Such conversion is inappropriate when the parties lack sufficient notice and a reasonable opportunity for discovery. *See Zak*, 780 F.3d at 606; *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (en banc).

There are exceptions to the general rule. For instance, the court "may properly take judicial notice of matters of public record" in deciding a Rule 12(b)(6) motion without converting it into a summary judgment motion. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004)); *see Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss under [Rule 12(b)(6)], we are not precluded in our review of the complaint from taking notice of items in the public record . . . ."). The court also "may properly consider documents attached to a complaint . . . 'so long as

---

[3] The court has previously explained in this case its unfavorable view on the practice of incorporating an entire memorandum by reference into another memorandum and need not repeat it here. (*See* ECF No. 75 at 12-13.) Because the State's incorporation by reference occurred before the court had expressed its view, it will be excused for purposes of disposing of the motion to dismiss in this order. The parties' use of unexplained references to documents beyond the complaint in arguing a Rule 12(b)(6) motion is a separate practice that the court addresses now.

they are integral to the complaint and authentic.'" *Anand*, 754 F.3d at 198 (quoting *Philips*, 572 F.3d at 180).

Here, a number of documents referenced by the parties are readily subject to judicial notice. Eighteen documents are letters—sixteen of them between state officials and DOE officials (ECF Nos. 10-11, 10-12, 10-13, 10-14, 10-15, 10-16, 10-17, 10-18, 10-19, 10-20, 10-21, 10-22, 10-38, 10-39, 10-40, 27-3), one of them from a government contractor to Representative Joe Wilson (ECF No. 10-25), and one of them from seven U.S. senators to the Secretary of Energy (ECF No. 10-31)—all of which appropriately are subject to judicial notice, *see Brod v. Sioux Honey Ass'n Coop.*, 609 F. App'x 415, 415 (9th Cir. 2015); *Emma C. v. Eastin*, No. 96-cv-04179-TEH, 2015 WL 5029283, at *3 (N.D. Cal. Aug. 25, 2015); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 68 (D.D.C. 2014); *Alton v. Medtronic, Inc.*, 970 F. Supp. 2d 1069, 1075-76 (D. Or. 2013); *Ramirez v. Medtronic Inc.*, 961 F. Supp. 2d 977, 983-84 (D. Ariz. 2013); *Trimble v. IQ Grp.*, No. 1:10-cv-26, 2010 WL 3851398, at *1 (E.D. Tenn. Sept. 27, 2010); *Fellner v. Tri-Union Seafoods, L.L.C.*, 2007 WL 87633, at *1-2, *rev'd on other grounds,* 598 F.3d 237 (2008). Seventeen of the documents are official publications by federal agencies (including DOE, NNSA, the Government Accountability Office ("GAO"), and Oak Ridge National Laboratory) that are publicly available online (ECF Nos. 10-3, 10-4, 10-6, 10-28, 10-29, 10-30, 10-34, 10-42; *see* ECF No. 17 at 13 n.11, 15-16, 16 n.14; ECF No. 33 at 7) or upon request (to the very helpful staff at the Senate Committee on Energy and Natural Resources) (ECF Nos. 10-41, 17-1, 17-2) and are therefore properly the subject of judicial notice, *see Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 277 n.13 (7th Cir. 2016); *United States v. Savannah River Nuclear Solutions, LLC*, No. 1:16-cv-00825-JMC, 2016 WL 7104823, at *8 (D.S.C. Dec. 6, 2016). Seven documents properly may be judicially noticed because they contain records of decision by DOE or other official DOE documents found in the Federal Register.

(ECF Nos. 10-5, 10-7, 10-23, 10-24; *see* ECF No. 17 at 12 nn.8-9; ECF No. 33 at 8); *see also Dist. Hosp. Partners, L.P. v. Sebelius*, 794 F. Supp. 2d 162, 170-71 (D.D.C. 2011) (citing *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993)); *Nat'l Treasury Emps. Union v. Whipple*, 636 F. Supp. 2d 63, 78 n.8 (D.D.C. 2009)). Six references are to portions of the congressional record (*see* ECF No. 10-1 at 14 & n.26, 17-19 & n.36; ECF No. 17 at 24-25; ECF No. 27 at 19, 25 nn.12-13, 38; ECF No. 33 at 13-14) and are thus appropriately subject to judicial notice, *see, e.g.*, *United States v. Casson*, 434 F.2d 415, 420-22 (D.C. Cir. 1970); *Morning Star Packing Co. v. S.K. Foods, L.P.*, No. 2:09-cv-00208-KJM-KJN, 2015 WL 3797774, at *2 (E.D. Cal. June 18, 2015); *Montgomery Cnty. v. Fed. Nat'l Mortg. Ass'n*, No. DKC 13-0066, 2013 WL 1832370, at *3 n.3 (D. Md. Apr. 30, 2013). Three references are to information posted to DOE's websites and thus may be judicially noticed. (*See* ECF No. 17 at 11 nn.2-4); *see also Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 n.5 (2d Cir. 2008); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004). Two of the documents are the PMDA and its amendment (ECF Nos. 10-8, 10-26), and the court "may take judicial notice of a treaty and its terms," *United States v. Benoit*, 730 F.3d 280, 285 n.8 (3d Cir. 2013). Two documents are excerpted transcripts of congressional testimony (ECF Nos. 10-36, 10-37) and therefore may be judicially noticed, *see United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016); *Muller-Paisner*, 289 F. App'x at 466 n.5. There are two references to filings in other court proceedings (ECF No. 10-10; *see* ECF No. 10-1 at 21-22 & nn.45, 47-48), which are subject to judicial notice, *see Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 n.* (4th Cir. 2004); *Colonial Penn Inc. Co. v. Coil*, 887 F.2d 1236, 1239-40 (4th Cir. 1989). One document is a DOE press release (ECF No. 10-9) that may be judicially noticed, *see Winkelman*, 827 F.3d at 208; *Stewart v. Dimon*, No. 1:14-cv-1707,

2015 WL 11110945, at *2 (E.D. Va. March 13, 2015); *Caner v. Autry*, 16 F. Supp. 3d 689, 696 n.12 (W.D. Va. 2014).[4]

A number of documents referenced in the parties' briefing are also attached to, or referenced in, the State's complaint and therefore might be considered under the exception stated in *Anand*. However, consideration under this exception requires that the documents be integral to the complaint, and it is far from clear that the documents meet the definition of "integral" under any version of the yet-unsettled standard for making that determination. *See Savannah River Nuclear Solutions*, 2016 WL 7104823, at *6 (citing *Goines v. Valley Comty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *Royster v. Gahler*, 154 F. Supp. 3d 206, 227 (D. Md. 2015)). Because the court has concluded that all relevant documents may be considered under the judicial notice exception, it declines to determine whether they could be considered under the *Anand* exception.

The parties' profligate references to extrinsic documents creates a small complication for the court's analysis of the State's second cause of action.[5] Regarding that cause of action, the motion to dismiss presents a single, purely legal issue: whether § 2566(c)(1) imposes a discrete requirement on the Secretary to remove one metric ton of defense plutonium from South Carolina upon the occurrence of certain conditional events, such that the court could compel the action under § 706(1) of the APA if it concludes that a required action has been unlawfully withheld.

---

[4] The court cannot consider under this exception two documents referenced by the State. One of them, a memorandum from the Congressional Research Service ("CRS") (ECF No. 10-27), although a report by a federal agency, is not publicly available according to CRS's very helpful staff. Another, an investigative assessment by a firm hired by a consortium of government contractors (ECF No. 10-35), is not a government report and does not appear to be publicly available. The court's refusal to consider these documents has no bearing on its Rule 12(b)(6) analysis, as the State cites these documents in support of propositions that Defendants do not dispute and that do not affect the interpretation of the statute.

[5] They present no such complication for the assessment of the State's first cause of action, as the parties' briefing on that cause of action implicates none of the documents.

Looking only to the statutory language, there is no doubt that a Rule 12(b)(6) motion is the proper vehicle for deciding this purely legal issue, as determining whether a statute imposes a discrete requirement enforceable under § 706(1) would not involve the resolution of factual matters.

If the court looks beyond the statutory language and considers the documents submitted by the parties in an effort to interpret § 2566(c)(1) by reference to legislative intent as indicated by § 2566's legislative history, the court believes it may do so without converting the motion to dismiss into a motion for summary judgment because, as explained above, the documents fit under the public record exception. However, if the court considers the documents in making its Rule 12(b)(6) determination, then Fourth Circuit precedent appears to preclude at this stage a final decision on the legal issue. The Fourth Circuit has said that a district court is required to construe documents considered in a Rule 12(b)(6) context in the light most favorable to the plaintiff. *Zak*, 780 F.3d at 607 (citing *Clatterbuck v. City of Charlottesville*, 708 F.3d 597, 607 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218 (2015), *as recognized in Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015)). This appears to be so even if the documents are part of the legislative history of a statute that the court must interpret. *See Clatterbuck*, 708 F.3d at 557-58.[6] Thus, if the court resolves in the plaintiff's favor a dispute as to the correct

---

[6] *Clatterbuck* is not entirely clear on this point. In that case, the Fourth Circuit reiterated that certain (but not all) items "garnered from the public record associated with the enactment of a [statute]" may, in certain cases, constitute "'legislative facts, the substance of which cannot be trumped' upon judicial review, and are 'not a matter beyond the pleadings but an adjunct to the [statute] which may be considered by the court as a matter of law.'" *Clatterbuck*, 708 F.3d at 558 (quoting *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995) (internal quotation marks and ellipsis omitted), *vacated on other grounds*, 517 U.S. 1026 (1996)). Beyond cases involving a First Amendment challenge, the court did not elaborate under what circumstances this rule might apply, and, beyond the testimony of an individual citizen at a public hearing, the court did not elaborate which public-record items would not constitute legislative facts that should not be subjected to judicial review. *See id.* More importantly, even after quoting the rule from *Schmoke*, the *Clatterbuck* court appears to state several times that even items qualifying as legislative facts must be viewed in the light most favorable to the plaintiff at the pleading stage. *See id.* at 557-58.

interpretation of a statute by reference to extrinsic documents that constitute legislative history, that resolution cannot be viewed as final because the same dispute may be resolved in the defendant's favor in later stages of the litigation.[7]

Assuming, however, that the court could not consider the documents without converting the motion into one for summary judgment, *see* Fed. R. Civ. P. 12(d), the question then arises whether the court could dispose of the motion without expressly notifying the parties of its intent to convert and without the parties having conducted discovery. The court believes that it could so convert the motion to dismiss to a summary judgment motion, as the two requirements for doing so are met here. First, the State, the non-movant, is on notice that the court might convert the motion into one for summary judgment because it is aware that materials outside the pleadings are before the court. *Greater Balt. Ctr.*, 721 F.3d at 281 (explaining that required "notice exists . . . 'when a party is aware that material outside the pleadings is before the court'" (brackets omitted) (quoting *Gay v. Wall*, 761 F.2d175, 177 (4th Cir. 1985)); (*see also* ECF No. 51 at 28. (asserting that motion to dismiss is essentially a cross-motion for summary judgment). Second, the State was afforded a reasonable opportunity for discovery on the issue because it had an opportunity to, and in fact did, submit documents that responded to those submitted by Defendants (*see* ECF No. 27); because it conceded that no more discovery was needed to respond to the motion to dismiss (*see* ECF No. 51 at 29); and because nothing suggests that further discovery would elicit materials that the State could not otherwise present. *See Tuttle v. McHugh*, 457 F. App'x 234, 236 (4th Cir.

---

[7] The court notes the oddity of declining to issue a final decision on a purely legal question as to the interpretation of a statute, which usually can be resolved at the pleading stage, on the basis of a potential factual dispute regarding the statutes' legislative history, which usually could not be addressed until the summary judgment stage or ultimately resolved until after a jury trial. *See Bread for the City v. U.S. Dep't of Agric.*, ___ F. Supp. 3d ___, 2016 WL 5715922, at *3 (D.D.C. Sept. 30, 2016); *Houlton Band of Maliseet Indians v. Ryan*, No. Civ. 05-180-B-W, 2006 WL 300406, at 9 n.15 (D. Me. Feb. 3, 2006). Nonetheless, the court is constrained to abide by Fourth Circuit precedent, which appears to countenance this outcome.

2011); *Onan v. Cnty. of Roanoke*, 52 F.3d 321, at *3 & n.9 (4th Cir. 1995) (unpublished table disposition).

To account for the procedural awkwardness and uncertainty as to the appropriate legal standard occasioned by the parties' references to extrinsic documents, the court's analysis will proceed as follows. First, looking only to the language of § 2566, the court concludes that it plainly and unambiguously imposes a requirement on the Secretary to remove one metric ton of defense plutonium upon the occurrence of the conditions specified in subsection (c)(1) and that, therefore, the motion to dismiss as to the second cause of action must be denied. Second, to the extent the court's analysis that the statutory language is plain and unambiguous is flawed in some way, the legislative history, as demonstrated by the documents submitted, which must be read in the State's favor, bolsters the court's conclusion that the statute imposes a requirement to remove the one metric ton of defense plutonium and would compel the court to deny the motion to dismiss as to the second cause of action. Third, to the extent the court's consideration under Rule 12(b)(6) of the documents submitted by the parties is flawed in some way, the court would convert the motion into one for summary judgment and would deny the motion as to the second cause of action under the applicable legal standard for such motions.

### III. LEGAL STANDARDS

#### A. Rule 12(b)(6) motion to dismiss

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). To be legally

sufficient a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal is appropriate when the complaint fails to give the respondent fair notice of the basis of the complainant's claims. *See Dolgaleva v. Va. Beach City Pub. Sch.*, 364 F. App'x 820, 826-27 (4th Cir. 2010) (explaining that "the complaint must give the respondent fair notice of the basis for the plaintiff's claims" and "must also allege enough facts to state a claim for relief that is plausible on its face" (internal quotation marks and brackets omitted)); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (demonstrating that the fair notice standard of *Conley v. Gibson*, 355 U.S. 41 (1957), remains applicable after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

Further, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). This means that a complainant's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 555–56 (citations omitted). When considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the complainant. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Dismissal is appropriate if, even accepting well-pleaded allegations and viewing the complaint in the complainant's favor, the complaint could not state a legally cognizable claim for which the court could grant relief. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) ("[A] Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove

any set of facts in support of his claim entitling him to relief."); *c.f. Johnson v. City of Shelby*, ___ U.S. ____, 135 S. Ct. 346, 347 (2014) (per curiam) (explaining that the *Iqbal* and *Twombly* plausibility standard is not always at issue).

**B. Rule 56 motion for summary judgment**

Summary judgment is appropriate when the materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n ruling on a motion for summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [its] favor.'" *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1863 (2014) (per curiam) (brackets omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248.

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in its pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *See id.* at 324.

## IV. ANALYSIS

For the reasons set forth below, the court concludes that, under either Rule 12(b)(6) or Rule 56, Defendants' motion should be denied with respect to the second cause of action in the State's complaint but that, under Rule 12(b)(6), it should be granted with respect to the first cause of action.

**A. Second cause of action: removal under § 2566(c)(1)**

As explained in Parts I and II above, the motion to dismiss presents a single ground for dismissing the State's second cause of action, namely that subsection (c)(1) of § 2566 does not impose a requirement to remove defense plutonium and, thus, that the second cause of action which seeks removal of one metric ton of defense plutonium from South Carolina pursuant to subsection (c)(1) fails to state a claim for which the court could grant relief. The court begins its assessment of this portion of the motion by determining whether the language of § 2566, alone, plainly and unambiguously imposes the removal requirement asserted by the State and, thus, whether dismissal is required. Next, looking to the documents to which the parties refer in their briefing, the court determines whether the legislative history demonstrates that the lawmakers who enacted § 2566 intended that it impose the removal requirement and, thus, whether dismissal would be required under Rule 12(b)(6). Lastly, assuming that consideration of the documents referenced by the parties would first necessitate converting Defendants' motion into one for summary judgment, the court determines whether Defendants are entitled to summary judgment on the basis that the statute imposes no removal requirement in subsection (c)(1).

1. *Assessment of the statute's language, context, and structure*

a. The use of "shall" in § 2566(c)(1) creates the presumption of mandatory removal. Section 2566(c)(1) states that "[i]f the MOX production objective is not achieved as of January 1, 2014, the *Secretary shall*, consistent with [NEPA] and other applicable laws, *remove* from the State of South Carolina, for storage or disposal elsewhere . . . not later than January 1, 2016, not less than [one] metric ton of defense plutonium . . . ." 50 U.S.C. § 2566(c)(1) (emphasis added). As the italicized language quoted above indicates, the subject and verb of subsection (c)(1)'s only independent clause state that the *Secretary shall remove*. As the State correctly points out,

18

numerous authorities hold that, as a general rule, the word "shall," when used in a statute, is mandatory. *See, e.g.*, *Shapiro v. McManus*, ___ U.S. ___, 136 S. Ct. 450, 454 (2015) ("'[T]he mandatory shall normally creates an obligation impervious to . . . discretion.'" (internal quotation marks and ellipsis omitted) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1988))); *In re Rowe*, 750 F.3d 392, 397 (4th Cir. 2014) ("'It is uncontroversial that the term shall customarily connotes a command . . . .'" (internal quotation marks and brackets omitted) (quoting *Air Line Pilots Ass'n, Int'l v. U.S. Airways Grp., Inc.*, 609 F.3d 388, 342 (4th Cir. 2010)). Indeed, courts have said that, under the rules of statutory construction, the use of the word "shall" creates a presumption that the action is mandatory "'unless there is clear evidence to the contrary.'" *Viet. Veterans of Am. v. Cent. Intelligence Agency*, 811 F.3d 1068, 1081 (9th Cir. 2015) (quoting *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573-74 (2000)); *see Orozco-Velasquez v. Attorney Gen.*, 817 F.3d 78, 83 (3d Cir. 2016) ("[W]e presume that, when Congress says *shall*, it conveys a mandatory rather than a hortatory instruction."); *Amgen Inc. v. Sandoz Inc.*, 794 F.3d 1347, 1359 (Fed. Cir. 2015) ("[T]he word 'shall[]' . . . presumptively signals a statutory requirement."); *United Auto. Workers of Am. v. Dole*, 919 F.2d 753, 756 (D.C. Cir. 1990) (noting "the usual presumption that . . . 'shall' imposes an obligation to act."); *Nat'l Wildlife Fed'n v. Interstate Commerce Comm'n*, 850 F.2d 694, 699 (D.C. Cir. 1988) ("The word 'shall' in th[e] section presumably requires that the [agency] act according to its terms."); *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 656 (D.C. Cir. 1983) ("Certainly the use of the word 'shall' presumptively implies some type of mandatory obligation . . . ."); 3 Norman Singer & Shambie Singer, *Sutherland Statutory Construction* § 57:2 (7th ed. 2012) ("'Shall' is considered presumptively mandatory unless there is something in the context or the character of the legislation which requires it to be looked at differently."); *cf. In re New Haven Projects Ltd. Liability Co.*,

225 F.3d 283, 287 (2d Cir. 2000) ("We are persuaded that the ordinary meaning of the word 'may' applies here because nothing in [the statute] suggests otherwise . . . .").

In addition to the general rule that "shall" in a statute is presumptively mandatory and not permissive, several other aspects of its use in § 2566(c)(1) suggest that removal is mandatory. For instance, the fact that "shall" is part of the verb of the only independent clause in the provision supports the conclusion that removal is mandatory. *See In re Rowe*, 750 F.3d at 396 ("'[T]he most natural reading of this provision is that the independent clause states a mandatory rule, while the dependent clause states when that rule applies.'" (quoting *In re Salgado-Nava*, 473 B.R. 911, 916 (B.A.P. 9th Cir. 2012))). The fact that "shall" is employed in conjunction with a deadline for the removal also suggests that removal is mandatory. *See* 3 Singer & Singer, *supra*, § 57:19 ("Generally, when the word 'shall' is used in referring to a time provision, it should be construed as mandatory.") Furthermore, the fact that Defendants do not dispute that the statute's use of the word "shall" in other instances is mandatory (and even concede that "shall" is mandatory in some of those instances)[8] supports the conclusion that lawmakers intended the use of the word "shall" in subsection (c)(1) to be mandatory as well. *See Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 584 (2007) (Thomas, J., concurring) (noting the "usual presumption that the same words repeated in different parts of the same statute have the same meaning" (citing *Atl. Cleaners & Dryers, Inc.*

---

[8] *See* ECF No. 17 at 14 (explaining that under subsection (a), which uses the word "shall" six times, "[t]he statute *requires* the [Secretary] to submit a series of plans and reports to Congress concerning construction and operation of the MOX facility" (emphasis added)); ECF No. 51 at 71 ("Congress *requires* all kinds of reporting of the agency's activities . . . under the MOX program in [§] 2566 [and] its activities to disposition other plutonium at SRS under [50 U.S.C. §] 2567." (emphasis added)); ECF No. 17 at 17 (explaining that, under subsection (b)(5), which uses the phrase "shall suspend further transfers," "DOE had suspended further transfers of such material to be processed at the MOX facility in SRS in *compliance* with," and "in keeping with the *statutory obligations* of," subsection (b)(5) (emphasis added)); ECF No. 51 at 60 (arguing that, under subsection (d)(1), which uses the phrase "shall . . . pay," "[o]nce there has been no removal or MOX production objective [achieved] and there's also been appropriation, there's *no longer any discretion* as to whether to pay." (emphasis added)).

*v. United States*, 286 U.S. 427, 433 (1932))); *accord U.S. Dep't of Labor v. N.C. Growers Ass'n*, 377 F.3d 345 n.8 (4th Cir. 2004); *see also* 3 Singer & Singer, *supra*, § 57:11 ("[A]n inference [of uniform meaning] can be drawn from the use of the same verb in different but related provisions of the same statute.").

"The form of the verb used in a statute, i.e., something 'may,' 'shall' or 'must' be done, is the single most important textual consideration determining whether a statute is mandatory or [permissive]." 3 Singer & Singer, *supra*, § 57:3. However, the use of the word "shall," although strongly suggesting that what follows it is mandatory, alone, is not dispositive. *See id.* Defendants correctly note that courts have sometimes concluded that "shall" in certain statutes is not mandatory or that "may" is not permissive. (*See* ECF No. 17 at 26 & n.20 (citing *Lopez v. Davis*, 531 U.S. 230, 241 (2001); *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (4th Cir. 2016); *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011)).)[9] And they also correctly

---

[9] Defendants correctly note that, if a statute uses both the words "may" and "shall," courts presume that Congress intended thereby to distinguish between permissive and mandatory actions and that "shall" is presumed to be mandatory, *see Anglers*, 809 F.3d at 671, and that § 2566 does not use the word "may" when describing actions to be taken by the Secretary. (ECF No. 17 at 26 n.20.) The court is not aware, however, of any authority supporting the inverse, that, if the statute does not use both "shall" and "may," then "shall" should not be presumed to be mandatory. Although the case for a mandatory "shall" might be stronger if the same statute employs "may," the absence of the word "may" is hardly a strong indication that "shall" should be understood as permissive. Thus, to the extent Defendants cite to *Lopez*, *Anglers*, and *Sierra Club* in an effort to persuade the court of a weak presumption of a mandatory "shall" in § 2566(c)(1), the court is not convinced.

The State also correctly points out that the cases cited by Defendants are of little help. (*See* ECF No. 27 at 16 n.6.) Although the *Anglers* court noted that, on rare occasions, a statute's use of "shall" has been deemed permissive and "may" mandatory, it ultimately rejected the argument that the statute at issue in that case used "may" in a mandatory sense. *Anglers*, 809 F.3d at 671-72. *Lopez* stands only for the proposition that when "may" and "shall" are used together in the same statute, "may" is presumed to be permissive; it does not even go as far as *Anglers* to say that, in such cases, "may" might be understood as mandatory. *See Lopez*, 531 U.S. at 722. The *Sierra Club* court confirmed that the use of the word "shall" in the statute at issue was mandatory, but concluded that the action was only mandated by the statute "as necessary" to prevent certain conduct, a phrase that granted the agency discretion to determine when the action was necessary and provided the court no meaningful standard against which to judge the agency's use of *that* discretion. *See Sierra Club*, 648 F.3d at 856. Thus, not only did the *Sierra Club* court not conclude

point out that, in determining whether subsection (c)(1) imposes a discrete requirement on the Secretary, the court cannot interpret particular words, phrases, or even paragraphs and subsections in isolation but instead must consider the statutory context and structure in which the words, phrases, paragraphs, and subsections are employed. (*See id.* at 26-27 (citing *King v. Burwell*, ___ U.S. ___, 135 S. Ct. 2480, 2489 (2015); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))); *see also United Hosp. Ctr., Inc. v. Richardson*, 757 F.2d 1445, 1453 (4th Cir. 1985). Indeed, as Defendants note, even the rule of construction favoring a presumption of consistent usage "readily yields to context." *Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, ___ U.S. ___, 134 S. Ct. 2427, 2441 (2014) (internal quotation marks omitted); *see also King*, 135 S. Ct. at 2493 n.3.[10] Thus, the court turns next to Defendants' contextual and structural arguments.

---

that the "shall" at issue was permissive, but it also reached its conclusion that dismissal was appropriate based on language that is not found in § 2566.

[10] The court notes that the two cases on which Defendants rely for the proposition that the presumption of consistent usage readily yields to context, *King* and *Utility Air*, interpreted the Patient Protection Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Clean Air Act, 77 Stat. 392, as amended, 42 U.S.C. § 7401 *et seq.*, respectively. The ACA is a sprawling legal text that "contains more than a few examples of inartful drafting" after being composed "behind closed doors rather than through the traditional legislative process" and passed under "a complicated budgetary procedure . . . which limited opportunities for debate and amendment," resulting in a statute that "does not reflect the type of care and deliberation that one might expect of such significant legislation." *King*, 135 S. Ct. at 2492 (internal quotation marks omitted). The Clean Air Act, as amended, is "a lengthy, detailed, technical, complex, and comprehensive response to a major social issue," *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 848 (1984), that, due to poor draftsmanship contains "profligate use" of "obviously" inconsistent terminology that is "not conducive to clarity," *Util. Air*, 134 S. Ct. at 2441. Of both Acts, an unimpressed Supreme Court pronounced that they are, on the whole, "far from a *chef d'oeuvre* of legislative draftsmanship," forcing the Court to "do [its] best" in interpreting specific provisions of these overgrown statutes that contain obvious errors. *King*, 135 S. Ct. at 2492, 2493 n.3; *Util. Air.*, 134 S. Ct. at 2441. Largely because of these characteristics, the Supreme Court determined that the presumption of consistent usage readily could be jettisoned. *See King*, 135 S. Ct. at 2492, 2493 n.3; *Util. Air.*, 134 S. Ct. at 2441. Unlike the ACA and Clean Air Act faced by the Supreme Court in *King* and *Utility Air*, there is no suggestion by the parties that § 2566 involves sprawling, sloppily-drafted legislation, which skipped many of the

b. The context and structure of § 2566 confirm that removal is required under § 2566(c)(1).

Defendants argue that the State's interpretation of subsection (c)(1) would result in two "anomalies" in the operation of other provisions in § 2566, specifically in the operations of subsection (c)(2) and subsection (b)(5) (*See* ECF No. 17 at 27-29.) Addressing each asserted anomaly in turn, the court concludes they are illusory.

The first anomaly asserted by Defendants concerns subsection (c)(2), which states:

> If the MOX production objective is not achieved as of January 1, 2014, the Secretary shall, consistent with [NEPA] and other applicable laws, remove from the State of South Carolina, for storage or disposal elsewhere . . . not later than January 1, 2022, an amount of defense plutonium or defense plutonium materials equal to the amount of defense plutonium or defense plutonium materials transferred to [SRS] between April 15, 2002, and January 1, 2022, but not processed by the MOX facility.

50 U.S.C. § 2566(c)(2). Under the State's reading of subsection (c)(1), if the MOX production objective is not achieved as of January 1, 2014, then the Secretary is obligated to remove one metric ton of defense plutonium from South Carolina by January 1, 2016. Defendants assert that, if the State's view is correct, then, under subsection (c)(2), if the MOX production objective is not met by January 1, 2014, then the Secretary also would be obligated by January 1, 2022, to remove an amount of defense plutonium equal to the amount of defense plutonium transferred to SRS between April 15, 2002, and January 1, 2022, that has not been processed (the "vicennial amount"). This result, Defendants contend, cannot be countenanced: subsection (c)(2) cannot be understood

---

parliamentary procedures that might have caught numerous glaring but unnoticed errors. On the contrary, § 2566 is a relatively concise, self-contained piece of legislation, and nothing indicates hurried, imprecise draftsmanship or glaring textual errors. Moreover, the statute has twice been amended, both times with surgical precision. *See* National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 3116, 126 Stat. 1632, 2172-73; Energy and Water Development Appropriations Act of 2006, Pub. L. No. 109-103, § 313, 119 Stat. 2247, 2280-81 (2005). Although the presumption of consistent usage readily yields to context, the court does not believe § 2566 is the type of statute, like the ACA and the Clean Air Act, in which the presumption readily is subject to doubt at the outset of construction and interpretation.

as requiring removal of the vicennial amount of defense plutonium by January 1, 2022, merely because the MOX production objective was not met eight years earlier by January 1, 2014. Furthermore, if subsection (c)(2) cannot be read to impose an obligation to remove the vicennial amount, then subsection (c)(1), which employs the same triggering language as subsection (c)(2), should not be understood to impose an obligation to remove one metric ton of defense plutonium. Although Defendants offer three reasons why subsection (c)(2) cannot impose an obligation to remove the vicennial amount of defense plutonium, the court is not persuaded.

First, Defendants point out that, under the State's view as applied to subsection (c)(2), the vicennial amount would have to be removed from South Carolina by January 1, 2022, so long as the MOX production objective had not been met as of January 1, 2014, even if the MOX production objective were met every year after 2014. In Defendants' view, "there would be *no rational reason* to force closure of a productive facility hitting its milestones[] solely because it missed one milestone [almost] a decade earlier." (ECF No. 17 at 27 (emphasis added).) Defendants' emphasize one of Congress' legislative findings in enacting § 2566: "[t]he MOX facility will also be economically beneficial to the State of South Carolina, and that economic benefit will not be fully realized unless the MOX facility is built." Bob Stump National Defense Authorization Act for Fiscal Year 2003, § 3181, 116 Stat. at 2747.

The court does not agree with Defendants. To begin with, the court notes a major error in both parties' positions regarding the purpose of § 2566. Throughout these proceedings, Defendants have argued at every turn that "*the* very purpose of the statute . . . [is] producing MOX fuel at SRS" as expediently as possible. (ECF No. 33 at 9 (emphasis added); *see id.* at 10-12, 14 & n.2; ECF No. 38 at 20-21; ECF No. 51 at 33.) The State, on the other hand, has maintained that "*the entire* purpose of [§] 2566" "is to prevent South Carolina from becoming the 'dumping ground'

for the Nation's plutonium." (ECF No. 27 at 29 (emphasis added); *see id.* at 13, 20-21, 24-25 &

n.12, 27; ECF No. 42 at 8, 11; ECF No. 51 at 11-13, 18, 58.) The parties' error is in assuming that

there must be a singular, tightly circumscribed purpose that alone can be ascribed to lawmakers in

enacting a statute. Setting aside for the moment the metaphysical and jurisprudential difficulty

(and, perhaps, impossibility) in defining the purpose of a legislative body in enacting a statute

(and—completely forgotten by the parties—the purpose of the President in approving or not

vetoing the bill), the belief that a court must ascribe to Congress (and the President) a single,

inviolate purpose, before which all other intentions (not to mention the express language employed

by Congress and approved or not rejected by the President) must bow is one which the law does

not tolerate (let alone require) and which defies common sense. A law, like its makers, can have

more than one purpose.

Assuming it is appropriate for a court to attempt to divine the legislative intent behind a

statute (an assumption that, despite the court's doubts, will be carried forward for the remainder

of this order), here, the court need look no further than the text of the law itself. Defendants quoted

one sentence of the legislative findings, but a fuller account of the legislative findings is as follows:

> The United States and the State of South Carolina have a compelling
> interest in the safe, proper, and efficient operation of the plutonium disposition
> facilities at [SRS]. The MOX facility will also be economically beneficial to
> the State of South Carolina, and that economic benefit will not be fully realized
> unless the MOX facility is built.
>
> The State of South Carolina desires to ensure that all plutonium
> transferred to the State of South Carolina is stored safely; that the full benefits
> of the MOX facility are realized as soon as possible; and, specifically, that all
> defense plutonium or defense plutonium materials transferred to [SRS] either
> be processed or be removed expeditiously.

Bob Stump National Defense Authorization Act for Fiscal Year 2003, § 3181(5)-(6), 116 Stat. at

2747. Thus, the very text of the law ascribed at least two purposes to itself: to expeditiously

construct the MOX facility in order to convert defense plutonium into MOX fuel and to ensure

that all defense plutonium transferred to South Carolina was eventually disposed either through

MOX processing or through removal. This conclusion is hardly novel, as Judge Harwell reached

the same conclusion nearly a decade ago:

> The intent behind the provisions of 50 U.S.C. § 2566 appear to be two-fold.
> First, in connection with its ties to foreign policy and non-proliferation
> agreements, . . . § 2566 was intended to implement the construction and
> operation of a MOX facility at the SRS. Second, § 2566 was intended to
> prevent the possibility of a buildup of defense plutonium and defense
> plutonium materials at the SRS. . . . [SRS was not to] become the de facto
> dumping ground for the nation's nuclear materials.

*Aiken Cnty. v. Bodman*, 509 F. Supp. 2d 548, 554-55 (D.S.C. 2007) (internal quotation marks

omitted). As set forth below, the fact that the law itself states that it has two major purposes—

facilitating the processing of MOX fuel and preventing the accumulation of defense plutonium in

South Carolina—undercuts much of Defendants' arguments.

The twin purposes of the statute undercut the first reason for Defendants' position that

subsection (c)(2) cannot be understood to impose an obligation on the Secretary to remove the

vicennial amount of defense plutonium. In Defendants' view, removal would be antithetical to the

statute's purpose because the whole point of the statute is to facilitate MOX fuel processing; after

all, lawmakers could have "no rational reason" to impede the operation of a successful facility

simply because it missed a milestone eight years prior. Of course, this view ignores the other

purpose of § 2566, ensuring South Carolina would not become a repository for unprocessed

defense plutonium. When these two purposes are acknowledged, there is nothing irrational in

requiring removal of the vicennial amount by 2022 based on the failure to meet the MOX

production objective by 2014. By doing so, the statute facilitates MOX fuel processing by

incentivizing Defendants to meet the MOX production objective by 2014, and (assuming they fail

to do so) by providing them eight years in which to convert as much of the vicennial amount of defense plutonium into MOX fuel (perhaps all of it) before 2022.[11] At the same time, the statute protects South Carolina's interest by providing a deadline in which to meet the MOX production objective and a plan to eventually process or remove the vicennial amount within eight years if the deadline is missed. Doubtless, there are other ways lawmakers could have chosen to balance these competing purposes, but there is, under the State's view as applied to subsection (c)(2), a rational relationship between the statute's objectives and the means chosen to achieve them. The mere fact that the means chosen by lawmakers might seem unwise to Defendants (or even the court, for that matter) does not make them irrational.

Second, Defendants assert that reading subsection (c)(2) to require removal of the vicennial amount by January 1, 2022, is inconsistent with § 2566(e). Subsection (e) states:

> If on July 1 each year beginning in 2025 and continuing for as long as the MOX facility is in use, less than 34 metric tons of defense plutonium or defense plutonium materials have been processed by the MOX facility, the Secretary shall submit to Congress a plan for—
>
> (1) completing the processing of 34 metric tons of defense plutonium and defense plutonium material by the MOX facility; or
>
> (2) removing from the State of South Carolina an amount of defense plutonium or defense plutonium materials equal to the amount of defense plutonium or defense plutonium materials transferred to the Savannah River Site after April 15, 2002, but not processed by the MOX facility.

50 U.S.C. § 2566(e). In Defendants' view, subsection (c)(2) cannot impose a requirement to remove the vicennial amount by 2022 because subsection (e) contemplates that the MOX Facility would still be operational and processing defense plutonium until 2025. This argument is a non-

---

[11] It is worth noting that the eight-year cushion provides time to prepare for any shock to the local economy occasioned by the need to remove any portion of the vicennial amount that remains unprocessed. *See* Bob Stump National Defense Authorization Act for Fiscal Year 2003, § 3181(5)-(6), 116 Stat. at 2747 (noting, as one reason for legislation, the economic benefits for the area where the MOX Facility was to be constructed).

starter. As an initial matter, the court notes, with some displeasure, that the entire argument is made in a single sentence that fails to explain the asserted inconsistency, and the court would reject the argument on this basis alone. (*See* ECF No. 17 at 28.) In any event, subsection (e) begins with a lengthy introductory clause that strongly suggests that it only applies *if* the MOX Facility is operating in 2025. Thus the premise of Defendants' argument—that subsection (e) contemplates that the MOX Facility *will* be operating until 2025—is flawed. Moreover, even if subsection (e) were interpreted in the way advanced by Defendants, it would not be inconsistent with the State's view as applied to subsection (c)(2). Inconsistency would exist only if, under the State's view, subsection (c)(2) mandates that the MOX Facility stop operating by 2022 because there would be no more defense plutonium to process or remove. But, even under the State's view, the vicennial amount subject to removal under subsection (c)(2) does not include defense plutonium transferred to SRS before April 15, 2002, or after January 1, 2022. Defense plutonium transferred to SRS before or after the vicennial period would still be subject to the provisions of subsection (e). Thus, even accepting Defendants' flawed premise, there is no inconsistency between subsection (e) and the State's view as applied to subsection (c)(2).

Third, Defendants assert that reading subsection (c)(2) to require removal of the vicennial amount by January 1, 2022, is inconsistent with subsection (d)(2)(A), which states:

> If, as of January 1, 2022, the MOX facility has not processed mixed-oxide fuel from defense plutonium and defense plutonium materials in the amount of not less than—
>
> > (i) one metric ton, in each of any two consecutive calendar years; and
> >
> > (ii) three metric tons total,
>
> the Secretary shall, from funds available to the Secretary, pay to the State of South Carolina for economic and impact assistance an amount equal to $1,000,000 per day, not to exceed $100,000,000 per year, until the removal by the Secretary from the State of South Carolina of an amount of defense

> plutonium or defense plutonium materials equal to the amount of defense plutonium or defense plutonium materials transferred to [SRS] between April 15, 2002, and January 1, 2022, but not processed by the MOX facility.

50 U.S.C. § 2566(d)(2)(A). Defendants note that subsection (d)(2)(A) creates additional goals for MOX processing that are to be achieved by 2022 in order to avoid making economic and impact assistance payments in 2022 and following years. Defendants contend that the fact that Congress incentivized expeditious MOX fuel processing up until 2022 under subsection (d)(2)(A) is inconsistent with the State's view that, even if the additional goals are met so that the economic and impact assistance payments in subsection (d)(2)(A) are avoided, Defendants nonetheless must remove the vicennial amount by January 1, 2022. This result, Defendants contend, would render the additional goals set forth in subsection (d)(2)(A) superfluous.

There are two flaws in Defendants' argument. The first is found in the text of the statute itself, specifically in subsection (d)(2)(B), which states that "[n]othing in [subsection (d)(2)] may be construed to terminate, supersede, or otherwise affect any other requirements of [§ 2566]." 50 U.S.C. § 2566(d)(2)(B). Subparagraph (B) forecloses Defendants' argument from the outset, as they essentially concede (*see* ECF No. 33 at 12 n.1.) that their argument is an attempt to extinguish any potential removal requirement in subsection (c). Despite Defendants' attempt to diminish subparagraph (B)'s effect on the grounds of vagueness (*see id.*), its language is clear, and its application is most sensible in relation to the requirements found in subsection (c).[12] The second flaw in Defendants' argument is the notion that a scheme to incentivize the expeditious conversion of defense plutonium into MOX fuel up until 2022 is somehow inconsistent with removal of any unconverted defense plutonium by 2022. As explained above, the text of § 2566 balances the twin purposes for which the law itself says it was enacted: to expeditiously convert defense plutonium

---

[12] *See infra* note 14.

into MOX fuel and to ensure that any defense plutonium transferred to SRS was eventually disposed by processing it into MOX fuel or by removing it for disposition elsewhere. *See supra* pp. 25-27. With these purposes in mind, there is nothing inconsistent with the scheme resulting from the State's view: lawmakers reasonably could have determined that Defendants' failure to meet the MOX production objective by 2014 should trigger protective measures for South Carolina, including the removal of the vicennial amount by 2022, while also determining that, during the interim years, Defendants should be incentivized to expeditiously process MOX fuel by imposing economic impact and assistance payments for failure to achieve the additional goals set forth in subsection (d)(2)(A). *See id.* In any event, the court fails to see how mandatory removal of the vicennial amount under subsection (c)(2) would make the additional goals in subsection (d)(2)(A) superfluous. The principle of statutory construction disfavoring superfluity or surplusage has application where the interpretation advanced would "render statutory terms meaningless" and another interpretation could "give effect to every statutory provision" in the statute. *Scott v. United States*, 328 F.3d 132, 139 (4th Cir. 2003); *accord Clark v. Absolute Collection Serv., Inc.*, 741 F.3d 487, 491 (4th Cir. 2014). Here, the fact that subsection (c)(2), under the State's view, requires removal of the vicennial amount by 2022, does not render the additional goals for MOX processing in subsection (d)(2)(A) meaningless, as there is no suggestion that removal necessarily makes meeting those goals impossible or that meeting the goals necessarily makes removal impossible. Because the State's view as applied to subsection (c)(2) is not inconsistent with the provisions in subsection (d)(2), the court rejects Defendants' argument.[13]

---

[13] Defendants overlook an obvious argument regarding subsection (d)(2). Subsection (c)(2) requires the removal of the vicennial amount by January 1, 2022, whereas subsection (d)(2) requires, under certain circumstances, that the Secretary make economic impact and assistance payments starting in 2022 and in following years until the vicennial amount is removed. The court expected Defendants to argue that the fact that subsection (d)(2) expressly contemplates removal of the vicennial amount *after* January 1, 2022, demonstrates that subsection (c)(2)'s statement that

The second anomaly asserted by Defendants concerns subsection (b)(5), which states:

> If, after January 1, 2014, the Secretary determines that the MOX production objective has not been achieved because of a failure to achieve milestones set forth in the most recent corrective action plan under this subsection, the Secretary shall suspend further transfers of defense plutonium and defense plutonium materials to be processed by the MOX facility until the Secretary certifies that the MOX production objective can be met.

50 U.S.C. § 2566(b)(5). Defendants argue that subsection (b)(5) contemplates that, if the MOX production objective is met or if the Secretary certifies that it can be met, defense plutonium could be transferred to SRS between January 1, 2014, and January 1, 2016. The ability to transfer additional defense plutonium to SRS between 2014 and 2016, Defendants contend, is inconsistent

---

the Secretary shall remove the vicennial amount *before* January 1, 2022, does not impose an obligation to remove the vicennial amount, and thus subsection (c)(1) should not be understood to impose an obligation to remove one metric ton of defense plutonium. This would be a strong argument if not for subparagraph (B). The presence of subparagraph (B) turns what would have been Defendants' strongest point into one of the State's strongest arguments (which, alas, also goes unmade). Not only does subparagraph (B) foreclose Defendant's would-be argument, it also explains the relationships between subsection (c)'s paragraphs and subsection (d)'s paragraphs in a way strongly favoring the State's view. As explained more fully below, subsection (c)(1) requires that the removal of one metric ton of defense plutonium be accomplished before January 1, 2016, and subsection (d)(1) requires economic and impact assistance payments starting in 2016 and years thereafter until, in those years, one metric ton of defense plutonium is removed from South Carolina. In other words, the required removal of one metric ton of defense plutonium in subsection (c)(1) is not the same as the removal of one metric ton of defense plutonium in subsection (d)(1), on which economic and impact assistance payments are conditioned. No language like that found in subparagraph (B) is needed in subsection (d)(1) because subsection (c)(1)'s requirement to remove one metric ton of defense plutonium, if satisfied, does not extinguish (d)(1)'s condition that economic and impact assistance payments be made until one metric ton of defense plutonium is removed. Subsections (c)(2) and (d)(2), however, refer to the removal of *the same* vicennial amount of defense plutonium, such that, absent subparagraph (B), subsection (c)(2)'s requirement to remove the vicennial amount would render subsection (d)(2)'s condition that economic and impact assistance payments be made until the vicennial amount is removed surplusage, unless a court construed subsection (d)(2) to not impose an obligation to remove the vicennial amount. To avoid this result, lawmakers included subparagraph (B), which simultaneously allows subsection (c)(2) to impose the removal requirement and subsection (d)(2) to maintain a removal condition, despite their otherwise inconsistent nature. Thus, the State's view accounts for the presence of subparagraph (B) in subsection (d)(2) and the absence of a similar provision in subsection (d)(1). Defendants' view accounts for neither of these features, and they all but concede that subparagraph (B), under their view of the statute, is superfluous. (*See* ECF No. 33 at 12 n.1.)

with the State's view that subsection (c)(1) requires removal of one metric ton of defense plutonium between those same dates. The argument appears to be that it makes no sense to require removal of one metric ton of defense plutonium during a two year period in the interests of preventing South Carolina from accumulating defense plutonium, while during the same period allowing an unlimited amount of defense plutonium to be transferred to South Carolina. Defendants imply that resolution of this inconsistency requires rejecting the State's view and interpreting subsection (c)(1) in a way that does not require removal of the one metric ton of defense plutonium.

The court rejects this argument. In doing so, the court need look no further than the text of subsection (c), which states that, if the conditions for doing so are met, "the Secretary shall . . . remove from the State of South Carolina" the one metric ton (and the vicennial amount) of defense plutonium "*for storage or disposal elsewhere.*" 50 U.S.C. § 2566(c) (emphasis added). The plain text of subsection (c)(1) thus requires that, when the one metric ton of defense plutonium at issue in that provision is removed from South Carolina, that particular metric ton of defense plutonium must be stored or disposed in some place other than in South Carolina. In other words, once removed, that particular ton of defense plutonium may not be again stored or disposed in South Carolina: so long as it remains defense plutonium needing storage or disposition, it may not be re-transferred back to South Carolina for those purposes.[14] Once this facet of subsection (c) is

---

[14] The cogency of this result becomes clearer when hypothesizing what could occur if re-transfer to SRS of defense plutonium that has been removed from SRS were permitted. The Secretary could satisfy any requirement or condition to remove defense plutonium by earmarking it for storage or disposition outside of South Carolina, transporting it across the Savannah River into Georgia, and turning around and placing it back at SRS, all within a relatively short period of time. This type of "removal" would be at odds with either parties' view of the statute. Under the State's view, it would make the required removal in subsection (c) illusory, and, under Defendants' view, it would make the removal on which economic and impact assistance payments are conditioned in subsection (d) illusory.

recognized, the remainder of Defendants' argument falls apart. Section 2566 accomplishes the purpose of preventing the accumulation of defense plutonium in South Carolina primarily not by limiting the amount of defense plutonium that can be transferred in the first instance to SRS but, instead, by requiring, under certain circumstances, the removal of specified amounts of unprocessed defense plutonium and preventing its *re*-transfer to SRS. Thus, there is no inconsistency between the State's view of subsection (c)(1) and subsection (b)(5): if subsection (b)(5)'s conditions are met, there is no limitation on the amount of defense plutonium that may be transferred to SRS between 2014 and 2016, so long as none of it is part of the particular one metric ton of defense plutonium that must be removed for storage or disposition elsewhere under subsection (c)(1).

The court also notes that Defendants' view of § 2566 would fare no better than the State's under the weight of their own criticism. In Defendants' view, the ability to transfer to SRS additional amounts of defense plutonium during a given period is somehow incompatible with a statutory directive to remove defense plutonium from South Carolina during the same period. As Defendants contend, subsection (b)(5) contemplates the transfer of additional amounts of defense plutonium to SRS starting in 2014 and continuing in the following years. Under Defendants' view, paragraphs (1) and (2) of subsection (d) give the Secretary the option either to remove the one metric ton and the vicennial amount of defense plutonium or else to make the economic and impact assistance payments. Thus, even under Defendants' view, the statute contemplates removal of defense plutonium from South Carolina in the years following January 1, 2016, as an optional remedy for Defendants' failure to meet the MOX production objective. Yet, pursuant to Defendants' own argument, this option is nonsensical because it is incompatible with the Secretary's ability, confirmed in subsection (b)(5), to transfer additional, unlimited amounts of

defense plutonium to SRS during the same period. The court's interpretation, of course, solves this problem, but it also negates Defendants' attack on the State's view.

Aside from the fact that the two statutory anomalies to which Defendants point turn out to be illusory, two other facets of § 2566 also confirm that Defendants' view is incorrect. First is the interplay between subsection (c)(1) and subsection (d)(1). Defendants assert that subsection (d)(1) acts as the "enforcement mechanism" for subsection (c)(1). (*See* ECF No. 17 at 23 ("Subsection (c) imposes certain goals for processing or removal, and subsection (d) enforces them through the [economic and impact] assistance payment."); *id.* at 24 ("[S]ubsection (d) functions as the enforcement mechanism for subsection (c)").) Defendants go even further and assert that subsection (d)(1) enforces the deadline for removal of the one metric ton of defense plutonium in subsection (c)(1):

> Congress . . . chose a . . . mechanism to enforce the removal deadlines in [§] 2566(c): the assistance payment. Through the interplay between subsections (c) and (d), Congress told [Defendants] to process MOX by certain dates or begin removing defense plutonium from SRS, and instructed that if [they] did not, [they] would have to pay the assistance payment . . . . Subsection (c) thus sets processing and removal goals, and subsection (d) sets the consequences for failing to meet those goals.

(ECF No. 33 at 12; *see* ECF No. 17 at 23 ("In the event that the [MOX] production objective is not achieved, subsection (d)(1) addresses the consequences of failing to meet subsection (c)(1)'s 2016 deadline to remove one ton of plutonium[.]"); *id.* at 26 ("[S]ubsection (d) [is] the only enforcement provision for a purported failure to meet the objectives of [§] 2566, including those specified in subsection (c)."); *id.* at 30 ("The statute . . . impose[s] processing and removal goals in subsection (c), and . . . specif[ies] enforcement mechanisms for those requirements in subsection (d)."); ECF No. 51 at 37 ("[Subs]ection [(d)] and [sub]section [(c)] link up in terms of the date on which removal has to occur[,] and . . . every [authority] that [the parties] have cited in [their]

briefs[] says the enforcement mechanism is the payment.").) Under Defendants' view, the fact that the statute provides, in subsection (d)(1), its own remedies for any failure in meeting subsection (c)(1)'s directives, deprives the court of authority to compel by injunction Defendants' compliance with subsection (c)(1).

The court concludes, however, that the plain language of subsections (c)(1) and (d)(1) demonstrate that subsection (d)(1) does not enforce the deadline for removing the one metric ton of defense plutonium set in subsection (c)(1). Subsection (c)(1) states that, if the MOX production objective is not achieved as of January 1, 2014, then the Secretary shall remove one metric ton of defense plutonium from South Carolina not later than January 1, 2016. 50 U.S.C. § 2566(c)(1). Subsection (d)(1) states that, if the MOX production objective is not achieved as of January 1, 2016, the Secretary shall make economic and impact assistance payments "each year beginning on or after [January 1, 2016] through 2021" until "the date on which the MOX production objective is achieved in such year" or "the date on which the Secretary has removed from the State of South Carolina in such year at least [one] metric ton of defense plutonium," whichever date is later. 50 U.S.C. § 2566(d)(1). Contrary to Defendants' position, the requirements of subsection (d)(1) are not contingent upon the failure to meet the requirements of subsection (c)(1), and, thus, subsection (d)(1) does not enforce the requirements of subsection (c)(1) and specifically does not set forth consequences for failing to meet the deadline for removing the one metric ton of defense plutonium in subsection (c)(1). First, subsection (d)(1)'s economic and impact assistance payments are not contingent upon achieving the MOX production objective by January 1, 2014, the date specified in subsection (c)(1); instead, they are contingent upon meeting the objective by January 1, 2016. If subsection (d)(1) enforced the deadlines in subsection (c)(1), one would expect that the failure to meet subsection (c)(1)'s deadline for achieving the MOX production objective would have some

consequence specified in subsection (d)(1). It does not. Instead, subsection (d)(1) sets an entirely different deadline for meeting the MOX production objective, suggesting that subsection (d)(1) does not enforce the deadline in subsection (c)(1). Consider the outcome of meeting the MOX production objective in 2015: in such circumstances, Defendants have failed to meet the January 1, 2014 deadline specified in subsection (c)(1); however, under subsection (d)(1), there are no consequences for this failure, as Defendants have met the MOX production objective before January 1, 2016. Thus, the court concludes, subsection (d)(1) does not enforce subsection (c)(1)'s deadline for meeting the MOX production objective, undermining Defendants' argument that subsection (d)(1) is the sole enforcement mechanism for subsection (c)(1)'s removal requirement.

More importantly, subsection (d)(1)'s economic and impact assistance payments are not contingent upon failure to satisfy subsection (c)(1)'s requirement to remove one metric ton of defense plutonium by January 1, 2016. If the Secretary fails to remove the one metric ton of defense plutonium by January 1, 2016, nothing in the language of subsection (d)(1) suggests a consequence for this failure. Even more telling, if the Secretary complies with subsection (c)(1) by removing one metric ton of defense plutonium before January 1, 2016, doing so would not satisfy the condition in subsection (d)(1) that, to avoid economic and impact assistance payments, the Secretary should remove one metric ton of defense plutonium from South Carolina. This is so because the removal in subparagraph (B) of subsection (d)(1) must be accomplished on or after January 1, 2016. Subparagraph (B)'s condition is satisfied on "the date on which the Secretary has removed from the State of South Carolina *in such year* at least [one] metric ton of defense plutonium." 50 U.S.C. § 2566(d)(1)(B) (emphasis added). In the phrase "in such year," the word "such" modifies the noun "year," and, according to canons of statutory interpretation, refers to a particular antecedent, in this case, the first occurrence of the word "year" in subsection (d)(1). *See*

*TNA Merchant Projects, Inc. v. Fed. Energy Regulatory Comm'n*, 616 F.3d 588, 592 (D.C. Cir. 2010) ("[T]he use of the iterative adjective 'such' indicates that th[e] language is understandable only by reference to [a] prior reference . . . ." (internal quotation marks omitted)); *United States v. Ahlers*, 305 F.3d 54, 61 (1st Cir. 2002) ("Congress used the adjective 'such' to modify the [second noun]. That usage plainly refers back to the [noun] mentioned in the previous text . . . .") 2A Singer & Singer, *supra*, § 47:33 n.1 ("Courts assume that when 'such' precedes a noun it refers to a particular antecedent noun . . . ."); 73 Am. Jur. 2d *Statutes* § 150 (2012) (observing that statutes use "such" in order "to make clear that the second reference [of a word] is to exactly the same concept mentioned previously"). The antecedent "year" is accompanied by several modifiers within the phrase "each year on or after that date through 2021," and, because "that date" must refer to January 1, 2016, the only date mentioned in subsection (d)(1), the term "such year" in which the Secretary must remove one metric ton of defense plutonium in order to avoid the economic and impact assistance payments required under subsection (d)(1) must mean "each year starting on or after January 1, 2016 through 2021." *See* 2A Singer & Singer, *supra*, § 47:33 n.1 ("Courts assume that when 'such' precedes a noun it refers to a particular antecedent noun and any dependent adjective or adjectival clauses modifying that noun . . . ."). Consequently, in order for removal of one metric ton of defense plutonium to qualify for purposes of subparagraph (B), it must occur on or after January 1, 2016. However, subsection (c)(1) requires that the removal at issue in that subsection occur "not later than January 1, 2016." 50 U.S.C. § 2566(c)(1). Plainly, then, subsections (c)(1) and (d)(1) do not refer to the removal of the same one metric ton of defense plutonium. A reading that views the two subsections to be referring to removal of the same one metric ton of defense plutonium would render the phrase "in such year" in subparagraph (B) meaningless. *See United States v. Chi Tong Kuok*, 671 F.3d 931, 945 (9th Cir. 2012) ("Without a

phrase that limits or defines the [second use of the noun], the [provision]'s use of the word 'such' is meaningless.") As a result, the removal of one metric ton of defense plutonium before January 1, 2016, pursuant to subsection (c)(1), would do nothing to extinguish the obligation to make economic and impact assistance payments under subsection (d)(1). In other words, even if the Secretary removed one metric ton of defense plutonium before January 1, 2016, in compliance with subsection (c)(1), he would still have to remove one metric ton of defense plutonium on or after January 1, 2016, assuming the MOX production objective had not been met by that date, in order to avoid making economic impact and assistance payments.

In short, if subsection (d)(1) was a provision that acted as the sole remedy for a failure to meet the requirements of subsection (c)(1) or the sole enforcement provision for the requirements of subsection (c)(1), then satisfying subsection (c)(1)'s requirement should extinguish, at least part-way, the obligation to make economic and impact assistance payments in subsection (d)(1). Because the plain language of the two subsections demonstrate that, even if the requirements of subsection (c)(1) were fulfilled, subsection (d)(1) might still impose an obligation to make economic and impact assistance payments, the court concludes that subsection (d)(1) does not offer a remedy to the State for the Secretary's failure to remove one metric ton of defense plutonium by January 1, 2016, and, therefore, does not enforce the requirements of subsection (c)(1).

Responding to this interpretation of subsections (c)(1) and (d)(1), Defendants more or less concede the accuracy of the foregoing analysis, asserting that they "never argued that pre-2016 removal would 'extinguish' any obligations under [subsection (d)(1)]" because subsection (d)(1)'s "obligations are neither triggered nor negated by removal [under subsection (c)(1)]." (ECF No. 33 at 13.) Defendants appear to maintain, however, that subsection (d)(1) is the sole remedy for failure to meet subsection (c)(1)'s deadlines and the sole enforcement mechanism for those deadlines.

(*See* ECF No. 63 at 7-8 n.3; *see also* ECF No. 60 at 29.) The court has trouble understanding this response. If Defendants maintain, as they seem to do even after their concession (ECF No. 51 at 37), that subsection (d)(1) is the sole remedy for not complying with subsection (c)(1)'s deadlines and the sole enforcement mechanism for those deadlines, in what way can subsection (d)(1) be said to be a remedy for non-compliance with subsection (c)(1) or an enforcement mechanism for its deadlines, if, by the subsections' very terms (and as Defendants concede), failure to comply with subsection (c)(1) triggers no obligations in subsection (d)(1)? Perhaps Defendants are merely arguing, as they appear to do in other instances (*see* ECF No. 63 at 7-8 n.3), that subsection (d) is the sole remedial provision and enforcement mechanism for all of § 2566, not because non-compliance with any other particular subsection results in obligations under subsection (d) but, rather, because the purpose of § 2566, as Defendants see it, precludes any remedy or enforcement method that might jeopardize the ability to transfer defense plutonium to SRS or impede the expeditious conversion of defense plutonium into MOX fuel. To the extent Defendants argue that subsection (d) is the sole remedial and enforcement provision based solely on their view of the purpose of the statute, the court has already rejected that argument. *See supra* pp. 24-27. Regardless of what precise argument Defendants are attempting to make, they have not persuaded the court that the requirement to remove one metric ton of defense plutonium under subsection (c)(1) cannot be enforced by court order on the ground that subsection (d) provides the sole remedy and enforcement mechanism for any noncompliance with subsection (c)(1).

Another facet of § 2566 that undercuts Defendants' view is the fact that the deadlines in subsection (c) have twice been amended along with other deadlines in § 2566. The first amendment, which occurred in 2005, extended by three years the original deadlines for the Secretary to submit plans, reports, and certifications to Congress and the original production

deadlines which such plans, reports and certifications are required to contain. *See* Energy and Water Development Appropriations Act, Pub. L. No. 109-103, § 313, 119 Stat. 2247, 2280-81 (2005). Notably, the amendment included extending by three years the original deadlines in subsections (c) and (d) for meeting the MOX production objective, for removing the separate metric tons of defense plutonium, and for removing what is now the vicennial amount and shifting forward by three years the period during which the Secretary would be obligated to make economic and impact assistance payments. *See* 119 Stat. at 2281. Likewise, the second amendment, which occurred in 2013, extended by two years the deadlines for reporting certain additional information to Congress, for determining whether the MOX production objective has not been achieved due to a failure to meet a milestone, and for submitting certain plans to Congress. *See* National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 3116, 126 Stat. 1632, 2172-73. The second amendment also extended by two years the same deadlines in subsections (c) and (d) that had previously been extended by three years by the first amendment. *See* 126 Stat. at 2173.

In the court's view, the fact that subsection (c)'s deadlines were extended along with other deadlines that Defendants do not dispute are mandatory, supports the conclusion that subsection (c)'s deadlines are also mandatory. This conclusion is further buttressed when the amendments to subsection (c) are viewed in light of the parties' arguments. Under the State's view, extending subsection (c)'s deadlines is understandable: assuming lawmakers desired to extend deadlines for accomplishing actions required to be taken by the Secretary, then it makes sense to extend the deadline for removing the one metric ton of defense plutonium under subsection (c)(1) along with all the other deadlines for mandatory action. The reasonableness of the amendments do not fare as well under Defendants' view. If, as Defendants appear to concede, failure to meet the deadlines in subsection (c)(1) carries no consequences, why would lawmakers extend the time for

accomplishing the tasks set forth in subsection (c)(1)? If subsection (c)(1) merely sets forth goals, and the sole remedy provision is found in subsection (d), why would lawmakers extend the deadlines set by both subsections? Although there may be answers to these questions that harmonize with Defendants' view of the statute, in the court's view, they are not as cogent as the answers presented by the State's view.

In sum, the context and structure of § 2566 provide no basis for Defendants' contention that subsection (c)(1) does not impose a non-discretionary duty to remove one metric ton of defense plutonium from South Carolina upon the occurrence of the conditions therein.

c. The removal requirement of § 2566(c) is not absurd on its face. Next, Defendants assert a straightforward argument that the State's view is absurd on its face. Defendants observe that, under the State's view, the Secretary has a non-discretionary duty to remove one metric ton of defense plutonium by January 1, 2016, and a non-discretionary duty to remove the vicennial amount of defense plutonium by January 1, 2022, both triggered by the failure to meet the MOX production objective by January 1, 2014. Defendants contend that this result is absurd and hypothesize two scenarios that, they claim, demonstrate the absurdity. First, the Secretary could meet the MOX production objective before January 1, 2014, but thereafter utterly fail at expeditiously processing MOX fuel, and the State would be deprived of the ability to force removal of the one metric ton or the vicennial of the defense plutonium merely because the Secretary happened to meet the objective by 2014. Second, the Secretary could fail to meet the MOX production objective by January 1, 2014, but thereafter wholly succeed at expeditiously processing MOX fuel, and Defendants would be forced to remove one metric ton of defense plutonium by 2016 and the vicennial amount of defense plutonium by 2022, all of which could successfully have been converted into MOX fuel, merely because the Secretary happened to fail to meet the objective

by 2014. In Defendants' estimation, lawmakers could not have intended remedies so incongruous to the ailment: they could not have intended to give the Secretary a pass in 2016 and 2022 merely because he was successful in 2014, and they could not have intended to deprive the Secretary of the opportunity to process the one metric ton and the vicennial amount of defense plutonium by 2016 and 2022, respectively, merely because he was not successful in meeting a production goal by 2014. In support of this argument, Defendants cite a number of cases in which courts have rejected the plain language of a statute when following it would lead to results that are absurd or in contravention of the statute's purpose. *See, e.g.*, *King v. Burwell*, 135 S. Ct. at 2492-93; *Chesapeake Ranch Water Co. v. Bd. of Comm'rs*, 401 F.3d 274, 278-80 (4th Cir. 2005).

Although on occasion courts will "disregard the plain language of a statute," they "are without authority to [do so] except in the rare circumstances in which there is 'a clearly expressed legislative intent to the contrary,' literal application would frustrate its purpose, or literal application would lead to an absurd result." *In re Vial*, 115 F.3d 1192, 1196 (4th Cir. 1997) (en banc) (internal citations omitted) (quoting *Reeves v. Ernst & Young*, 507 U.S. 170, 177 (1993) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982); *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543 (1940)); *accord Chesapeake Ranch Water Co.*, 401 F.3d at 280. Much of Defendants' argument here essentially rehashes their contention that lawmakers would have no rational reason to make removal of defense plutonium by 2022 dependent on whether the MOX production objective was met by January 1, 2014. The court has already rejected this argument, *see supra* pp. 24-27, and thus concludes that there is no indication in the statute of legislative intent that would be controverted by making the failure to meet the MOX production objective by January 1, 2014, a trigger for the required removal of one metric ton of defense plutonium by January 1, 2016, and the vicennial amount by January 1, 2022. For the same reasons,

the court likewise concludes literal application of this triggering mechanism would not frustrate the purposes of § 2566.

The only remaining issue is whether, *prima facie*, literal application of the triggering mechanism would lead to an absurd result. In the absence of any ambiguity on the issue in the text of the statute as a whole, courts are especially reticent to augur absurd results from the statute's operation, and a challenge to the plain, unambiguous language of the statute on the basis of absurdity face a very demanding standard. *See Tiscareno-Garcia v. Holder*, 780 F.3d 205, 208 (4th Cir. 2015) ("[R]esults in an outcome that can truly be characterized as absurd [are those] that [are] so gross as to shock the general moral or common sense . . . ." (internal quotation marks omitted)); *In re Vial*, (to upend "literal application of the statutory language," the result must be "'so inconsistent with public policy and abhorrent to the sense of justice' as to warrant disregarding the plain language of the statute on the basis of its absurdity" (brackets omitted) (quoting *Sorrells v. United States*, 287 U.S. 435, 449 (1932))); *Payne v. Fed. Land Bank of Columbia*, 916 F.2d 179, 182 (4th Cir. 1990) ("[I]n most cases, the plain meaning of a provision not contradicted by any other provision in the same instrument, is not to be disregarded because we believe the framers of the instrument could not intend what they say. It must be one in which the absurdity and injustice of applying the provision to the case would be so monstrous that all mankind would without hesitation, unite in rejecting the application." (quoting *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 202-03 (1819))); 2A Singer & Singer, *supra*, § 45:12 ("[D]eparture from literalism, generally known as the 'absurd results doctrine,' should be used sparingly because it does entail the obvious risk that the judiciary will displace legislative policy on the basis of speculation that the legislature could not have meant what it unmistakably said.")

Here, the literal application Defendants challenge—which requires removal of the one metric ton of defense plutonium by January 1, 2016, and removal of the vicennial amount of defense plutonium by January 1, 2022, because the MOX production objective was not met by January 1, 2014—does not come close to meeting this exacting standard. Aside from the erroneous assertion that the statute's only purpose is to facilitate the expeditious construction of the MOX Facility and conversion of defense plutonium into MOX fuel, Defendants offer only one argument to support their contention that viewing subsection (c)(1) as imposing a mandatory obligation to remove defense plutonium is absurd. They argue that lawmakers would have chosen financial remedies, not injunctive remedies, because lawmakers were aware that the Secretary would face a host of obstacles if the statute forced Defendants to "abruptly change course and transfer" defense plutonium elsewhere and "suddenly force [Defendants] to fundamentally reorient [their] approach to defense plutonium disposition." (ECF No. 17 at 30.) This argument does not persuade the court that it would be absurd—abhorrent to the sense of justice and so monstrous as to be rejected without hesitation—to view subsection (c) as imposing a mandatory obligation to remove defense plutonium. For one thing, even assuming that Defendants were completely unaware until January 1, 2014, that the MOX production objective would not be achieved by that date, they would still have two years in which to secure another location outside of South Carolina for storing or disposing the one metric ton of defense plutonium and eight years in which to secure one for the vicennial amount. These time periods belie Defendants complaints regarding "abrupt" or "sudden" shifts in policy that they could not anticipate. Further, the assumption that Defendants would not know until January 1, 2014, whether the MOX production objective would be achieved in time does not hold water, as numerous provisions in § 2566 call for the Secretary to pay close attention

to whether the MOX production objective will be timely met.[15] Because the statutory scheme gives Defendants time to implement subsection (c)'s removal requirements, the court rejects Defendants contention that mandatory removal would be absurd because it would force sudden, abrupt changes in the nation's defense plutonium disposition strategy. Moreover, the court notes that Defendants' argument in this regard still appears to ignore half of the twin purposes for which the law itself states it was enacted. In Defendants' view, the only remedies provided in § 2566 for failure to convert the defense plutonium transferred to SRS into MOX fuel are financial, not injunctive, because of the difficulty involved in transferring defense plutonium elsewhere. This view makes no accommodation for one of the express purposes of § 2566: to prevent the accumulation of defense plutonium in South Carolina by ensuring "that all defense plutonium . . . transferred to [SRS] either be processed *or be removed* expeditiously." Bob Stump National Defense Authorization Act for Fiscal Year 2003, § 3181(6), 116 Stat. at 2747 (emphasis added).

To sum up, looking only at the statute, subsection (c)(1)'s use of the word "shall" creates a presumption that the removal described therein is mandatory. The context and structure of § 2566, rather than overcome this presumption, only serve to confirm it. Moreover, Defendants have failed to meet the demanding standard required for the court to hold that the plain and unambiguous language of subsection (c)(1) should be rejected because it produces absurd results.

---

[15] Subsection (a) requires the Secretary to submit a plan for achieving the MOX production objective by January 1, 2012, and, between 2004 and 2010, to submit annual reports that assess compliance with the schedule designed to achieve the MOX production objective and that certify whether or not the MOX production objective will be met by January 2012. *See* 50 U.S.C. § 2566(a)(2)(A), (3)(B). Much of subsection (b) is dedicated to requiring the Secretary to take corrective actions in the event his reports to Congress required by subsection (a) indicate that the MOX production objective will not be timely met. *See* 50 U.S.C. § 2566(b)(1)-(4).

2. *Assessment of the legislative history under the Rule 12(b)(6) standard*

As previously explained, the court believes it may consider the numerous extrinsic documents attached to the parties' briefing without converting Defendants' motion to dismiss into one for summary judgment. To the extent the court's conclusion that the plain and unambiguous language of § 2566 demonstrates that subsection (c)(1) imposes a non-discretionary duty on the Secretary to remove one metric ton of defense plutonium from South Carolina for storage or disposal elsewhere is somehow flawed, the court, despite its qualms about ascribing intent to a legislative body and somehow auguring that intent from sources beyond the text of the law they enacted, would look to the legislative history of § 2566 to determine whether lawmakers intended to impose on the Secretary the non-discretionary duty asserted by the State. *See Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir. 2015) ("[I]f the text of a statute is ambiguous, [courts] look to 'other indicia of congressional intent such as the legislative history' to interpret the statute." (quoting *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 53 (4th Cir. 2011))).

Although the parties refer to a number of documents potentially constituting the legislative history of § 2566, their dispute as to the interpretation of § 2566 to be drawn from the legislative history centers on only five types of evidence regarding legislative intent: (1) correspondence containing negotiation between South Carolina officials and DOE officials, culminating in an April 11, 2002 letter from the Secretary to the Governor of South Carolina that the State asserts formed the basis for § 2566; (2) comments made by individual legislators during congressional debates, indicating their views on how § 2566 ultimately would operate; (3) reports to Congress by NNSA and the Congressional Budget Office ("CBO") regarding the bill that eventually became § 2566, which indicate Congress' understanding of how the statute would operate; (4) a GAO report to Congress regarding the costs of disposing of defense plutonium that, Defendants assert,

demonstrates Congress' intent to not remove plutonium from SRS; and (5) correspondence from the Governor to the Secretary regarding Defendants' conduct in complying with § 2566's provisions. Addressing each type of evidence in turn and construing the evidence in the light most favorable to the State, *see Zak*, 780 F.3d at 607; *Clatterbuck*, 708 F.3d at 607, the court concludes that the legislative history presented by the parties confirms the court's view that subsection (c)(1) imposes a non-discretionary duty on the Secretary to remove one metric ton of defense plutonium.

The first evidence of legislative intent comes in the form of an April 11, 2002 letter from the Secretary to the Governor (*see* ECF No. 10-20) that, the State asserts, was the culmination of negotiation between South Carolina and DOE officials in trying to reach (non-statutory) agreement regarding the construction of the MOX Facility at SRS, transfer of defense plutonium to SRS, and disposition of defense plutonium at SRS through MOX fuel processing (*see* ECF No. 10-1 at 10-14; ECF No. 27 at 21-24 & nn.9-11). Accompanying the Secretary's letter was a proposed agreement between South Carolina and DOE that included a provision that, if MOX fuel was not processed at a specific rate, DOE would remove from South Carolina defense plutonium earmarked for MOX fuel processing in compliance with NEPA, specifying that "[a]t least one ton will be removed within two years and all material will be removed within no more than eight years." (ECF No. 10-20 at 10). Noting South Carolina's concern that it would not be able to enforce this and other provisions, the Secretary, in an effort to appease these concerns, explained that the proposed agreement also "contains a legislative proposal that specifically requires [DOE] to remove all plutonium brought to [SRS] after April 15, 2002[,] if the MOX facility is not built and operating on schedule." (*Id.* at 5.) The proposed agreement states that both parties would agree to support the legislative proposal, which stated:

> If the MOX Fuel Fabrication Facility is not producing at least one metric ton of MOX per year by January 1, 2009, the Secretary shall, consistent

> with NEPA and other governing laws and subject to the availability of appropriations, remove at least one ton of weapons-usable plutonium by January 1, 2011, and shall remove an amount of weapons-usable plutonium equal to the amount of weapons-usable plutonium transferred to [SRS] after April 15, 2002[,] by January 1, 2017.

(ECF No. 10-20 at 10.) The State asserts, and the court agrees, that the proposed provision is essentially the same provision found in § 2566(c), as originally enacted.[16]

Based on this letter, the State argues that, when the Secretary essentially drafted subsection (c)'s language, he understood the language to accord with the State's view that subsection (c) requires removal of one metric ton of defense plutonium within two years after failing to meet the deadline set for achieving a MOX processing goal and removal of the remainder of the defense plutonium transferred to SRS within eight years of that failure. (*See* ECF No. 27 at 13-14, 21-24 & nn.9-11) Thus, the State argues, lawmakers, in enacting the provision originally drafted and proposed by the Secretary, intended the same result that the Secretary envisioned in 2002 and that the State now advances. (*See id.* at 24.) Defendants, hoewever, assign little weight to the correspondence because neither the Secretary's letter nor the proposed agreement make any mention of economic and impact assistance payments contained in the legislation that was

---

[16] As originally enacted, subsection (c) read:

> If the MOX production objective is not achieved as of January 1, 2009, the Secretary shall, consistent with [NEPA] and other applicable laws, remove from the State of South Carolina, for storage or disposal elsewhere—
>
> (1) not later than January 1, 2011, not less than 1 metric ton of defense plutonium or defense plutonium materials; and
>
> (2) not later than January 1, 2017, an amount of defense plutonium or defense plutonium materials equal to the amount of defense plutonium or defense plutonium materials transferred to [SRS] between April 15, 2002 and January 1, 2017, but not processed by the MOX facility.

Bob Stump National Defense Authorization Act for Fiscal Year 2003, § 3182(c), 116 Stat. at 2749.

ultimately enacted and, thus, are not capable of answering whether lawmakers intended economic and impact assistance payments to be the sole remedy for any failures to comply with subsection (c). (*See* ECF No. 33 at 14 & n.2.)

Both parties' arguments are well-taken. Although, in the court's estimation, the Secretary's letter and proposed agreement are clear indicators that, in 2002, the Secretary understood the language eventually incorporated into subsection (c) to impose a non-discretionary duty to remove defense plutonium that would be enforceable by the State, the court cannot assign this evidence controlling weight. The evidence does not explain how the Secretary's view of the language might have changed if a provision for economic and impact assistance payments like the one eventually incorporated into subsection (d), were before him. More importantly, it does not explain whether the lawmakers who enacted § 2566 had the same view of the language as espoused by the Secretary. Nonetheless, viewing the evidence in the light most favorable to the State, the court can draw a fair inference that, because lawmakers incorporated much of the language drafted and proposed by the Secretary, they would have found his view of the language, as expressed in his letter, influential in making decisions regarding the language to include in § 2566.

The second evidence of legislative intent comes from a number of comments by legislators regarding § 2566. During Senate debates in July 2001, Senator Ernest "Fritz" Hollings noted that he had submitted an amendment to delay defense plutonium shipments to SRS until DOE solidified its commitment to convert it to MOX fuel and to transfer the materials out of SRS. 147 Cong. Rec. S78901, 2001 WL 815212 (daily ed. July 19, 2001) (statement of Sen. Hollings). In joining Senator Hollings, Senator Strom Thurmond, explained that, although the MOX fuel processing program was critically important, he remained "concerned the administration is not fully committed to [it],

leaving South Carolina a dumping ground for our Nation's surplus nuclear weapons material." *Id.* (statement of Sen. Thurmond).

During Senate debate of the conference report for the Energy and Water Development Appropriations Act of 2006, which amended § 2566 by extending a number of its deadlines, including the deadlines set by subsections (c) and (d), by three years, Senator Lindsey Graham expressed his concern that the MOX fuel processing program was underfunded and construction of the MOX Facility was delayed even though "South Carolina took considerable risks by allowing shipments of defense plutonium to be sent to [SRS] . . . in advance of the construction of the MOX plant." 151 Cong. Rec. S12744-45, 2005 WL 3039286 (daily ed. Nov. 14, 2005) (statement of Sen. Graham). Senator Graham further explained that, under § 2566,

> language was negotiated between the State of South Carolina and the Federal Government that required [DOE] to convert one metric ton of defense plutonium into fuel for commercial nuclear reactors by 2011 or face penalties of $1 million per day up to $100 million per year until the plutonium is either converted into the fuel or removed from the State. It has never been the intention of South Carolina to receive penalty payments; the residents of the State simply sought reassurances that weapons-grade plutonium would not remain at SRS indefinitely. South Carolina would not have accepted plutonium without this statute. However, until the plant is operational, it is critical to maintain the protections provided in [§ 2566].

*Id.* In response, Senator Pietro "Pete" Domenici stated that the bill included "a [three]-year delay in the penalty payment;" that, if funding for the MOX fuel processing program were eliminated, this would "likely foreclose a disposal pathway for plutonium stored at [SRS], causing [DOE] to pay the State of South Carolina up to $100,000,000 per year in fines starting in 2014;" and that, "in the event that [DOE] is unable to meet the statutory requirements for the [MOX] facility, the solution ensures that South Carolina does not become the permanent storage site for defense plutonium." *Id.* (statement of Sen. Domenici).

Following enactment of the Energy and Water Development Appropriations Act, the House of Representatives considered an appropriations bill that had been reported out of subcommittee, which touched on some of the Act's provisions. During debate, Representative John Spratt expressed concern that the subcommittee had recommended "zero[ing] out" funds for constructing the MOX Facility. 152 Cong. Rec. H3164, 2006 WL 1420552 (daily ed. May 24, 2006) (statement of Rep. Spratt). Representative Spratt further explained:

> In 2002, the state of South Carolina, in an arrangement with [DOE] and Congress, agreed to allow 34 tons of weapons grade nuclear material for MOX processing [to] be stored at [SRS]. In exchange, the state of South Carolina received assurances that the MOX fuel plant would be completed on schedule. And to be sure, we put in place penalty payments for [DOE] if the MOX fuel plant's construction delayed beyond 2011.
>
> . . . .
>
> . . . . [W]ithout the MOX program, South Carolina is stuck with 34 tons of weapons grade plutonium with no clear pathway for disposal. When South Carolina agreed to take the Nation's plutonium, it did not do so to become plutonium's final burial place. We only took the plutonium with the promise that a processing facility and ultimate removal would be forthcoming. The penalty payments imposed on [DOE] were our ace in the hole to make sure this happened.
>
> . . . . Tons of plutonium have been shipped to South Carolina, based on the iron-clad promise that it would be processed into MOX reactor fuel and shipped out on schedule. . . . To cancel this substantial project so precipitously, with no input from [DOE], with no consideration of sunk cost, and with the enormous cost to terminate for convenience does not seem wise or right to me, particularly when we lack an agreed-upon alternative that has been studied and found superior to the MOX fuel option.

*Id.*

Defendants argue that the statements by Senator Graham and Representative Spratt, both members of South Carolina's congressional delegation, demonstrate a congressional understanding that the economic and impact assistance payments were the only remedy available to enforce DOE's commitment to remove defense plutonium. Defendants emphasize Senator

Graham's statement that DOE was required to convert one metric ton of defense plutonium into MOX fuel or make the economic and impact assistance payments until the defense plutonium is processed or removed. (*See* ECF No. 17 at 24-25.) They likewise emphasize Representative Spratt's statement that the economic impact and assistance payments were South Carolina's "ace in the hole" to force compliance with § 2566. (*See id.*; ECF No. 33 at 14 n.3.) In Defendants' estimation, these statements demonstrate that the economic and assistance payments were the only remedy to be used in the event that the MOX production objective was not met and removal did not occur; the State could not obtain both removal and economic impact and assistance payments. (*See* ECF No. 17 at 24.)

The State argues that Defendants shortchange and misinterpret Representative Spratt's remarks and emphasize his statement that South Carolina agreed to accept the transfer of defense plutonium based on the promise that it would eventually be removed from the state. (*See* ECF No. 27 at 25 n.12). In the State's view, Representative Spratt's statement should not be understood as suggesting that making the economic and impact assistance payment would relieve the Secretary of the obligation to remove the defense plutonium from South Carolina. (*See id.*) With respect to the exchange between Senators Graham and Domenici, the State emphasizes the latter's comment that extending deadlines in the statute is needed to further the ends of the statutory scheme, which ensures that South Carolina does not become the final repository for defense plutonium. (*See* ECF No. 51 at 10.) The State also points to Senator Thurmond's statement that, once SRS was designated as the location for the MOX Facility, South Carolina was concerned that, if funding for its construction was not guaranteed, then South Carolina would be the de facto dumping ground for defense plutonium. (*See* ECF No. 27 at 25-26 & n.13; ECF No. 51 at 6.) In the State's estimation, all these remarks demonstrate that the primary concern of South Carolina's delegation

was that the state not become the repository for defense plutonium and that, however the economic impact and assistance payments operate, lawmakers did not intend to allow them to be used to completely evade the removal requirement.

The court does not find the statements by these legislators to hold much, if any, weight. With the exception of Senator Thurmond's remarks, each of the statements to which the parties refer were made only after the law now codified at § 2566 was enacted. "As the Supreme Court has observed, 'post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.'" *Union Carbide Corp. v. Richards*, 721 F.3d 307, 316 (4th Cir. 2013) (brackets omitted) (quoting *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011)). Representative Spratt's statement was made in debating a later appropriations bill, and his description of the operation of § 2566's provisions could have no bearing on whether § 2566 would be enacted or how the lawmakers who enacted it viewed it at the time. *See Bruesewitz*, 562 U.S. at 242 ("Real (pre-enactment) legislative history is persuasive to some because it is thought to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law. But post-enactment legislative history by definition 'could have had no effect on the congressional vote'" (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005))); *Laborers' Local 265 Pension Fund v. iShares Trust*, 769 F.3d 399, 409 (6th Cir. 2014) ("[A] post-enactment legislative body has no special insight regarding the intent of a past legislative body." (citing *Penn. Med. Soc. v. Snider*, 29 F.3d 886, 898 (3d Cir. 1994))). Senator Graham's statements were made in the context of amending some of § 2566's provisions; however, the amendments at issue made no relevant changes of substance to the working of subsections (c) and (d) and, therefore, his description of the operation of those subsections carries little to no weight in determining the legislative intent

53

behind them. *See Pierce v. Underwood*, 487 U.S. 552, 566-67 (1988) (rejecting as authoritative congressional gloss contained in committee report on previously enacted legislation "because it is not an explanation of any language that the . . . [c]ommittee drafted . . . and because there is no indication that [the subsequent Congress] thought it was doing anything insofar as the present issue is concerned"); *Univ. Med. Ctr. of Se. Nev. v. Thompson*, 380 F.3d 1197, 1202 (9th Cir. 2004) ("[S]ubsequent legislative history is an unreliable guide to legislative intent. This is particularly the case when . . . the discussion of existing law does not accompany a related amendment to the pertinent statutory provision." (internal quotation marks and citation omitted) (citing *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 840 (1988))). Senator Domenici's remarks, which more clearly concern the amendments made to § 2566, are too ambiguous to shed much light on the issue. Senator Thurmond's statement, although pre-enactment and thus relevant to legislative intent, states that South Carolina had no intention of becoming a dumping ground for defense plutonium, but makes no mention of the statutory mechanisms for ensuring that its intention would be realized.

To the extent the court accords any weight to the statements referenced by the parties, it concludes that, viewing them in the light most favorable to the State, they do not impair the conclusion that the removal described in subsection (c) is a non-discretionary, enforceable requirement. As the State points out, the statements of all four of the legislators confirm what the text of the statute states: that one of its purposes is to ensure that defense plutonium transferred to SRS does not accumulate and remain in South Carolina but is, instead, converted into MOX fuel or removed from the state. From the statements by Senator Graham and Representative Spratt, Defendants divine an intent to achieve this purpose only through use of economic and impact assistance payments. The court is not persuaded that these two statements should be accorded the

weight or meaning ascribed to them. Senator Graham's brief statement on the issue evinces a clear misunderstanding of another aspect of the statutory language, *see* 151 Cong. Rec. S12744 (describing the MOX production objective in subsection (c) as the requirement "to convert one metric ton of defense plutonium into fuel for commercial nuclear reactors by 201[4]"), and therefore his view of the interplay between subsections (c) and (d) is not convincing. Defendants appear to take Representative Spratt's remark that the economic and impact assistance payments were the "ace in the hole" for South Carolina to mean that they were the only enforceable remedy. However, the idiom Representative Spratt employed does not refer to one's *only* recourse; rather, it refers to an *effective* recourse *used only when needed. See Oxford Dictionary of English Idioms* 2 (John Ayto ed., 3d ed. 2010) (defining "ace in the hole" and similar expression to mean "hav[ing] an effective resource . . . kept hidden until it is necessary to use it; hav[ing] a secret advantage"); Christine Ammer, *The American Heritage Dictionary of Idioms* 2 (2d ed. 1997) (defining "ace in the hole" as "[a] hidden advantage or resource kept in reserve until needed"). Thus, the only statements on which Defendants rely are of little help to them.

Most importantly, even if the court ascribed to the legislators' statements the meaning that Defendants advance, whatever weight the court accorded to them would be outmatched by "'the most persuasive evidence of [c]ongressional intent'" that legislative history can afford, *see Kofa v. U.S. Immigration & Naturalization Serv.*, 60 F.3d 1084 (4th Cir. 1995) (quoting *Davis v. Lukhard*, 788 F.2d 973, 981 (4th Cir. 1986)), the conference report of the original bill that became § 2566, which both parties have inexplicably ignored. The conference report states:

> The Senate amendment contained a provision . . . direct[ing] the Secretary of Energy to submit . . . a plan[, which would] include a schedule for construction and operations . . . to achieve the MOX production objective, to ensure that one ton of MOX fuel has been produced by December 31, 2009 . . . . If in any year the Secretary of Energy does not comply with the plan and the schedule, the Secretary would have to make economic assistance payments

to the State of South Carolina at the rate of $1.0 million per day but not to exceed $100.0 million in any year. . . .

At various stages in the process, if the Secretary of Energy is not in compliance with the plan or any subsequent corrective action plans, the Secretary would *also* have to remove all or part of the defense plutonium materials that had been shipped to [SRS] in South Carolina.

The House bill contained no similar provision.

The House recedes with an amendment providing that any requirement to pay economic assistance payments to the State of South Carolina may be made from any funds available to the Secretary without the requirement for further authorizations or appropriations for such payments and an additional MOX processing requirement for the period between 2011 and 2017.

H.R. Rep. No. 107-772, at 798 (2002) (Conf. Rep.) (emphasis added). As the conference report explains, the provisions for removal and for economic and impact assistance payments were discussed by the conference committee because they were included in the Senate version of the bill but absent from the House version. *Id.* The conference committee plainly stated not only that the Secretary would have to make economic impact and assistance payments in the event the MOX production objective was not met, but *also* that he would have to remove all or a portion of the defense plutonium transferred to SRS. *Id.* To the extent the statements of individual legislators suggest a different view of § 2566, the court would side with the view expressed in the conference report.

The third evidence of legislative intent comes in the form of two reports submitted to Congress prior to the statute's enactment. In May 2002, the CBO prepared a report regarding the cost of implementing what would become the Bob Stump National Defense Authorization Act for Fiscal Year 2003 and submitted the report to the Senate on June 18, 2002. *See* 148 Cong. Rec. S5677-85, 2002 WL 1332143 (daily ed. June 18, 2002). Relevant here, the CBO report states:

Section [2566] would require that the Secretary of Energy pay up to $100 million a year to the state of South Carolina beginning in 201[6], if the

planned conversion schedule was not met. The federal government could avoid these penalties, however, if it removes at least one metric ton of plutonium a year from South Carolina over the 201[6]-20[21] period and removes all remaining plutonium after 20[21].

. . . . If DOE does not remove the required surplus plutonium from the state of South Carolina, DOE would need to pay up to $100 million a year to the state starting in 201[6].

*Id.* at S5682. In February 2002, NNSA submitted a report to Congress detailing the options for disposing of the defense plutonium it had transferred, and planned to transfer to SRS. Relevant here, the report assessed the consequences of storing defense plutonium at SRS, stating that "[s]torage in place undercuts existing commitments to the states, particularly South Carolina, which is counting on disposition as a means to avoid becoming the permanent 'dumping ground' for surplus weapons-grade plutonium by providing a pathway out of [SRS] for plutonium brought there for disposition." (ECF No. 10-4 at 53.)

Defendants argue that the CBO report is based on the presumption that, if the MOX production objective is not met, the Secretary would have the choice to either remove defense plutonium or make the economic impact and assistance payments. (*See* ECF No. 17 at 24.) They note that the CBO report makes no mention of a remedy requiring removal in addition to the payment remedy. (*See id.*) The State reads the CBO report to refer only to the payment requirements now found in subsection (d)(1), which, after the amendments extending the deadlines by five years, requires the Secretary, in each year starting 2016 through 2021, to make the economic and impact assistance payments until one metric ton of defense plutonium is removed from South Carolina during each of those years. (ECF No. 27 at 19-20.) The State also argues that the NNSA report confirms its view that lawmakers never intended to make South Carolina the final repository for defense plutonium and that any view of the statute that countenances this result should be rejected. (*See id.* at 24.)

In the court's view, neither the CBO report nor the NNSA report are of much interpretative value. The CBO report clearly assesses only the budgetary impact of the provisions now incorporated into subsection (d). It refers only to the deadline for meeting the MOX production objective in subsection (d) and does not mention the earlier deadline (by two years) for meeting the MOX production objective now found in subsection (c). Nor does it mention the requirement to remove the one metric ton of plutonium prior to the deadline in subsection (d) or the requirement to remove what is now the vicennial amount after the period set forth in subsection (d). Thus, the fact that the CBO report makes no mention of an injunctive remedy to remove plutonium under subsection (c) in addition to the payment remedy in subsection (d) should come as no surprise, as the report made no attempt to assess subsection (c) or compare it to subsection (d). As a result, the CBO report offers no support for the view that the lawmakers who relied on the report would view subsection (d) as the exclusive remedy provision for § 2566. Viewed in the light most favorable to the State, the NNSA report offers some (albeit weak) support for the conclusion that the lawmakers who might have relied on the report did not intend to leave the State without any ability to enforce removal of the defense plutonium shipped to SRS.

The fourth evidence proffered for the purpose of determining legislative intent is based on a February 2014 GAO report to the House of Representatives Subcommittee on Energy and Water Development and Related Agencies. *See* U.S. Gov't Accountability Office, GAO-14-231, *Plutonium Disposition Program: DOE Needs to Analyze the Root Causes of Cost Increases and Develop Better Cost Estimates* (2014), *available at* http://www.gao.gov/assets/670/660927.pdf. Summarizing information regarding MOX Facility construction delays and cost overruns provided by NNSA, the GAO report estimates "that the MOX facility would start operations in November 2019 and that it would take approximately 15 years to complete the mission to dispose of 34 metric

tons of surplus weapons-grade plutonium." *Id.* at 24. Defendants note that, despite GAO's estimation that MOX fuel processing would not commence until 2019 and would not be completed until 2034, lawmakers have "kept funding construction, as recently as late 2015, knowing full well that the facility would not be operational until shortly before, and possibly after, 2022." (ECF No. 33 at 10 (citing National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, § 3119(a)(1), 129 Stat. 1197 (Nov. 25, 2015)).) Defendants argue that it would be absurd to believe that lawmakers would continue to fund construction of the MOX Facility for the purpose of converting defense plutonium into MOX fuel while they were aware that "the facility would suddenly have no defense plutonium at SRS to process as soon as it was built." (*Id.*)

The court is not persuaded by this argument. As an initial matter, the court notes that this particular argument was first raised in Defendants' reply brief, offering no opportunity for the State to respond. "'The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.'" *Moodie v. Kiawah Island Inn Co., LLC*, 124 F. Supp. 3d 711, 725 n.11 (D.S.C 2015) (quoting *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006)). Nevertheless, even if the court decided to consider the argument, it would not change the court's view. Not only does the information contained in the GAO report as well as lawmakers' decision to continue funding construction of the MOX Facility constitute post-enactment legislative history that could not possibly have any bearing on the legislative intent in enacting the statute, *see Bruesewitz*, 562 U.S. at 242; *Union Carbide Corp.*, 721 F.3d at 316, the decision to continue funding, even under the State's view of the statute, is not absurd. Lawmakers could decide to continue funding construction of the MOX Facility even knowing that MOX fuel processing would not commence until 2019, that the vicennial amount must be removed by 2022, and that MOX processing could not be complete until 2034. This is so

because there are multiple reasons for completing construction of the MOX Facility and commencing conversion of defense plutonium into MOX fuel aside from the goal of completing the conversion of all 34 tons of defense plutonium into MOX fuel. First, there would be defense plutonium to process. As much as Defendants want to act as if 2019 is essentially 2022, it is not; if the MOX Facility commenced operations in 2019, it would have until 2022 to process as much as possible of the defense plutonium otherwise subject to subsection (c)(2)'s vicennial-amount provision. Further, subsection (c)(2) only requires removal by 2022 of the vicennial amount; any defense plutonium transferred to SRS before April 15, 2002, or after January 1, 2022, could be processed by the MOX Facility after the 2022 deadline. Second, even if the amount of defense plutonium converted to MOX fuel were relatively small, lawmakers might still view continued construction of the MOX Facility worth funding. At a minimum, continued construction demonstrates good faith on the part of the federal government in living up to the commitments it has made to state governments and to foreign governments (especially those commitments made to Russia in the PMDA), even if the actions demanded by those commitments have been heretofore delayed. Moreover, continued construction has the benefit of maintaining for the time being the status quo for the nation's defense plutonium disposition policy, a policy area in which there are limited options, all of which appear to have path-dependent characteristics, making it difficult to change course once committed. Lawmakers might also consider in their decision to continue funding construction of the MOX Facility, the likelihood of a later legislative fix, such as an extension of the deadlines for meeting the MOX production objective, removing defense plutonium, and making economic impact and assistance payments, a fix that already has been employed twice in § 2566's short history. For these reasons alone, attributing to lawmakers a

decision to continue funding the MOX Facility's construction, even in the face of existing deadlines for required removal, is not absurd.

The fifth evidence of legislative intent, offered by Defendants, is a December 14, 2015 letter from the Governor to the Secretary, in which the Governor stated that DOE was obligated to meet the MOX production objective or remove one metric ton of defense plutonium by January 1, 2016; that, if DOE failed to do so, it would be required to make economic impact and assistance payments; and that, because it appeared DOE would fail to meet the MOX production objective or remove the one metric ton of defense plutonium, South Carolina intended to begin collecting economic and impact assistance payments. (*See* ECF No. 10-39 at 2-3.) Defendants argue that this letter demonstrates that South Carolina has expressed an understanding that subsection (d)'s economic and impact assistance payments are the only enforceable remedy for failure to meet the MOX objective or remove defense plutonium in compliance with subsection (c). (ECF No. 17 at 25-26.)

The court rejects Defendants' argument. First, to the extent Defendants rely on the letter as an indicator of lawmakers' views prior to enactment of the statute, it is of no use. As post-enactment legislative history, the letter fails to provide reliable evidence of South Carolina's understanding of the operation of what is now codified at § 2566, much less the understanding of the federal lawmakers who enacted the statute. *See Bruesewitz*, 562 U.S. at 242; *Union Carbide Corp.*, 721 F.3d at 316. Second, to the extent Defendants rely on the letter as an indicator of South Carolina's recent or current understanding of § 2566, it is irrelevant. Unless Defendants wish to advance some sort of estoppel argument (which they have not done), the recent or current views of South Carolina officials' on the statute have no bearing on whether subsection (c)(1) imposes a non-discretionary duty on the Secretary to remove one metric ton of defense plutonium upon the

61

occurrence of the conditions stated therein. If the State's current views of the law were in any way authoritative, this order would be much, much shorter.

In sum, much of the evidence of legislative intent referenced by the parties either is irrelevant or carries little to no weight. To the limited extent the evidence indicates the intent of lawmakers in enacting § 2566, the court, viewing the evidence in the light most favorable to the State, determines that it only confirms its conclusion that subsection (c)(1) imposes a non-discretionary duty on the Secretary to remove from South Carolina one metric ton of defense plutonium when the conditions for doing so have occurred.

3. *Assessment of the legislative history under the Rule 56 standard*

As previously explained, assuming that it is necessary to assess the parties' evidence regarding legislative intent, if the court's determination that it could assess that evidence under Rule 12(b)(6)'s standard is somehow flawed, the court believes it could properly convert the instant motion into one for summary judgment and assess the evidence under Rule 56's standard. Under that standard, Defendants, as the movants, bear the initial burden of demonstrating, through evidence or otherwise, that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 323. Once Defendants have done so, the State, by presenting evidence or otherwise, must demonstrate that there remains a genuine issue of material fact. *See id.* at 324. In making a summary judgment determination, the court must view the evidence in the light most favorable to the State and draw all reasonable inferences in its favor. *See S.B. ex rel. A.L. v. Bd. of Educ.*, 819 F.3d 69, 74 (4th Cir. 2016).

Because the standards for the court's review of the evidence of legislative history are nearly the same under Rule 12(b)(6) and Rule 56, the court's analysis proceeds along the same lines as the analysis in Part IV.A.2. Because the court concludes that the GAO report submitted to Congress

and the December 14, 2015 letter from the Governor to the Secretary are irrelevant for purposes

of determining legislative intent, they are of no aid to Defendants in demonstrating that there is no

genuine issue of material fact or that they are entitled to judgment as a matter of law. Viewing the

April 11, 2002 letter from the Secretary to the Governor, the statements by individual legislators

(to the extent they are relevant), and the reports submitted to Congress by CBO and NNSA in the

light most favorable to the State, the court concludes that this evidence raises a genuine issue of

material fact, namely, as to whether lawmakers, in enacting subsection (c)(1), intended to impose

a non-discretionary duty on the Secretary to remove one metric ton of defense plutonium upon the

occurrence of the conditions specified therein.

**B. First cause of action: constitutional violation**

Next, Defendants mount a Rule 12(b)(6) challenge to the State's first cause of action—

which alleges that Defendants' failure to meet their statutory obligations under § 2566 amounts to

a constitutional violation of their duty to faithfully execute the law (ECF No. 1 at 26)—on three

separate grounds (*see* ECF No. 17 at 20-22).

First, Defendants contend that the first cause of action lacks "'sufficient factual matter,

accepted as true, to state a claim that is plausible on its face'" because it "fails to identify the

specific statutory violations that purportedly rise to the level of a constitutional violation." (ECF

No. 17 and 20-21 (citing *Iqbal*, 556 U.S. at 678).) Although Defendants reference *Iqbal*'s

plausibility standard, it appears to the court that the real thrust of the argument does not concern

whether the complaint pleads enough facts that, if true, demonstrate a failure to comply with the

terms of the statute. Rather, the thrust of the argument appears to be that the complaint does not

sufficiently notify Defendants of which provision of § 2566 they are alleged to have violated. (*See*

*id.* at 20 (explaining that "[§] 2566 contains eight subsections, some of which have multiple

subparts").) Following the plausibility standard's being cemented into place by *Twombly* and *Iqbal*, it is not uncommon for litigants to overlook the fact that the fair notice standard remains alive and well, in that dismissal under Rule 12(b)(6) is appropriate if the complaint fails to give the respondent fair notice of the basis of the complainant's claims. *See Johnson*, 135 S. Ct. at 347; *Erickson*, 551 U.S. at 93; *Dolgaleva*, 364 F. App'x at 826-27. To the court, this appears to be the case with Defendants' argument.

To the extent Defendants assert that the first cause of action fails to meet the plausibility standard because it does not plead sufficient factual matter that, taken as true, states a plausible claim that Defendants have failed to comply with § 2566's provisions, the court disagrees. The State's complaint contains numerous factual allegations, including that Defendants have not removed defense plutonium from South Carolina and that they have made no economic and impact assistance payments. Alone, these allegations, taken as true, are enough to state a plausible claim that Defendants have violated § 2566's provisions. To the extent Defendants assert that the first cause of action does not meet the fair notice standard, the court disagrees with this argument as well. Under the first cause of action, the complaint states that § 2566 "direct[s] the Secretary to submit a plan for construction and operation of [the] MOX facility . . . including reporting deadlines, construction deadlines, and operational deadlines" and that "Defendants have failed to meet their mandatory statutory obligations under § 2566." (ECF No. 1 at 26.) Without more, the court would agree with Defendants that this fails to notify them with sufficient specificity of the provisions of § 2566 they are alleged to have violated. However, the general factual allegations of the complaint specify the provisions of § 2566 that Defendants failed to comply with: they "failed to remove defense plutonium . . . per the mandatory direction of . . . the governing statute, [§] 2566, and . . . failed to comply with the economic and impact assistance payments to the State of

South Carolina per the mandatory direction of . . . the governing statute, [§] 2566." (*Id.* at 25.) These allegations give sufficient notice of the provisions that Defendants are alleged to have violated.

Second, Defendants argue that, to the extent the first cause of action alleges that the President has failed his duties under the Take Care Clause, the APA provides no cause of action against the President because he is not an "agency" for purposes of the APA. (*See* ECF No. 17 at 21 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).) Defendants also argue that, even if the APA or other authority permitted such a suit, it would not be justiciable. (*See id.* (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867) ("[T]he duty of the President in the exercise of the power to see that the laws are faithfully executed . . . [when] [t]he duty thus imposed [by the law at issue] is in no just sense ministerial . . . is purely executive and political.")).) The State, however, notes that the President is not named as a defendant in this case and thus argues that the rules stated in *Franklin* and *Johnson* are inapplicable. (ECF No. 27 at 43 (citing *Franklin*, 505 U.S. at 799 (emphasizing that, under the terms of the statute at issue, "[t]he President, not the Secretary [of Commerce], takes the final action" for which APA review was sought)).)

The court declines to dismiss the first cause of action on this ground asserted by Defendants. *Franklin* does not apply here because, as the State correctly argues, it has not sued the President under the APA but, rather, has sued federal officials and agencies. Moreover, the applicability of *Johnson* to the instance case is far from clear. *Johnson* did not directly address whether a federal official could be sued under the Take Care Clause. Instead, it addressed the question whether the President may be enjoined by the judiciary from carrying into effect an act of Congress alleged to be unconstitutional. *See Johnson*, 71 U.S. (4 Wall.) at 498. In answering this question in the negative, the Supreme Court distinguished those cases in which a federal officer

had been mandamused to carry out a purely ministerial duty. *See id.* at 498-99 (citing *Kendal v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524) (1838); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)). Thus, it is not clear what application, if any, *Johnson* might have in a suit, such as this one, against federal officers (rather than the President) seeking a mandamus obligating them to perform an act (rather than enjoining them from action) that is non-discretionary (rather than discretionary). Defendants have pointed the court to no authorities addressing these issues and, without more, the court will not dismiss the first cause of action on this ground.

Third, Defendants argue that a federal officer's non-compliance with a statute, alone, is not enough to state a claim for a constitutional violation. (ECF No. 17 at 21-22 (citing *Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("Our cases do not support the proposition that every action . . . by an[] executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution."); *id.* at 474 (noting the "well established" "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other"))). Along with this argument, Defendants also contend that there is no situation in which the court would grant relief on the constitutional claim asserted in the first cause of action. (*See* ECF No. 51 at 47-48.) If the State succeeds on its statutory claims, then the relief afforded under the APA would remedy any injury to the State and make resolution of the constitutional claim both unnecessary and imprudent under the doctrine of constitutional avoidance. (*See* ECF No. 17 at 21-22 (citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204-06 (2009)).) If the State does not succeed on its statutory claims, meaning it fails to prove Defendants failed to comply the statute, then its claim that Defendants violated the Constitution by not complying with the statute necessarily fails. (*See* ECF No. 51 at 48.)

The court agrees with Defendants. First, as *Dalton v. Specter* makes clear, the mere allegation that an official is not in compliance with a statute is not enough to state a claim that the official violated the Constitution. 511 U.S. at 472, 474. Something more is needed; a cause of action may validly state a claim that an official violated the Constitution, for instance, if the official disclaims statutory authority for his actions and, instead, relies solely on authority vested by the Constitution, *see id.* at 473 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)), or if the cause of action alleges that the statute on which the official relies for his authority is itself unconstitutional, *see id.* at 473 n.5 (citing *Pan. Refining Co. v. Ryan*, 293 U.S. 388 (1935)). Here, the State has not alleged an absence of, and Defendants have not disclaimed, statutory authority to act, nor has the State alleged that § 2566 itself is somehow unconstitutional. Instead, the State has confirmed that its assertion of a constitutional violation is grounded solely on Defendants' alleged failure to comply with § 2566. (*See* ECF No. 27 at 42 ("Th[e first] cause of action provides a supplemental basis for other causes of action, all of which collectively seek the same declaratory and injunctive relief.").) Accordingly, the first cause of action is subject to dismissal under Rule 12(b)(6) on the ground that it fails to set forth a cognizable claim of a constitutional violation.

Second, the court agrees with Defendants that there is no situation in which the State could succeed on the constitutional claim stated in the first cause of action. On one hand, if the State succeeded on its statutory claim, the doctrine of constitutional avoidance would prevent the court from resolving the constitutional claim. *See Nw. Austin*, 557 U.S. at 205 (applying constitutional avoidance doctrine where plaintiff "expressly describes its constitutional [claim] as being 'in the alternative' to its statutory [claim]"). Notably, at the motions hearing, the court asked the State whether it "need[ed] to reach any constitutional issue to get to [its] matter." (ECF No. 51 at 57.) The State responded that, if it succeeded and obtained "relief on the statutory claims, the [the court]

do[es] not need to reach any constitutional issue." (*Id.*) This is precisely the type of colloquy calling for application of the doctrine. *See Nw. Austin*, 557 U.S. at 206 (applying doctrine based on the following colloquy at oral argument: "Question: Do you acknowledge that if we find in your favor on the [statutory] point we need not reach the constitutional point? Answer: I do acknowledge that" (internal brackets omitted)). On the other hand, if the State does not succeed on its statutory claims, it also cannot succeed on the constitutional claim in its first cause of action. The first cause of action alleges that Defendants violated the Constitution by failing to faithfully execute duly enacted law, and the only basis for this allegation is that Defendants failed to meet their obligations under § 2566, namely removing defense plutonium under subsection (c)(1) and making economic and impact assistance payments under subsection (d)(1). (*See* ECF No. 1 at 25-26.) Thus, success on the constitutional claim is entirely dependent on the State's success in prosecuting the statutory claims in the second and third causes of action. If it fails in the latter, it must fail in the former. Because, as a categorical matter, there would never arise a situation in which the court would resolve the constitutional claim, the first cause of action is subject to dismissal under Rule 12(b)(6).

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the State's complaint (ECF No. 17) is hereby **GRANTED IN PART**, with respect to the complaint's first cause of action, and **DENIED IN PART**, with respect to the complaint's second cause of action. The first cause of action in the State's complaint (ECF No. 1 at ¶¶ 84-88) is hereby **DISMISSED**.

**IT IS SO ORDERED**.

*J. Michelle Childs*

United States District Court Judge

March 14, 2017
Columbia, South Carolina