IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

State of South Carolina,          )      CA: 1:16-00391-JMC
                           )
          Plaintiff(s),       )
                           )
              v.           )
                           )
United States, *et al.*,       )
                           )
         Defendant(s).     )

## **DEFENDANTS' STATEMENT CONCERNING REMEDY**

As ordered by this Court's August 1, 2017 text order, ECF No. 98, the Federal

Defendants hereby provide the following statement concerning the appropriate remedy for this

Court's ruling that the Federal Defendants unlawfully withheld performance of a non-

discretionary statutory duty to remove one metric ton of defense plutonium from the State of

South Carolina as required by 50 U.S.C. § 2566(c)(1).

## **INTRODUCTION**

Processing and moving defense plutonium, among the most powerful and potentially

dangerous substances on the planet, is not an area to be taking shortcuts.  While all parties

involved, particularly the State, are frustrated that delays and cost increases to the MOX project

have made it impossible for Defendants to meet the MOX production and defense plutonium

removal objectives set forth in § 2566(c), processing and removing large amounts of plutonium

takes a significant amount of time to comply with the myriad statutes, regulations, rules, and

requirements that govern the handling, processing, transport, and disposition of defense

plutonium.  A failure to do so could put Defendants' employees, the environment, the public, and

national security at risk, and this Court should keep these considerations in mind when fashioning its order of injunctive relief.

As the attached declaration of H. Allen Gunter establishes, Defendants have been complying diligently and in good faith with the Court's March 20, 2017 ruling that the Department of Energy ("DOE") must remove one metric ton of defense plutonium from South Carolina. Nonetheless, the State asks this Court to order Defendants to remove one metric ton of defense plutonium from South Carolina within two years, a feat which would not only be logistically impossible but also impossible to do in compliance with applicable statutes and regulations. The State makes no attempt to offer any explanation for how Defendants may accomplish this; instead, despite this Court having previously dismissed the State's claim for monetary damages, the State seeks to have this Court impose a virtually identical monetary punishment on Defendants, payable to the State, in the form of "contempt" damages. The State also requests that this Court insert itself into DOE's decision-making process – a process encompassing the highly technical task of processing and removing defense plutonium – not only in the form of retaining jurisdiction over Defendants' removal of one metric ton of defense plutonium, but also to usurp both the Executive and Legislative Branches as to how best to deal with America's surplus defense plutonium by ordering DOE to continue processing all plutonium at the Savannah River Site going forward, even though that is far beyond the scope of this litigation and the authority of this Court.

In its March 20th Order, this Court stated that it was "hesitant" to issue a final order "retaining continuing jurisdiction over this matter until it finds that Defendants are in compliance with § 2566," as requested by the State. ECF No. 86 at 33. The Court stated that it would not take such an extraordinary step "absent compelling circumstances." *Id*. The State has failed to

make such a showing, nor proffered any reason for the Court to exercise its supervisory powers.  Accordingly, this Court should reject the State's requests for such unreasonable and far-reaching injunctive relief, and instead issue an injunctive order that is narrowly-tailored to remedy the precise wrong in this case.  Here, the only record evidence submitted by either party shows that Defendants have been working for years to remove defense plutonium by down-blending, and that efforts to remove certain amounts of defense plutonium from South Carolina through down-blending (a) have been selected after complying with the National Environmental Policy Act ("NEPA"); (b) conform to all other applicable laws, rules, regulations, and requirements; and (c) have not only been successfully tested but are currently ongoing.  No other alternative methodology for removing defense plutonium from South Carolina has been selected in accordance with NEPA, and there is no indication that any other method would be any more expeditious than the current down-blending efforts.  Accordingly, this Court should deny the State's requested injunctive relief and issue an order that Defendants continue their efforts to work in good faith to remove one metric ton of defense plutonium from South Carolina as expeditiously as reasonably possible.  Should the Court instead enter mandatory dates for compliance, it should take into account the timetable set forth in Mr. Gunter's declaration and reject the State's unreasonable proposed two-year timeline.

## **BACKGROUND**

This Court is already well-acquainted with the history of 50 U.S.C. § 2566 and the DOE's program to bring defense plutonium into South Carolina for the purpose of processing it into some other form before removing it to another location, having provided a recitation of relevant facts in its order on the Federal Defendants' motion to dismiss the Plaintiff's complaint. *See* ECF No. 84 at 1-5.  Federal Defendants have also provided several lengthy recitations of

facts in prior briefing. *See* ECF No. 17 at 3-9; ECF No. 38 at 2-6. Accordingly, given the

Court's familiarity with the facts and the limited nature of the issue remaining before the Court,

the Federal Defendants will only focus on the facts relevant to the issue of remedy.

The very nature of nuclear material, such as the defense plutonium at issue in this

litigation, requires an abundance of caution by everyone involved in every stage of interaction

with it. Defense plutonium has the potential to cause harm to those in close proximity to it, to

have detrimental effects on the public if ingested or inhaled, to have detrimental environmental

effects, and to imperil national security and nonproliferation if it is not stored securely, safely,

and under closely monitored conditions. Because of these concerns, there are many laws,

regulations, rules, and requirements which must be complied with before Defendants take any

action with regard to defense plutonium. There are laws and regulations that require Defendants

to minimize impacts on workers, the public, and the environment in their handling of plutonium.[1]

Other rules and regulations impose requirements upon Defendants for the handling,[2] storage and

---

[1] For a list of statutory and regulatory duties, *see* 2015 Environmental Impact Statement, § 5-2 & tbl. 5-1 ("The complexity of managing nuclear materials is reflected in the regulatory scheme governing these activities.").

[2] *See, e.g.*, 10 C.F.R. Part 830 ("Nuclear Safety Management"); 10 C.F.R. Part 835 ("Occupational Radiation Protection"); DOE Order 410.2 ("Management of Nuclear Materials") (8/17/09); DOE Order 435.1, Chg. 1, *Radioactive Waste Management* (08/28/01) (setting radioactive waste management requirements to protect workers, public health, and the environment); DOE Order 458.1, Admin. Chg. 3, *Radiation Protection of the Public and the Environment* (1/15/13).

disposal,[3] and transport[4] of defense plutonium, as well as the construction and maintenance of

facilities for storing defense plutonium.[5]  In recognition of this complex and large framework of

laws, regulations, and rules imposing myriad requirements upon Defendants when dealing with

defense plutonium, 50 U.S.C. § 2566(c) explicitly requires that any removal efforts by

Defendants be conducted "consistent with the National Environmental Policy Act of 1969 and

other applicable laws."

In large part because of the many concerns and requirements that must be satisfied when

interacting with defense plutonium, the expectations surrounding the MOX facility at SRS have

changed since its original conception.  The contractor hired to build the MOX facility did not

begin construction until 2007.  *See* GAO, *Plutonium Disposition Program* 2, (Feb. 2014) ("2014

---

[3]  Waste Isolation Pilot Plant Land Withdrawal Act of 1992, Pub. L. No. 102-579, 106 Stat. 4777, *amended by* Pub. L. No. 104-201, §§ 3181-91 (1996) (establishing requirements for any materials sent to WIPP for disposal); 40 C.F.R. Part 191 (governs radiation exposure limits and the disposal of certain nuclear materials); 10 C.F.R. Part 820 ("Procedural Rules for DOE Nuclear Activities"); DOE Policy 470.1A, *Safeguards and Security Program* (12/29/10) (requirements for protecting nuclear material); DOE Order 470.3B, *Graded Security Protection Policy* (8/12/08) [classified]; DOE Order 470.4B, Minor Chg. 2 (MinChg), *Safeguards and Security Program* (1/17/17).

[4]  *See, e.g.*, 49 U.S.C. §§ 5101 *et seq.* (Transportation of Hazardous Materials); 49 C.F.R. §§ 171-180 (Department of Transportation requirements for packaging, handling, and transporting hazardous materials); 10 C.F.R. Part 71 (same); DOE Order 460.1D, *Hazardous Materials Packaging and Transportation Safety* (12/20/16); DOE Order 460.2A, *Departmental Materials Transportation and Packaging Management* (12/22/04); DOE Order 461.1C, *Packaging and Transportation for Offsite Shipment of Materials of National Security Interest* (07/20/16).

[5]  *See, e.g.*, 40 C.F.R. Part 61, subpart H (emission standards for DOE facilities); 40 C.F.R. § 51.166 (pre-construction air-quality review); DOE Order 426.2, Pg. Chg. 1, *Personnel Selection, Training, Qualification, and Certification Requirements for DOE Nuclear Facilities* (7/29/13); DOE Order 433.1B, Pg. Chg. 1, *Maintenance Management Program for DOE Nuclear Facilities* (3/12/13) (requirements for safety management program for DOE nuclear facilities); DOE Order 420.1C, Pg. Chg. 1, *Facility Safety* (2/27/15) (establishes programmatic safety requirements for DOE nuclear facilities).

GAO Report"). In the five years after section 2566's enactment, the estimated cost of the MOX facility increased exponentially. *See* 2014 GAO Report, *supra*, at 32-33 (five-fold increase); Aerospace Corp., *Plutonium Disposition Study Options Independent Assessment* 3 (Apr. 13, 2015) (ten- to twenty-fold increase); Oak Ridge Nat'l Lab., *Final Report of the Plutonium Disposition Red Team* x (Aug. 13, 2015) ("2015 Oak Ridge Report") (five-fold increase). The project has also faced unforeseen multi-year delays, caused by numerous technical, financial, and other factors. *Id.* at ix. The Department has nonetheless continued building the MOX facility to this day, as required by Congress in yearly appropriations. *See, e.g.*, Nat'l Defense Authorization Act for Fiscal Year 2017 ("2017 NDAA"), Pub. L. No. 114-328, § 3116(a)(1), 130 Stat. 2000, 2760 (2016); *see also* Consol. Appropriations Act of 2017, Pub. L. No. 115-31, div. D, tit. III, 131 Stat. 135, 310 (2016).

        In addition to the defense plutonium previously slated for fabrication into MOX fuel, DOE has been working diligently to find ways to dispose of the other defense plutonium at SRS. Between 2009 and 2011, the Department combined some defense plutonium at SRS with high-level waste and vitrified the mixture into glass logs, for eventual disposal in a geologic repository. Gunter Decl. ¶ 12. In 2011, Defendants utilized a different approach and issued Interim Action Determinations to allow the down-blending[6] of 585 kilograms of defense plutonium at SRS. Gunter Decl. ¶ 13; David C. Moody, *Interim Action Determination, Disposition of Certain Plutonium Materials Stored at the Savannah River Site*, Savannah River Operations Office (Oct. 17, 2011), available at http://www.srs.gov/general/pubs/envbul/documents/Interim_Action_500kg_to_WIPP_10-17-11.pdf. Defendants began down-blending in

---

        [6] "Down-blending" is the process of mixing a radioactive substance with particular inert material, which renders the substance more proliferation resistant and suitable for being stored (or "emplaced") long-term in an underground geologic repository. Gunter Decl. ¶ 13 and n.6.

2012, and they shipped some of the down-blended plutonium to the Waste Isolation Pilot Plant ("WIPP"), in New Mexico, until a fire and an underground radiological event temporarily suspended waste emplacement at that facility in early 2014. Gunter Decl. ¶¶ 14-15 & n.8. Defendants have also shipped approximately 10 kilograms of defense plutonium to other sites outside of South Carolina specifically for use in other DOE programs. Gunter Decl. ¶ 16.

In April 2015, the Department completed its NEPA analysis for the disposal of 13.1 metric tons of additional defense plutonium, for which the Department had not yet made a disposition decision. *See* Dep't of Energy, *Final Surplus Plutonium Disposition Supplemental Environmental Impact Statement*, EIS-0283-S2, Apr. 2015 ("2015 Environmental Impact Statement"). The extensive analysis, which stretches more than a thousand pages, considered four alternatives, including fabrication into MOX fuel for the plutonium, and the WIPP down-blending alternative for the plutonium. In December 24, 2015, the Department announced that its preferred alternative for six metric tons of this material was the WIPP approach. *See Preferred Alternative for Certain Quantities of Plutonium*, 80 Fed. Reg. 80348 (Dec. 24, 2015) ("*Preferred Alternative*"), Ex. 4 to ECF No. 38. It explained that the WIPP approach would allow it "to continue progress on the disposition of surplus weapon usable plutonium in furtherance of the policies of the United States to ensure that surplus plutonium is never used in a nuclear weapon, and to remove surplus plutonium from the State of South Carolina." *Id.* at 80349. In April 2016, the Department announced its decision to implement that approach, *see Surplus Plutonium Disposition*, 81 Fed. Reg. 19588 (Apr. 5, 2016) ("2016 Record of Decision"), Ex. 1 to ECF No. 38, which sets forth DOE's decision to down-blend and package 6 metric tons of defense plutonium for disposal at WIPP, explaining that "[b]lending for disposal at WIPP is a proven process that is ongoing at SRS" and that "disposal of this surplus non-pit plutonium will

avoid long-term impacts, risks, and costs associated with storage." *Id*. at 19591; Gunter Decl. ¶ 17.

There are currently several important operational limitations on the rate at which DOE is able to process defense plutonium using down-blending. First and foremost, DOE only has one "glovebox"[7] operational and approved for down-blending plutonium in compliance with the applicable safety and security rules and regulations. Gunter Decl. ¶ 4. To expedite the rate of down-blending in the future, the National Nuclear Security Administration ("NNSA") has requested in its FY18 budget appropriations to fund a project to design and construct additional gloveboxes which will be used to down-blend defense plutonium for removal from South Carolina. Gunter Decl. ¶ 18. Once operational, it is estimated that these gloveboxes will give DOE the ability to down-blend at least one metric ton of plutonium every year. *Id*. However, these additional gloveboxes are not expected to be operational until 2026 at the earliest. *Id*.

Down-blending requires a team of at least four personnel that includes at least three operators and one radiological control person. Gunter Decl. ¶ 21. The process requires many items of special clothing and equipment, and employees are required to take a number of safety precautions. *Id*. In order to become an operator who works on down-blending, an applicant must be hired, trained, and approved for a security clearance and other qualifications. Gunter Decl. ¶ 19. This process from start to finish takes approximately two to three years. *Id*.[8] Finally, newly applicable security requirements impact the storage, characterization, and

---

[7] A glovebox is an "engineered enclosure with separate ventilation that provides containment of the plutonium and protects the worker, the environment, and the public from contamination." Gunter Decl. ¶ 4 n.1 and Att. 2 at 1.

[8] The steps involved in this process and the accompanying timeline is set forth in more detail in Attachment 3 to Gunter's Declaration.

shipment of down-blended defense plutonium, and require DOE to construct a new facility at

SRS to ship out down-blended defense plutonium consistent with these new requirements.

Gunter Decl. ¶ 23.  This new facility is expected to be operational by the end of 2020 but will

impact the possible rate of down-blending of defense plutonium at SRS until that time.  *Id.*

Because of these constraints, DOE estimates that, based on current funding and expected

future appropriations, down-blending will result in the removal of one MT of defense plutonium

from South Carolina by the end of FY 2025.  Gunter Decl. ¶ 4.  Attachment 1 to Mr. Gunter's

declaration shows the current estimates for the annual amounts of plutonium through FY

2025that Defendants expect to down-blend and remove, respectively, from South Carolina using

down-blending.

On February 9, 2016, the State filed its complaint seeking to have the Court (1) hold that

Defendants violated the Constitution by failing to comply with the requirements of § 2566; (2)

hold that Defendants unlawfully withheld a non-discretionary duty to remove one metric ton of

defense plutonium under § 2566(c)(1); and (3) hold that Defendants unlawfully withheld a duty

to pay the State $1 million per day up to a maximum of $100 million per year under § 2566(d).

ECF No. 1 at ¶¶ 87-88, 95-96, 111-12.  On October 31, 2016, this Court dismissed the State's

third cause of action for lack of subject matter jurisdiction.  ECF No. 56.  On March 14, 2017,

this Court dismissed the State's first cause of action for failure to state a claim upon which relief

may be granted.  ECF No. 84.

On March 20, 2017, this Court granted summary judgment in favor of the State on its

second cause of action, holding that Defendants unlawfully withheld performance of a non-

discretionary duty to remove one metric ton of defense plutonium from South Carolina.  ECF

No. 86.  In doing so, this Court held that "although the court must enter an order compelling the

Secretary to remove from South Carolina one metric ton of defense plutonium, the court cannot, in that order, compel the Secretary to do so *immediately*." *Id*. at 32. This Court noted that § 2566(c) specifically provided that Defendants' duty to remove one metric ton of defense plutonium must be "consistent with [NEPA] and other applicable laws," *id*., and stated that the Court could not order Defendants to take an action that was in violation of the law. *Id*. This Court also recognized that its final order "must consider the work that is necessary to accomplish the removal consistently with NEPA and other applicable laws," and also "recognize[d] that the order must be fashioned so as to not decree how the Secretary should accomplish the task of removing the one metric ton of defense plutonium." *Id*. at 33.

This Court held that "[a]lthough it appears that the court has discretion to retain jurisdiction over a case pending the accomplishment of an agency action that has been unlawfully withheld, the court should be hesitant to do so absent compelling circumstances." *Id*. (citations omitted). This Court therefore ordered the Parties to provide further information sufficient for the Court to enter a final order. *Id*. at 37. Accordingly, the Court also ordered the Parties to brief the issue of whether the Court will grant the State's request to retain jurisdiction over this case after issuing its final order. *Id*. This Court stated that after viewing the Parties' submissions, "the court will re-evaluate whether to exercise its discretion to retain jurisdiction until compliance with the order has been accomplished." *Id*. at 34. On July 31, 2017, the Parties submitted a joint statement informing the Court that despite diligent efforts, they were not able to come to an agreement as to the nature of this Court's final order as to the State's second cause of action. ECF No. 96. Also on July 31, 2017, the State filed its proposed form of injunctive relief. ECF No. 97.

## ARGUMENT

**I.     This Court Should Consider Equitable Considerations in Fashioning a Remedy**

In this Court's March 20, 2017 Order granting the State's motion for summary judgment on its second cause of action, ECF No. 86, this Court devoted significant attention to the issue of whether it had discretion pursuant to § 10(e) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), to refrain from issuing an injunctive order based upon equitable considerations. Ultimately, this Court rejected Defendants' argument that it had such discretion, and held, largely adopting the reasoning of the Tenth Circuit's decision in *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999), that "the plain language of § 706(1) requires a reviewing court that has found that agency action has been unlawfully withheld to issue an order compelling that agency action and does not permit the court to decline to do so based on equitable considerations." ECF No. 86 at 29. While Defendants continue to disagree with this holding,[9] for the reasons articulated in their response in opposition to the State's motion for summary judgment, ECF No. 38 at 26-31, they recognize that this Court has decided that issue and will not attempt to re-litigate it now.

However, while this Court held that it could not consider equitable considerations in determining whether or not to grant injunctive relief, there is nothing constraining this Court from considering equitable considerations in deciding what form that injunctive relief will take. In fact, this Court seems to have recognized as much in its March 20 Order, holding that "although the court concludes that it must grant summary judgment to the State and enter an order compelling the Secretary to remove from South Carolina the one metric ton of defense

---

[9] Nothing Defendants set forth in this pleading should in any way be construed as a waiver of Defendants' right to appeal this Court's March 20, 2017 decision once a final order is issued.

plutonium, such an order *must consider the work that is necessary to accomplish the removal consistently with NEPA and other applicable laws*." ECF No. 86 at 33 (emphasis added). This Court also specifically noted that while it "must enter an order compelling the Secretary to remove from South Carolina one metric ton of defense plutonium, the court cannot, in that order, compel the Secretary to do so *immediately*." ECF No. 86 at 32. This is consistent with *Forest Guardians*, in which the court remanded the matter to the district court with the instruction that "any order now to impose a new deadline for compliance must consider what work is necessary" to comply with the statutory duty. 174 F.3d at 1193. This is also consistent with the Ninth Circuit's decision in *Environmental Defense Center v. Babbitt*, 73 F.3d 867 (9th Cir. 1995), which was approvingly cited by *Forest Guardians*, in which that court held that even though an agency violated a non-discretionary statutory duty, it was reversible error for the district court to issue an injunctive order ordering the agency to perform its statutory duty by a certain date when circumstances (in that case, through a moratorium on appropriations), made compliance by that date impossible. 73 F.3d at 872.

This is also consistent with the position specifically articulated by the State during oral argument on the Defendants' motion to dismiss and the State's motion for summary judgment, held in this Court on June 30, 2016. At that hearing, Mr. Lowell, counsel for the State, stated that the Court can take "some" of Defendants' concerns about removal "into consideration in fashioning whatever, *whatever equitable remedy in the injunctive relief this Court wants to issue. I mean that's – that's fair and reasonable. The case law supports the idea that your honor has some discretion in fashioning the remedy*." Tr. of Oral Argument, ECF No. 51 at 23: 9-14 (emphasis added). Mr. Lowell added shortly thereafter, "[s]o, this notion has been around for a long time. *So you do have the discretion to fashion a remedy. You can take into consideration*

*their excuses for noncompliance*." *Id.* at 23: 19-21 (emphasis added). The State's position at oral argument was clear, and identical to Defendants' argument here on this issue, as the Court recognized. ECF No. 86 at 32 ("The State has conceded this point and does not dispute that the Secretary could not, consistent with NEPA and other applicable laws, immediately remove the one metric ton of plutonium from South Carolina."). This litigation is now at the remedy stage, and this Court can and should consider equitable issues, specifically the legal and logistical limitations on the rate at which Defendants are able to remove plutonium, in fashioning the appropriate injunctive order.

As the following discussion will show, those equitable concerns are at their strongest when dealing with the potential danger involved with the handling, storage, processing, and movement of defense plutonium. Although Defendants have described, in good faith, a proposed timeline for removing one metric ton of defense plutonium, that timeline necessarily depends upon a number of variables, including the continued availability of appropriations, to be feasible. Accordingly, including a specific date in the injunctive order itself presents the real possibility that Defendants may end up in a situation where they have to choose between placing employees at SRS, the public, the environment, or national security and nonproliferation at risk to expedite processing, or violating a deadline set forth in this Court's order. In light of the presumption that the Government will act in good faith in accordance with the decision, *see* ECF No. 86 at 36 ("In the absence of extraordinary circumstances, courts rightly presume that executive officials will be responsive to judicial determinations that they are in violation of legal obligations….") (citations omitted); and the ordinary remedy of remand to the agency in APA cases, *see id.* at 33 ("The court also recognizes that the order must be fashioned so as not to decree *how* the Secretary should accomplish the task of removing the one metric ton of defense plutonium."),

13

this Court should order that Defendants use their best efforts to expeditiously comply with the timeline set forth in the attached declaration of Mr. Gunter.

## II. Any Injunctive Order of This Court Should Consider the Undisputed Facts Concerning the Defendants' Ongoing Efforts to Process and Remove Defense Plutonium Through Down-Blending

Any injunctive order that this Court decides to issue should not disrupt Defendants' long-standing ongoing efforts to process defense plutonium via down-blending for removal from South Carolina. While this Court previously held that § 706(1) mandates that the Court award the State some form of injunctive relief, this Court certainly has a wide range of equitable discretion to determine exactly what form that injunctive relief will take. Here, the record shows that Defendants have engaged in an ongoing long-term effort to down-blend and remove defense plutonium from South Carolina, and this Court should not disrupt that ongoing process by ordering the removal of defense plutonium on a timeline any faster than the timeline set forth in the attached declaration of Mr. Gunter.

As an initial matter, Defendants note that they dispute in the strongest possible terms the State's attempts to portray them as acting dilatorily and in bad faith. In its statement proposing its requested form of injunctive relief, the State makes the deeply disingenuous statement that "the Federal Defendants unlawfully withheld this action and have yet to provide any evidence that they even *attempted* to comply with the specific mandate of subsection (c)(1) of Section 2566 or that, after a good faith and diligent attempt, compliance was impossible." ECF No. 97 at 7. The State later alleges that "Federal Defendants' attitude towards the State has consistently been one of arrogant disdain." *Id.* at 14 n.13. This accusation of bad faith is baseless in light of the fact that, as the State even acknowledges later in the same pleading, ECF No. 97 at 14, Defendants' understanding of this statute prior to litigation and their position in this litigation

was that § 2566(c)(1)'s directive to remove one metric ton of defense plutonium was *not* a non-discretionary obligation but rather provided that Defendants may be responsible for paying the State the amounts provided for in § 2566(d) if one metric ton of defense plutonium was not removed from South Carolina by January 1, 2016. *See* ECF No. 17 at 15-23. It was not until this Court rejected this argument and held that Defendants did have a non-discretionary duty to remove one metric ton of defense plutonium from South Carolina by January 1, 2016, on March 20, 2017, ECF No. 86, that it was determined that Defendants had a non-discretionary duty.

A.  The Plan and Timeline For Removal Set Forth in Mr. Gunter's Declaration Is the Most Reasonable and Expeditious Method of Removing Plutonium from South Carolina

Contrary to the State's allegations, Defendants have been diligently engaged in actions to come up with a sustainable method for processing defense plutonium at SRS for removal from South Carolina. These efforts are now well underway and should not be disturbed by this Court.

The record shows that over a decade ago, once it became apparent that MOX would not be operational in time to meet the statutory production objectives, Defendants began taking measures to come up with an alternative method for processing and removing defense plutonium from South Carolina. Defendants have chosen a removal approach and are actively working to continue removing plutonium from SRS. That choice and those efforts have been shaped by a number of technical obstacles and competing legal obligations to which Defendants are subject, and will continue to be subject after this Court issues an injunction. These extensive legal obligations are explicitly acknowledged in section 2566(c) itself, which requires that any approach to removal from SRS be "consistent with [NEPA] and other applicable laws."

NEPA, for starters, requires agencies to "follow certain procedures prior to undertaking any" action "that may affect the environment." *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir.

2002); *see* 42 U.S.C. §§ 4321 *et seq.* NEPA, the Council on Environmental Quality (CEQ) NEPA regulations, *see* 40 C.F.R. §§ 1500-1508, and the accompanying DOE implementing procedures, 10 C.F.R. Part 1021, set forth a very particular process that must be followed by executive branch agencies such as DOE when undertaking any major action subject to its control and responsibility and has potential environmental impacts. DOE must first identify a need for a proposed action and develop a proposal for the project. *See, e.g.*, 40 C.F.R. §1508.18, 10 C.F.R. §1021.102, and 10 C.F.R. §1021.300. If the agency determines that the environmental effects are likely to be significant, which has been the case for previous actions involving large quantities of plutonium, *see, e.g.*, the Surplus Plutonium Disposition Supplemental Environmental Impact Statement Record of Decision EIS-0283-S2 (2016), the agency must prepare a notice of intent to prepare an Environmental Impact Statement (EIS) to analyze potential environmental impacts of the proposed action and reasonable alternatives, including the no action alternative. 10 C.F.R. §1021.311. After determining the appropriate scope of public involvement, the agency then proceeds to draft the EIS. 40 C.F.R. § 1502.2(a). There is then typically a period for public review, comment, and potentially other public involvement, if appropriate. 10 C.F.R. §1021.311. The agency then drafts the final EIS and makes it publically available. 10 C.F.R. §1021.313. The final step for the agency is issuing a record of decision (ROD), 10 C.F.R. §1021.315, and then implementing the decision.

 In practice, particularly when the project involves a substance with the potential to have as much impact on the environment as plutonium, this is a very thorough, deliberate process. The original Notice of Intent to prepare an EIS to dispose of surplus plutonium at SRS was issued in March 2007. Gunter Decl. ¶ 11. While Interim Action Determinations were issued in 2011 that allowed Defendants to begin down-blending some defense plutonium for eventual

removal from SRS and disposal at WIPP, the final EIS regarding using down-blending to process

defense plutonium at SRS was not issued until December 2015, and the ROD setting forth

Defendants' decision to use down-blending to process and package six metric tons of defense

plutonium for removal from SRS and disposal at WIPP was not issued until April 2016. It took

over nine years from the issuance of the Notice of Intent to the issuance of the ROD. In addition

to NEPA, any method Defendants use to remove defense plutonium from South Carolina must

not violate any other applicable statutes or regulations.

  With these multiple—and often competing—legal obligations in mind, the Department,

throughout the last decade, has been actively working to find a disposition option for the surplus

defense plutonium at SRS. The process for obtaining a final EIS and accompanying ROD for

proceeding with down-blending took over nine years from the time the original Notice of Intent

to prepare an EIS was issued in March 2007, Gunter Decl. ¶ 11, until the ROD was issued in

April 2016. Gunter Decl. ¶ 17. The final EIS, issued in December 2015, contains more than

1000 pages evaluating options for disposing of defense plutonium at SRS. *See* 2015

Environmental Impact Statement. However, it has authorized and begun down-blending, and has

shipped out over 60 kg of down-blended plutonium to other sites, primarily to WIPP. Gunter

Decl. ¶ 15. It has developed specific plans for down-blending and then removing six more

metric tons of defense plutonium from SRS. *Id.* ¶ 13. All of this has taken place alongside the

MOX program, to which Defendants have continued to devote substantial resources as the cost

and estimated completion date for the MOX project have escalated.

  Despite the numerous legal constraints and several unforeseen obstacles and delays,

Defendants have identified a method for processing and removing one metric ton of defense

plutonium from South Carolina. Emplacement at WIPP will achieve both removal and

disposition for multiple metric tons of defense plutonium currently at SRS. *See* 2016 Record of Decision, *supra*. Defendants have worked, and continued to work, diligently to remove one metric ton of defense plutonium from South Carolina as they are required to do by statute.

The declaration of Mr. Gunter, and Attachment 1 to the declaration, set forth Defendants' good faith estimates as to the rates at which defense plutonium will be (a) processed through down-blending; and (b) removed from South Carolina under the current plan. Defendants estimate that they should be able to down-blend and safely remove in accordance with NEPA and all other applicable laws one metric ton of defense plutonium from South Carolina by the end of FY 2025.

It is important for this Court to recognize and understand that this timeline is reasonable because of several important operational limitations on the rate at which DOE is able to process defense plutonium using down-blending. As explained in more detail above, DOE only has one "glovebox" operational and approved for down-blending plutonium in compliance with the applicable safety and security rules and regulations. Gunter Decl. ¶ 4. Additional gloveboxes will likely expedite the rate of down-blending, but no additional gloveboxes are expected to be operational until 2026 at the earliest. Gunter Decl. ¶ 18. The rate at which Defendants can process and remove plutonium is also constrained by the limited number of personnel available to work on this, and the fact that it takes two to three years for new employees to be hired, trained, and obtain the necessary security clearance and other qualifications. Gunter Decl. ¶¶ 19, 21. Defendants are also constrained by new security requirements, which require the construction of a new facility to ship out down-blended plutonium consistent with these requirements, which is not expected to be operational until the end of 2020. Gunter Decl. ¶ 23.

Mr. Gunter's estimate in his declaration, and estimated timetable for processing and removal set forth in Attachment 1 to his declaration, take all of these constraints into account. However, Defendants must note that the estimated timetable for removal is, by necessity, an estimate. Defendants cannot provide anything more concrete than an estimate because there are too many variables that could potentially impact the processing and removal of plutonium from South Carolina. If there was some sort of incident which rendered the glovebox unusable for down-blending, or a delay in the construction of the new facility to be used for shipping down-blended plutonium out of South Carolina, this would obviously impact the date by which one metric ton of defense plutonium could be removed. There is also the possibility of some other sort of unexpected contingency that may have an effect on the timeline. Finally, Mr. Gunter's estimate is predicated upon the continued availability of appropriations to be used for down-blending, and if Congress were to make such appropriations unavailable, obviously such operations would be forced to cease until such time as the situation changed.

In its March 20, 2017 order, this Court held that it would issue an injunctive order ordering Defendants to remove one metric ton of defense plutonium from South Carolina, but held that "such an order must consider the work that is necessary to accomplish the removal consistently with NEPA and other applicable laws." ECF No. 86 at 33. This Court held that neither party had provided "sufficient evidence" to support an injunctive order. In Mr. Gunter's declaration, Defendants have provided the court with sufficient evidence to consider the work that is necessary to accomplish the removal of one metric ton of defense plutonium from South Carolina, and that evidence shows that Defendants have been diligently working in good faith to remove plutonium from South Carolina. Any injunctive order issued by this Court should not disrupt or interrupt these efforts.

B.    <u>No Other Method of Removal Is Likely To Result in the Removal of One Metric Ton of Plutonium From South Carolina Any More Expeditiously than Down-Blending</u>

Nor is there any indication that any other method would result in a more expeditious removal of one metric ton of defense plutonium from South Carolina.  First and foremost, any alternative method would first have to go through the process mandated by NEPA, and DOE would have to issue a final EIS and a ROD selecting the removal of plutonium from SRS by this alternative methodology.  As is apparent from the time period required to obtain the final EIS and ROD selecting the down-blending of six metric tons of defense plutonium, this process alone can take years when it involves a substance which requires as much caution as defense plutonium.  DOE's good faith estimate of the time required to perform a NEPA analysis of any alternative method of plutonium disposal is between two and three years.  Gunter Decl. ¶ 26.  Of course, NEPA requires a thorough, substantive process of analysis of potential impacts posed by any proposed action, and there is no guarantee that a final EIS and ROD would be issued for any alternate method, if such a method was not in compliance with applicable statutes, regulations, and rules or posed significant risks to employees, the environment, or national security.  This process would have to be complete before Defendants could take any action to remove defense plutonium from SRS through any method other than down-blending.  Gunter Decl. ¶ 37.

Even if DOE issued such an authorization, it is not clear that any alternative method would result in the removal of one metric ton of defense plutonium from South Carolina any more expeditiously than the current down-blending plan.  For example, even if Defendants wanted to move forward with repackaging currently-stored defense plutonium and shipping it to another facility without being processed first, they would have to (1) identify another location with the capability of storing such materials, which could take months, Gunter Decl. ¶ 25; (2)

construct a new facility allowing Defendants to ship such materials out of SRS, which could take

years, *id*.; (3) construct a new facility at the recipient location, which could also take years,

Gunter Decl. ¶ 26; (4) conduct a safety analysis of the new location's fitness to receive one

metric ton of defense plutonium, which would take 6-18 months, Gunter Decl. ¶ 27; (5) gather

and certify the over 500 shipping containers required to ship one metric ton of defense plutonium

out of SRS, a process which would take 6-9 months, Gunter Decl. ¶ 28; and (6) repackage,

arrange for secure transport for, and actually transport such materials to the recipient facility,

Gunter Decl. ¶¶ 29, 34.  While some of these steps could be done simultaneously, none of them

could begin prior to the conclusion of the NEPA-mandated process and issuance of the ROD,

Gunter Decl. ¶ 26, and certain steps are constrained by regulations which restrict how long

certifications on items like shipping containers are good for.  *See* Gunter Decl. ¶ 28.  DOE

currently estimates that removing one metric ton of defense plutonium from South Carolina via

repackaging it and shipping it out in its current form would take approximately five years, *in

addition to* time it may take to go through the NEPA-mandated process and construct any

required new facilities.  Gunter Decl. ¶ 33.

　　　　Doing so would also have potentially grim consequences.  It would essentially put a halt

to the ongoing down-blending efforts, since the facilities and personnel currently engaged in

down-blending would have to be redirected towards repackaging.  Gunter Decl. ¶ 30.  It would

also expose personnel in certain areas of SRS to significant levels of radiation while they

performed the activities required to repackage unprocessed defense plutonium.  Gunter Decl.

¶¶ 31-32.  Because DOE regulations, 10 C.F.R. Part 835, impose limitations on the amount of

total radiation levels an employee can be exposed to per year, this means that some employees

may not be able to work on this task for the entire year if they reach the regulatory maximum, or

that new employees will have to be hired, trained, qualified, and receive security clearances to work on repackaging.  Gunter Decl. ¶¶ 31-33.  And, of course, the defense plutonium would actually have to be shipped from SRS to the recipient location on public roadways.  While every applicable regulation would be followed and every precaution taken, it would be impossible to entirely eliminate certain inherent risks in this process.

There would be no upside to such an approach.  It would incur significant cost, risk, and disrupt Defendants' ongoing down-blending efforts, with no guarantee whatsoever that it would result in the removal of one metric ton of defense plutonium from South Carolina any more expeditiously than ordering Defendants to continue working on processing and removal of plutonium through down-blending.  While Defendants are fully cognizant of the State's frustration that it is taking much longer than expected to remove plutonium for South Carolina, the record shows that DOE has been working for over a decade to take steps to ensure that South Carolina is *not* the permanent or indefinite repository for all of America's defense plutonium. The record shows that Defendants have explored all options for removing defense plutonium, that down-blending is the only alternative method Defendants are currently authorized to proceed with after complying with NEPA, and that no other methodology for removal is likely to result in the removal of one metric ton of defense plutonium from South Carolina any more expeditiously than if Defendants stay the course and proceed with down-blending.

C.    The State's Proposed Two-Year Deadline Is Impossible to Achieve, and Contradicted by the State's Prior Position

Unsupported by any evidence in the record, Defendants finally note that the State's request that this Court order Defendants to remove one metric ton of defense plutonium from South Carolina within two years of the issuance of the order, ECF No. 97 at 2-3, is an absurdity in that it asks this Court to order Defendants to do something which plainly cannot be done.

While the State attempts to argue that imposing such a hard deadline would reflect the judgment of Congress, it would actually thwart Congressional intent.  In drafting § 2566(c), Congress specifically included the caveat that any removal of plutonium from South Carolina pursuant to the subsection must be "consistent with the National Environmental Policy Act of 1969 and other applicable laws."  This was an express acknowledgement that the rate at which Defendants are able to remove plutonium from South Carolina is limited by applicable statutes and regulations, *see United States v. Mitchell*, 39 F.3d 465, 468 (4th Cir. 1994) ("[T]he plain meaning of 'law' includes regulations having the force and effect of law."), and reflects a judgment by Congress that such limitations must be recognized.  Here, the State has proposed a plan which is plainly impossible to accomplish, and in any event, is impossible without violating the applicable legal limitations, and its requested injunctive relief should be rejected by this Court.

For the reasons set forth in greater detail *supra* in Sections II.A and II.B, as well as the attached declaration of Mr. Gunter, it is impossible for Defendants to remove one metric ton of defense plutonium from South Carolina without violating NEPA and other laws, and without posing a significant risk to Defendants' employees, to the environment, and to national security.  The *only* method of removing defense plutonium from SRS that is currently authorized under NEPA and supported by any evidence in the record before this Court is down-blending the plutonium into a more stable form and then shipping it out for storage at WIPP in New Mexico.

The State's request for this particular injunctive relief is also at odds with prior statements it has made in the course of this litigation.  At oral argument, counsel for the State expressed understanding that the logistical constraints and Defendants' obligation to comply

with NEPA and other applicable laws meant that removal of one metric ton of plutonium from

South Carolina was likely to be a long-term process, stating:

> You know, they mention they have five years.[10]  Okay, well, let them submit to
> this Court a plan demonstrating that they are moving as expeditiously as possible
> to remove that one ton, let them come back and give you status and progress
> reports, and let's – let's be sure that we keep them on task to comply with that
> statutory requirement.

ECF No. 51 at 16: 15-21.  Later in the hearing, counsel for the State reiterated that it was not

opposed to any injunctive order issued by the Court allowing Defendants sufficient time to

comply with NEPA and all other legal requirements in their removal efforts:

> You know, they talk about they have got a plan, they have – also have an affidavit
> that talks about five years to remove.  I mean, we think that an injunction can
> include what they are talking about and let them report – we are not – we are not
> trying to tell them exactly how to do it.

ECF No. 51 at 57: 15-20.  As the Court noted in its March 20, 2017 order, "[t]he State has

conceded this point and does not dispute that the Secretary could not, consistent with NEPA and

other applicable laws, immediately remove the one metric ton of plutonium from South

Carolina."  ECF No. 86 at 32.

   Tellingly, the State does not even attempt to provide any explanation as to how this may

be accomplished in two years without posing a risk to the environment, employees, or national

security, or how it could logistically be accomplished without violating the applicable laws,

regulations, or rules governing the handling of defense plutonium.  While this Court held in its

---

[10]  Defendants believe the reference to "five years" was a reference to Mr. Gunter's
previous declaration, ECF No. 38 Ex. 2, in which he stated "[i]t would take approximately five
years to prepare for repackaging, repackage, and ship one metric ton of plutonium to an alternate
site for interim storage."  ECF No. 38 Ex. 2 ¶ 31.  However, as Mr. Gunter stated in that same
declaration, "NEPA analysis would be required to support any decision to ship the plutonium to
an alternate location," *id.* ¶ 21, so even that proposed "five years" discussed by the State would
have been on top of the time required for Defendants to comply with the entire NEPA process
and obtain a final EIS and ROD selecting repackaging and removal.

March 20, 2017 order that neither party provided "sufficient evidence" upon which to craft any injunctive order, ECF No. 86 at 33, the State has not produced *any* record evidence to support its proposed timetable.  It does not do so because it cannot – because the State is requesting the impossible.  The State's argument seems to rely entirely on the two-year gap between the January 1, 2014 date in § 2566(c) and the January 1, 2016 date in § 2566(c)(1).  However, in making this argument, the State ignores two important factors.  First, Congress passed § 2566 believing that the MOX facility would be operational prior to January 1, 2014, and certainly prior to January 1, 2016, and would thus be available to process defense plutonium for removal. It was not until several years after § 2566 was passed that it became clear that the ultimate cost of the MOX facility would be exponentially higher, and the date of completion many years later, than Congress had anticipated when passing the statute.  Secondly, in passing § 2566(c) Congress explicitly provided that any removal must first and foremost be "consistent with [NEPA] and other applicable laws," making the two-year timeframe only relevant if a removal can be done consistently with the applicable statutes and regulations.  Here, as explained above, a removal of one metric ton of plutonium simply cannot be done in this timeframe, and this Court should therefore reject the State's request for an order with which compliance would not be possible and contrary to law.

III.     **Contempt Measures Should Only Be Determined and Imposed if Defendants Violate a Court Order, Taking into Account the Relevant Facts and Circumstances at that Time**

The State also argues that this Court take the extraordinary step of pre-establishing contempt of court sanctions for Defendants.  This action is years in advance of the date upon which Defendants could actually be in violation of even the State's unreasonable proposed deadline for removing the one metric ton of defense plutonium.  There is simply no reason to

establish contempt penalties at this early stage of the injunction proceedings.  Furthermore, the State's proposed penalties appear to be not so much calculated to ensure Defendants' efforts to comply with any injunctive order of this Court as they are an attempt by the State to take "a second bite at the apple" on its claim for monetary damages under § 2566(d), which this Court held on October 31, 2106 that it does not possess jurisdiction to decide.  ECF No. 56 at 10-17.  The purpose of civil contempt sanctions is to ensure a party's compliance with a court order, and this Court should not make any decision as to the exact nature of those sanctions until any potential failure to comply with the injunctive order actually occurs, when the Court will be in a better position to consider all relevant facts in assessing the appropriate sanctions.

The State asks this Court to take the highly unusual step of including what are essentially pre-determined stipulated damages in its injunctive order.  ECF No. 97 at 3, 12.  The State does so despite the fact that there is no history of Defendants violating court orders in this underlying factual dispute, and there is not yet any injunctive order in place that the State can accuse Defendants of failing to comply with.  Such a step would be contrary to longstanding principles of civil contempt.

The State's call for this Court to decide what contempt sanctions are appropriate is premature.  Civil contempt is an appropriate sanction "if [the Court] can point to an order . . . which sets forth in specific detail an unequivocal command which a party has violated."  *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (citation and alterations omitted).  Further, the plaintiff in a civil contempt action bears the burden of establishing, by clear and convincing evidence, that the party it seeks to be found in contempt has violated a court order.  *Id.*  Because no such order has been issued yet in this case, there is obviously no violation to remedy.

This Court lacks authority to establish a prospective remedy under the guise of civil contempt. Remedies and sanctions for civil contempt "must be remedial and compensatory and, unlike criminal contempt, nonpunitive." *Id*. at 259. (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 302-04 (1947); *see also Carbon Fuel Co. v. United Mine Workers of Am.*, 517 F.2d 1348, 1349 (4th Cir. 1975) ("Civil contempt . . . is 'wholly remedial.'") (quoting *S. Ry. Co. v. Lanham*, 403 F.2d 119, 124 (5th Cir. 1969)). Because no violation can have occurred at this early date, any civil contempt relief would necessarily be prospective, rather than remedial or compensatory. The Supreme Court has also held that a court should not impose civil contempt sanctions on a party until that party has been given a chance to explain its failure to comply, holding that "civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and *an opportunity to be heard*." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) (emphasis added); *see also Walters v. People's Republic of China*, 72 F. Supp. 3d 8, 12 (D.D.C. 2014) (holding that even in circumstance where movant had demonstrated opposing party failed to comply with a court order, the imposition of sanctions was improper until party violating order was given opportunity to provide explanation for the violation). This logically means that a court should wait until a party actually fails to comply with an order before determining and imposing sanctions, since a party cannot logically be given an opportunity to explain its noncompliance if such noncompliance has not yet occurred.

While Plaintiff cites *Cromer v. Kraft Foods North America, Inc.*, 390 F.3d 812, 821 (4th Cir. 2004) for the proposition that a Court may use its civil contempt powers to order a party in violation of a court order to pay the other party amounts to "compensate the complainant for

losses sustained as a result of the contumacy," ECF No. 97 at 12, the case law shows that that

power is generally only used to compensate the "complainant" for amounts corresponding to

attorney's fees and costs associated with litigating the contempt matter.  *See, e.g.*, *Inst. of*

*Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 958-59 (9th Cir. 2014)

(awarding attorney's fees and costs of bringing the violation of the injunction to the court's

attention to the prevailing party); *N.Y. State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 96 (2d

Cir. 1998) (upholding award of attorney fees to plaintiffs for bringing contempt motions).

Defendants also note that most courts to have considered the issue appear to have held that

sovereign immunity protects the United States from contempt sanctions that are compensatory,

as opposed to coercive, in nature.  *See, e.g.*, *Coleman v. Espy*, 986 F.2d 1184, 1192 (8th Cir.

1993); *Barry v. Bowen*, 884 F.2d 442, 443 (9th Cir. 1989); *United States v. Horn*, 29 F.3d 754,

676 (1st Cir. 1994); *Yancheng Baolong Biochemical Products Co. v. United States*, 406 F.3d

1377, 1382-83 (Fed. Cir. 2005); *United States v. Dragones*, 728 F.3d 580, 590 (6th Cir. 2013);

*Tippett v. United States*, 98 Fed. Cl. 171, 180-81 (2011).

Here, the State has offered no explanation for why $1,000,000 per day would be a fair

compensatory amount for the harm it may suffer should Defendants fail to comply with this

Court's anticipated injunctive order.  The main rationale the State seems to offer is that this

Court should pre-set a contempt award to correspond with the economic and assistance payments

Congress set forth in § 2566(d)(1).  ECF No. 97 at 12 n.11.  This logic is deeply flawed for two

reasons.  First, Congress specifically placed annual caps on such payments, and also made them

"subject to the availability of appropriations," and the State proposes no such limitations on its

requested pre-determined contempt award.  Second, the sole purpose of civil contempt sanctions

is to devise the most appropriate measure necessary to coerce a party to comply with a court

order, *see In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 202 (4th Cir. 2010), whereas the economic and impact assistance payment mechanism devised by Congress in § 2566(d)(1) may have been the result of any number of negotiations and served a number of different purposes.

Finally, we note that by requesting that this Court set a deadline for the removal of one metric ton of defense plutonium from South Carolina that the State knows to be impossible, and then set a pre-determined penalty of $1,000,000 per day, the State appears to essentially revive its cause of action seeking the payment of economic and impact assistance payments under § 2566(d)(1). This Court has held that it does not possess jurisdiction over that claim, ECF No. 56 at 10-17, and dismissed that claim for lack of subject matter jurisdiction on February 7, 2017. ECF No. 76. To the extent the State is attempting to vindicate any right it believes it has under § 2566(d)(1) to receive payments for Defendants' failure to remove certain amounts plutonium from South Carolina to date, the appropriate venue for it to seek that remedy is the Court of Federal Claims, not this Court.

Contempt of court is an inherently fact-intensive determination. In order to make that determination fairly, this Court must consider the totality of the circumstances surrounding any failure to comply. Here, where there is not even an injunctive order in place yet, let alone any failure to comply with such an injunctive order, it would simply be premature for this Court to make such a determination. Accordingly, this Court should reject the State's request to pre-determine contempt penalties, payable to the State, that may or may not be imposed upon Defendants at some future date.

## IV.    This Court Should Not Retain Jurisdiction Over This Matter After It Issues Its Injunctive Order

While Defendants do not dispute that this Court has the discretion to retain jurisdiction, *see, e.g.*, *Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001), it should decline to do so here.

The ordinary course of action in APA cases is for a court *not* to retain jurisdiction after issuing its final order.  *See, e.g.*, *North Carolina v. EPA*, 531 F.3d 896, 929-30 (D.C. Cir. 2008); *Burlington Res., Inc. v. FERC*, 513 F.3d 242, 251 (D.C. Cir. 2008); *Wedgewood Vill. Pharmacy v. DEA*, 509 F.3d 541, 553 (D.C. Cir. 2007).  As this Court held in in its March 20, 2017 order, a court should be hesitant to retain jurisdiction over a matter "absent compelling circumstances." ECF No. 86 at 33 (citing *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d 108, 117 (S.D.N.Y. 2012)).

This Court has held that Defendants unlawfully withheld the removal of one metric ton of defense plutonium from South Carolina in violation of § 2566(c)(1).  ECF No. 86.  However, as explained more fully above, Defendants have simultaneously been moving forward with construction of the MOX facility, in compliance with NEPA and other applicable laws, proceeding with down-blending and removing defense plutonium from South Carolina.  The down-blending process is nowhere mentioned or anticipated by § 2566, but Defendants have spent the last decade moving forward with it to meet what this Court has held to be one of the statutory purposes of § 2566 and the interest the State presumably seeks to serve with its proposed injunctive relief – the avoidance of South Carolina becoming a permanent repository for the nation's defense plutonium.  Although this process may not have been expressly mentioned in § 2566, the record amply demonstrates that Defendants have worked, diligently and in good faith, to find a methodology in addition to MOX to process and remove defense plutonium from South Carolina.  Furthermore, there has been no court order ordering Defendants to take any specific action with regard to plutonium in South Carolina, so there is no history of Defendants defying court orders such that continuing jurisdiction would be necessary here. Accordingly, there are no "compelling circumstances" present in this case that would justify

exercising discretion to retain jurisdiction, and this Court should decline to do so. *See Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (holding, in reversing a district court, that "[n]ot only was it unnecessary for the [district] court to retain jurisdiction to devise a specific remedy for the Secretary to follow, but it was error to do so.")

This Court should likewise not order Defendants to prepare and submit status reports every 90 days, as the State proposes. ECF No. 97 at 12-13. The preparation of such frequent status reports would require Defendants' employees to take time away from oversight of the actual down-blending and removal operations to prepare such reports, and the drafting, preparation, and required supervisory review and approval of reports at such frequency would therefore be overly burdensome and counterproductive. In a case presenting similar issues, the district court in *Center for Food Safety v. Hamburg*, which the State cited in its statement, ECF No. 97 at 9, rejected the plaintiffs' request to order a federal agency to submit quarterly progress reports on the status of its efforts to comply with the court's order, holding that "the FDA has limited resources, and does not see the utility of imposing another task on the FDA in connection with the promulgation of these regulations." Order Granting Injunctive Relief, *Ctr. for Food Safety v. Hamburg*, No. 4:12-cv-04529-PJH (N.D. Cal. June 21, 2013), ECF No. 63 at 3. This Court should similarly deny the State's request to require Defendants to generate reports every 90 days.

Finally, this Court should not order Defendants to provide to the State and this Court all reports submitted by Defendants to Congress pursuant to the requirements of § 2566, as the State requests. ECF No. 97 at 13 n.12. Such reports are required by § 2566(a)(3)(A), and the information required to be in those reports is primarily focused on updating Congress on the progress of the MOX project. Here, however, the sole remaining issue in this litigation is the

removal of one metric ton of defense plutonium from South Carolina, and given that the plutonium being down-blended is not part of the 34 metric tons previously slated to be fabricated into MOX fuel, information regarding the status of construction and operation of the MOX facility is irrelevant to the issue remaining in this litigation and beyond the scope of what is necessary to ensure the removal of one metric ton of defense plutonium.

As an alternative to the State's requested reports, Defendants propose that they voluntarily post updated information about the amounts of defense plutonium both down-blended and removed from South Carolina on a website maintained by DOE's Office of Environmental Management.  This information will be updated by Defendants within 30 days of the submission of the reports containing any such information to Congress in the annual reports required by § 2566(a)(3)(A).  This is an adequate method of ensuring that the State receives regular updates on Defendants' efforts to remove one metric ton of defense plutonium from South Carolina as they have been ordered to do.

**V.    This Court Cannot and Should Not Order Defendants to Continue Construction on the MOX**

The last provision the State requests that this Court include in any final order is a requirement that until the one metric ton of defense plutonium is removed, "the Federal Defendants shall diligently and in good faith pursue construction of the MOX Facility or any other Congressionally approved and appropriated disposition pathway at SRS in accordance with Section 2566 and Congressional direction."  ECF No. 97 at 4.  This goes well beyond the scope of the remaining issue, is directly contrary to previous orders of this Court in this litigation, and should therefore be denied.

In granting summary judgment in favor of the State on its second cause of action, this Court held that "[i]f, under § 706(1), a plaintiff alleges that an agency's inaction has resulted in

the unlawful withholding of an agency action, the APA authorizes the court *only to compel the particular action that the plaintiff alleges has been unlawfully withheld*." ECF No. 86 at 12 (emphasis added). This Court ultimately determined that "[t]he Secretary's *failure to remove one metric ton of defense plutonium from South Carolina by the January 1, 2016 deadline* constitutes agency action unlawfully withheld for the purposes of § 706(1)." *Id*. at 30 (emphasis added) (citation omitted). Plaintiff has made no allegation that § 2566 imposes a non-discretionary duty upon Defendants to continue funding the MOX project, and this Court has made no such holding. Accordingly, the State's request goes well beyond the scope of what this Court has determined to be the action "unlawfully withheld" by Defendants, and any injunctive relief granted by this Court is limited only to what is necessary to compel that particular action. Plaintiff's request goes well beyond what is necessary to remove one metric ton of defense plutonium from South Carolina and in no way would expedite that action, so should therefore be denied.

Furthermore, whether to proceed with the MOX facility or some other method for removal of surplus defense plutonium is an inherently political question to be resolved by the Executive and Legislative Branches. *See also Am. Hosp. Ass'n*, 812 F.3d at 193 (cautioning district court to avoid issuing decision on matter of political dispute, stating that "ideally the political branches should resolve them"). To the extent Congress may decide in the future to no longer appropriate money to continue with the MOX facility, "[i]t is a well-settled matter of constitutional law that when an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation." *City of Houston v. Dep't of Housing & Urban Dev.*, 24 F.3d 1421, 1424 (D.C. Cir. 1994).

## CONCLUSION

For the reasons set forth herein, Defendants respectfully request that any injunctive order issued by this Court consider the equitable factors impacting Defendants' ability to remove plutonium from South Carolina, and order Defendants to continue to work in good faith to remove one metric ton of defense plutonium from South Carolina as expeditiously as reasonably possible.

Respectfully submitted,

CHAD A. READLER
Assistant Attorney General
Civil Division

ERIC WOMACK
Assistant Director
Federal Programs Branch

BETH DRAKE
United States Attorney

By: s/ Barbara M. Bowens
BARBARA M. BOWENS (#4004)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201
Telephone: (803) 929-3000

RAPHAEL O. GOMEZ (D.C. Bar #305540)
Senior Trial Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-1318
Facsimile: (202) 616-8460
raphael.gomez@usdoj.gov

MARTIN M. TOMLINSON (#76014)
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 353-4556
Martin.m.tomlinson@usdoj.gov

August 11, 2017                *Attorneys for the Defendants*